# AFFIDAVIT OF SPECIAL AGENT JENNIFER KEENAN IN SUPPORT OF CRIMINAL COMPLAINT.

I, Jennifer Keenan, being first duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") currently assigned to the Boston, Massachusetts Field Office. I have been a Special Agent with the FBI for approximately 28 years, and since joining the FBI, I have been assigned to squads investigating economic crimes, including securities fraud, as well as national security and counter terrorism. As a federal agent, I am authorized to investigate violations of United States law and to execute warrants issued under the authority of the United States.

2. In the course of my employment, I have received training and have been involved in the use of investigative techniques such as interviewing informants and cooperating witnesses; conducting physical surveillance; consensual and court-authorized monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone and pen register data; and analyzing financial records. I have prepared and/or executed numerous search warrants, including e-mail search warrants.

3. This affidavit is submitted in support of a criminal complaint charging FRANK REYNOLDS, M. JAY HEROD and KENNETH STROMSLAND with securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78i(a), 78ff and 17 C.F.R. § 240.10b-5.

4. This affidavit is being submitted for the limited purpose of establishing probable cause to conclude that FRANK REYNOLDS, M. JAY HEROD and KENNETH STROMSLAND committed violations of 15 U.S.C. §§ 78j(b), 78i(a), 78ff and 17 C.F.R. § 240.10b-5. I have not included each and every fact known to me concerning this investigation. The following facts are based on my personal participation in this investigation, as well as information and reports provided to me by other agents and employees of the FBI, the Securities

and Exchange Commission ("SEC") and others.

5.     As set forth below, I have probable cause to believe that, beginning in or about August 2013, in the District of Massachusetts and elsewhere, FRANK REYNOLDS, M. JAY HEROD and KENNETH STROMSLAND engaged in a scheme to defraud investors in PiaxarBio Corp. ("PixarBio") by, among other things, (1) making and causing to be made false and misleading statements about the company, its prospects, its financing and the background and track record of its chief executive officer, FRANK REYNOLDS, and (2) engaging in manipulative trading of its shares.

## BACKGROUND

6.     Defendant FRANK REYNOLDS is an individual who resided at times in Salem, New Hampshire, at times in Newton, Massachusetts and at times in Ft. Meyers, Florida. He was the President, Chief Executive Officer, Chief Financial Officer and Chief Science Officer of PixarBio, and the chair of its Board of Directors. REYNOLDS made all significant decisions for PixarBio, wrote the substance of the company's press releases and offering materials, and reviewed and approved the company's SEC filings.

7.     Defendant KENNETH STROMSLAND is a former classmate of REYNOLDS who resided in Plainfield, New Jersey and was an investor in PixarBio. In December 2015, he joined PixarBio as Chief Information Officer. In July 2016, he was promoted to Vice President of Investor Relations.

8.     Defendant M. JAY HEROD is a friend of REYNOLDS who resided in Cambridge, Massachusetts and was an investor in PixarBio.

9.     PixarBio was a company, primarily headquartered in Medford, Massachusetts, that purported to be developing "NeuroRelease," a proprietary method of delivering a non-

opioid pain-killer, carbamazepine, to treat post-operative pain and other conditions. On or about and between October 31, 2016 and January 23, 2017, PixarBio's shares traded on OTC Link, an over-the-counter securities market, under the ticker symbol PXRB. Trading in PixarBio shares was temporarily suspended by the SEC from January 23, 2017 to February 2, 2017. From February 3, 2017 through the present, the shares can still be traded over-the-counter but are no longer listed on OTC Link.

## REYNOLDS SOLICITED INVESTORS IN PIXARBIO
## WITH FALSE AND MISLEADING CLAIMS

10. From at least December 2015 until the present, REYNOLDS promoted investment in PixarBio by making, and causing PixarBio to make, false and misleading claims about the company's products, timelines to sales, financial status, financing, leadership team, and REYNOLDS' past business and scientific successes. Together, these false and misleading claims painted a picture of REYNOLDS as an extremely successful inventor and chief executive officer with a product that would end "thousands of years of morphine and opioid addiction" and provide investors with significant returns on their investments.

### A.  *The December 2015 Investor Solicitation*

11. For example, in a December 2015 email and memorandum to potential investors, REYNOLDS promised investors "a HUGE return on investment (ROI) for any investors in PixarBio's NeuroRelease." He told investors: "The value of our portfolio on Wall Street is soaring with excitement around our sales partnership. At only $1,000,000,000 right now, as we prepare to replace morphine in the clinic in late 2017 or early 2018, and we expect our valuation to long-term trend UP." He added that the "[f]orecasted financials are conservative." In this email, REYNOLDS also told investors that his own Reynolds School of Business had developed "the cure for paralysis in humans."

12. In fact, PixarBio had not finished the pre-clinical work required to apply for permission to conduct human trials, commenced manufacturing a product that could be used in humans, or started human clinical trials. It also never had a market value of one billion dollars.

13. PixarBio also did not have a product that could be expected to end "thousands of years of morphine and opiate addiction." In fact, its product is not a treatment for opiate addiction at all. It is, instead, a potential additional means of delivering carbamazepine via injection, in a time-release form. This same drug is already on the market in other forms, including time-release pills.

14. With his email to potential investors, REYNOLDS enclosed a December 2015 presentation entitled "Novel Biomaterials for Neurological Delivery Systems Breakthrough Non-Opiate, Non Addictive Pain Treatment." The presentation stated:

> Our September 30, 2015 meeting with the FDA lowered our hurdles for FDA approval and we're ready to transfer three pain treatments to the clinic for knee, hip, and shoulder pain…
>
> Live US FDA [] meeting on September 30, 2015 confirmed our IND [Investigational New Drug] package and discuss[ed] our pathway to clinical studies in 2017 and approvals in early 2018.

15. REYNOLDS knew those statements were materially false and misleading. In fact, PixarBio had not even submitted an Investigational New Drug ("IND") package—the package of materials that must be approved by the Food and Drug Administration ("FDA") before starting human clinical trials. Moreover, the FDA had made clear in its responses to PixarBio's application for orphan drug status that the company had substantial work to do before it would be ready to submit such a package, and that the FDA did not see why the company's product would be clinically superior to products already on the market. In short,

4

the FDA did not "lower" any regulatory hurdles and did not "confirm" PixarBio's IND package.

16. REYNOLDS' December 2015 presentation also made other false and misleading claims about REYNOLDS' purported achievements. For example, the presentation stated that REYNOLDS had attended "years of graduate school with formal training in Neuroscience, providing the foundation for his neuroscience expertise." In fact, although REYNOLDS claims to have received four masters degrees, none involved formal training in neuroscience. Similarly, REYNOLDS contended that he was "lead inventor" on the "NeuroScaffold" offered by his prior employer, InVivo Therapeutics ("InVivo"), to treat acute spinal cord injuries. In fact, the NeuroScaffold was invented by Robert Langer, a professor at the Massachusetts Institute of Technology ("MIT"), together with a neurosurgeon from Harvard Medical School. REYNOLDS also stated that he founded PixarBio after his "retirement" from InVivo. In fact, Reynolds has admitted in sworn testimony that he was "forced out" of InVivo and that he resigned from InVivo because he expected to be fired the next day.

### B. The Private Securities Offering and Form S-1

17. On or about August 22, 2016, REYNOLDS caused PixarBio to issue a press release announcing that a private securities offering underway at the time was "oversubscribed," and that the maximum offering amount would be increased from $20 million to $30 million. In fact, as REYNOLDS knew, the offering was not fully subscribed and had not raised even $10 million.

18. On or about October 20, 2016, REYNOLDS caused PixarBio to issue a press release announcing that the maximum offering amount would be increased from $30 million to $40 million. Once again, as REYNOLDS knew, the offering had not raised even $10 million.

19. On or about November 7, 2016, REYNOLDS caused PixarBio to issue a press release stating that the private offering announced in August 2016 "closed $7.2MM cash, $16.2MM in warrants, and we closed a $10MM line of credit to provide our runway with enough fuel through 2017." In fact, REYNOLDS knew that PixarBio did not have those funds actually closed and available, and had raised only about $5 million in cash during that time period.

20. On November 25, 2016, PixarBio filed with the SEC a Form S-1 registration statement to register 78,529,976 shares of common stock that PixarBio had previously issued to investors. REYNOLDS signed the Form S-1 as PixarBio's chief executive officer.

21. The Form S-1 stated:

> The Company and the US FDA participated in a face-to-face Pre-IND Meeting on September 30, 2015 to discuss pre-clinical and clinical requirements of the NeuroRelease 14-day product, indicated for a nerve block development program. The meeting minutes capture the required pre-clinical elements to support the clinical program. As a result of this meeting, we expect that clinical trials will begin in late 2017 and US FDA approvals for the NeuroRelease 14-day product are expected in 2018.

22. REYNOLDS knew that those statements were materially false and misleading and that, given FDA requirements and necessary review time, it was highly unlikely that clinical trials could begin in late 2017 or that NeuroRelease would receive FDA approval in 2018.

### C. Claims About Acquiring InVivo

23. On or about January 3, 2017, REYNOLDS caused PixarBio to issue a press release announcing a purported bid to acquire InVivo, REYNOLDS' former employer.

6

24. The press release, entitled "It's Time to Make US Pharma GREAT Again," announced that PixarBio was making a take-over bid to acquire InVivo. It stated: "PixarBio's $77,000,000 Stock Offer Will Create a New Pharma Called Reynolds Therapeutics Corporation to Solve the Opiate Crisis and To Regenerate Chronic Spinal Cord in Humans and Finally Cure Paralysis." It also stated: "The deal is expected to close in Q1 2017."

25. In fact, REYNOLDS knew that PixarBio had not made any formal offer, did not have the capacity to offer $77,000,000 to acquire InVivo, and had no reasonable expectation of doing so, let alone closing such a transaction in the first quarter of 2017. The press release once again falsely described REYNOLDS as the primary inventor and patent holder of NeuroScaffold.

26. On January 4, 2017, PixarBio issued a second press release, which it filed with the SEC attached to a Form 8-K that REYNOLDS signed in his capacity as the company's chief executive officer. The press release renewed the claim that REYNOLDS invented the NeuroScaffold and stated that PixarBio "will increase our offer for InVivo Therapeutics to $100,000,000."

27. REYNOLDS knew that the statements in the January 4, 2017 press release and Form 8-K were materially false and misleading and that neither PixarBio nor REYNOLDS had the capacity to offer $100 million to acquire InVivo.

**MANIPULATION OF PRICE AND VOLUME OF PIXARBIO STOCK**

28. Beginning in or about November 2016, while in close communication with REYNOLDS, STROMSLAND and HEROD made manipulative trades in PixarBio stock that simulated market interest in the stock and artificially pushed up the trading price. These trades included overlapping orders to buy and sell PixarBio stock at the same price per share (a

manipulative trading practice sometimes referred to as "matched trading"), small purchases to boost the trading price submitted shortly before trading closed at 4:00 p.m. (a manipulative practice sometimes referred to as "marking the close"), and orders to buy at a price much higher than the price of the preceding market transaction.

29. For example, on November 11, 2016, the trading price of PixarBio stock fell from $14 to $10 per share. At 3:05 p.m., STROMSLAND called his broker and placed an order to buy 100 shares at $14.25 per share. While still on the phone with his broker, STROMSLAND checked the OTC website and asked the broker, "How come on . . . the last price still says $10?" The broker explained that STROMSLAND's purchase had been marked out of sequence and did not affect the publicly quoted price of PixarBio stock. STROMSLAND said, "Yeah, but I need it to be in sequence" and "yeah, but that's not what I wanted . . . So anybody looking to buy this now just sees $10 and doesn't know that it's $14.25 is the last trade." He also asked: "Is there any way to fix it?"

30. STROMSLAND then called customer service at OTC Markets, the entity that runs OTC Link, but his purchase at $14.25 per share still did not appear on OTC's public website. At 3:42 p.m., STROMSLAND called his broker again and said, "I need to buy 100 shares at $14.25 of PXRB … real quick [and] right now." STROMSLAND's second purchase of 100 shares at $14.25 per share was executed at 3:55 p.m. The stock closed that day at $14.50.

31. After trading closed at 4:00 p.m., STROMSLAND called REYNOLDS. REYNOLDS thereafter instructed PixarBio's controller that STROMSLAND was entitled to a $27,500 "bonus".

32. As another example, on November 17, 2016 at 3:56 p.m., when the trading price of PixarBio was again down to $10 per share, STROMSLAND bought 100 shares at $12.50 per share.

33. On December 5, 2016, HEROD made three matched trades in which he placed orders to buy and sell 100 shares at the same time at the same price. In little more than one hour, his trades drove the price from $5.44 per share to $5.70 per share. On December 6 and December 7, 2016, HEROD also made matched trades in which he bought and sold 100 shares at the same time at the same price.

34. On December 20, 2016, at three different points at time, as the share price fell close to $4.00 per share, HEROD and STROMSLAND made purchases of PixarBio above the most recent price and thereby moved the stock price back up. For example, at 12:21:06 p.m., HEROD submitted an order to buy 100 shares at $4.20 per share, even though he had sold 1,810 shares at $4.06 per share three and a half minutes earlier. He thereby moved the price, which had been falling earlier in the day, back up from $4.00 to $4.20 per share. At 12:30:22 p.m., STROMSLAND bought 170 shares at $4.09 per share, even though the most recent price was $4.00 per share. At 12:58:34 p.m., HEROD purchased 100 shares at $4.50 per share, which was at least 31 cents more than the most recent price.

35. On the afternoon of December 21, 2016, when the share price was at $4.10 with less than ten minutes of trading before the market closed, HEROD placed an order to sell 630 shares at $4.05 per share. Less than a minute later, HEROD placed an order for 100 shares at $5.00 a share. The 100 shares he purchased were among the 630 he had offered to sell minutes earlier. As a result of these nearly simultaneous buy and sell orders, the share price temporarily went up to $5.00. Minutes later, when the stock dropped back to $4.00 (the low of the day) in

the three minutes before the market closed, HEROD again placed at least four buy orders, at prices ranging from $5.00 to $4.89, that resulted in the stock closing at $4.89 per share.

36. On December 27, 2016, HEROD again made purchases of shares above the trading price. For example, at 11:08 a.m., when stock was trading $4.40 per share, Herod purchased 100 shares at $4.99 per share, and thereby drove the price up to $4.99. Later in the day, when price had dropped to $4.50, and about one minute after he himself sold 100 shares at $4.50, he placed an order to buy 100 shares at $4.88 per share. The purchase order was filled with shares that he had offered to sell at $4.88 shortly before.

37. On December 28, 2016, HEROD made similar trades where he was both the buyer and seller of the shares and which drove up the price.

38. During the same period that he was selling a total of 211,901 shares of PixarBio stock to the public, HEROD also purchased a total of 6,618 shares, often at higher prices than his own pending orders to sell, as part of an effort to artificially inflate the reported price and trading volume of PixarBio's stock.

39. Between October 31, 2016 and January 23, 2017, when the SEC suspended trading in PixarBio shares, HEROD sold 211,901 shares of PixarBio stock for a net profit of about $877,488. HEROD provided $500,000 of the proceeds from his sales of PixarBio stock to PixarBio itself, and received additional PixarBio shares. HEROD provided $300,000 of the profits to REYNOLDS' spouse for the benefit of REYNOLDS, while keeping the remaining profits for himself.

## CONCLUSION

40.     Based on the information set forth above, I have probable cause to believe that in or about and between December 2015 and January 2017, FRANCIS A. REYNOLDS, M. JAY HEROD and KENNETH STROMSLAND committed securities fraud, in violation of Title 15 U.S.C. §§ 78j(b), 78i(a), 78ff, and 17 C.F.R. § 240.10b-5.

Sworn under the pains and penalties of perjury.

_____
Jennifer Hale Keenan
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on April __19__, 2018

_____
UNITED STATES MAGISTRATE JUDGE

