UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA </br></br> v. </br></br> FRANCIS M. REYNOLDS, </br> a/k/a </br> "Frank Reynolds," </br></br> Defendant. | Criminal No. 18-10154-DPW </br></br> Violations: </br></br> <u>Count One</u>: Securities Fraud; Aiding and Abetting </br> (15 U.S.C. §§ 78j(b) and 78ff(a); </br> 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2) </br></br> <u>Counts Two-Five</u>: Obstruction of an Agency Proceeding </br> (18 U.S.C. § 1505) </br></br> <u>Forfeiture Allegation</u>: </br> (18 U.S.C. § 981 and 28 U.S.C. § 2461) |

## SUPERSEDING INDICTMENT

At all times relevant to this Superseding Indictment:

### General Allegations

1.  The defendant, FRANCIS M. REYNOLDS, also known as "Frank Reynolds," was an individual who resided at times in Salem, New Hampshire, at times in Newton, Massachusetts, and at times in Ft. Meyers, Florida. He was the President, Chief Executive Officer, Chief Financial Officer, Chief Science Officer and Chair of the Board of Directors of PixarBio, a company headquartered for a time in Medford, Massachusetts. REYNOLDS made all significant decisions for PixarBio, wrote the substance of the company's press releases and offering materials, and reviewed and approved the company's filings with the Securities and Exchange Commission ("SEC").

2.  M. Jay Herod was an individual who resided in Cambridge, Massachusetts and was an investor in PixarBio.

3. Kenneth Stromsland was an individual who resided in Plainfield, New Jersey and was an investor in PixarBio. Beginning in or about December 2015, he joined PixarBio as Chief Information Officer. In July 2016, he was promoted to Vice President of Investor Relations.

4. On August 29, 2013, one week after REYNOLDS was forced out of his prior company, REYNOLDS founded PixarBio. PixarBio purported to be developing "NeuroRelease," a method of delivering carbamazepine, a non-opioid painkiller, to treat post-operative pain and other conditions.

5. Prior to December 2015, the investors in PixarBio were REYNOLDS, members of his family, and a few friends.

6. In or about December 2015, at REYNOLDS' direction, PixarBio offered to sell securities to other investors in a private placement.

7. On or about October 31, 2016, PixarBio's shares began trading publicly on OTC Link, an over-the-counter securities market, under the ticker symbol PXRB, after PixarBio acquired a publicly traded company, BMP Holdings, Inc. with minimal assets and operations of its own, in a transaction known as a "reverse merger."

8. The Securities and Exchange Commission ("SEC") is an independent agency of the executive branch of the United States government. The SEC is responsible for enforcing federal securities laws and promulgating rules and regulations concerning federal securities laws, which are, among other things, designed to protect the investing public by maintaining fair and honest securities markets and eliminating manipulative and deceptive practices that tend to distort the fair price of stock.

## Scheme to Defraud

9. Beginning in at least 2015, in the District of Massachusetts and elsewhere, REYNOLDS and others engaged in a scheme to defraud investors in PixarBio by, among other

things, (1) making and causing to be made false and misleading statements about the company, its prospects, its financing, and the background and track record of its chief executive officer, REYNOLDS, and (2) engaging in manipulative trading of PixarBio shares in an effort to simulate market interest in the stock and to artificially inflate the share price.

### Reynolds Solicited Investors in PixarBio With False and Misleading Claims

10. From at least December 2015 until at least April 2018, REYNOLDS promoted investment in PixarBio by making, and causing PixarBio to make, false and misleading claims about the company's products, timelines to product approvals and commercial launches, financial status, financing, leadership team, and REYNOLDS' past, including personal, business and scientific successes and the reasons for his departure from his prior employment. Together, these false and misleading claims painted a picture of REYNOLDS as an extremely successful inventor and chief executive officer with a product that would end "thousands of years of morphine and opioid addiction" and provide investors with significant returns on their investments.

### A. The December 2015 Investor Solicitation

11. In a December 2015 email and presentation to potential investors, REYNOLDS promised investors "a HUGE return on investment (ROI) for any investors in PixarBio's NeuroRelease." He told investors: "The value of our portfolio on Wall Street is soaring with excitement around our sales partnership. At only $1,000,000,000 right now, as we prepare to replace morphine in the clinic in late 2017 or early 2018, and we expect our valuation to long-term trend UP." He added that the "[f]orecasted financials are conservative." In this email, REYNOLDS also told investors that his own Reynolds School of Business had developed "the cure for paralysis in humans."

12. REYNOLDS knew those statements were materially false and misleading. In fact, PixarBio had not finished the pre-clinical work required to apply for permission to conduct human trials or commenced manufacturing a product that could be used in humans,. It also never had a market value of one billion dollars.

13. PixarBio also did not have a product that could be expected to end "thousands of years of morphine and opiate addiction." In fact, NeuroRelease is not a treatment for opiate addiction at all. It is, instead, a potential additional means of delivering carbamazepine via injection, in a time-release form. Carbamazepine is already available on the market in other forms, including time-release pills.

14. With his email to potential investors, REYNOLDS enclosed a December 2015 presentation entitled "Novel Biomaterials for Neurological Delivery Systems Breakthrough Non-Opiate, Non Addictive Pain Treatment." The presentation stated:

> Our September 30, 2015 meeting with the FDA [Food and Drug Administration] lowered our hurdles for FDA approval and we're ready to transfer three pain treatments to the clinic for knee, hip, and shoulder pain…
>
> Live US FDA [] meeting on September 30, 2015 confirmed our IND [Investigational New Drug] package and discuss[ed] our pathway to clinical studies in 2017 and approvals in early 2018.

15. REYNOLDS knew those statements were materially false and misleading. In fact, PixarBio had not even submitted an Investigational New Drug ("IND") package—the package of materials that must be approved by the FDA before starting human clinical trials. Moreover, during the September 30, 2015 meeting, the FDA had made clear to PixarBio that the company had substantial work to do before it would be ready to submit such a package, and that the FDA did not see why the company's product would be clinically superior to products already on the market for certain indications. In short, the FDA did not "lower" any regulatory hurdles and did not "confirm" PixarBio's IND package.

4

16. REYNOLDS' December 2015 presentation also made other false and misleading claims about REYNOLDS' purported achievements. For example, the presentation stated that REYNOLDS had attended "years of graduate school with formal training in Neuroscience, providing the foundation for his neuroscience expertise." In fact, REYNOLDS had no formal training in neuroscience. Similarly, REYNOLDS contended that he was "lead inventor" on the "NeuroScaffold" offered by his prior employer, InVivo Therapeutics ("InVivo"), to treat acute spinal cord injuries. In fact, the NeuroScaffold was invented by a professor at the Massachusetts Institute of Technology ("MIT"), together with a neurosurgeon from Harvard Medical School. REYNOLDS also stated that he founded PixarBio after his "retirement" from InVivo. In fact, Reynolds resigned from InVivo because he expected to be fired the next day.

B. The Private Securities Offering and Form S-1

17. On or about August 22, 2016, REYNOLDS caused PixarBio to issue a press release announcing that a private securities offering underway at the time was "oversubscribed," and that the maximum offering amount would be increased from $20 million to $30 million. In fact, as REYNOLDS knew, the offering was not fully subscribed and had not raised even $10 million.

18. On or about October 20, 2016, REYNOLDS caused PixarBio to issue a press release announcing that the maximum offering amount would be increased from $30 million to $40 million. Once again, as REYNOLDS knew, the offering had not raised even $10 million.

19. On or about November 7, 2016, REYNOLDS caused PixarBio to issue a press release stating that the private offering announced in August 2016 "closed $7.2MM cash, $16.2MM in warrants, and we closed a $10MM line of credit to provide our runway with

enough fuel through 2017." In fact, REYNOLDS knew that PixarBio did not have those funds actually closed and available, and had raised only about $5 million in cash by that time.

20. On or about November 25, 2016, PixarBio filed with the SEC a Form S-1 registration statement to register 78,529,976 shares of common stock that PixarBio had previously issued to investors. REYNOLDS signed the Form S-1 as PixarBio's chief executive officer.

21. The Form S-1 stated:

> We participated in a face-to-face Pre-IND Meeting with the U.S. FDA on September 30, 2015 to discuss pre-clinical and clinical requirements of the NeuroRelease 14-day product, indicated for a nerve block development program. The meeting minutes capture the required pre-clinical elements to support the clinical program. As a result of this meeting, we expect that clinical trials will begin in late 2017 and US FDA approvals for the NeuroRelease 14-day product are expected in 2018.

22. REYNOLDS knew that those statements were materially false and misleading and that, given FDA requirements and necessary review time, it was not realistic that clinical trials could begin in late 2017 or that NeuroRelease would receive FDA approval in 2018.

C. Claims About Acquiring InVivo

23. On or about January 3, 2017, REYNOLDS caused PixarBio to issue a press release announcing a purported bid to acquire InVivo, REYNOLDS' former employer.

24. The press release, entitled "It's Time to Make US Pharma GREAT Again," announced that PixarBio was making a take-over bid to acquire InVivo. It stated: "PixarBio's $77,000,000 Stock Offer Will Create a New Pharma Called Reynolds Therapeutics Corporation to Solve the Opiate Crisis and To Regenerate Chronic Spinal Cord in Humans and Finally Cure Paralysis." It also stated: "The deal is expected to close in Q1 2017."

25. In fact, REYNOLDS knew that PixarBio had not made any formal offer, did not have the capacity to offer $77,000,000 to acquire InVivo, and had no reasonable expectation of

6

doing so, let alone closing such a transaction in the first quarter of 2017. The press release once again falsely described REYNOLDS as the primary inventor and patent holder of NeuroScaffold. In fact, [add the true inventor and patent holder here.]

26.     On or about January 4, 2017, PixarBio issued a second press release, which it filed with the SEC attached to a Form 8-K that REYNOLDS signed in his capacity as the company's chief executive officer. The press release renewed the claim that REYNOLDS invented the NeuroScaffold and stated that PixarBio "will increase our offer for InVivo Therapeutics to $100,000,000."

27.     REYNOLDS knew that the statements in the January 4, 2017 press release and Form 8-K were materially false and misleading and that neither PixarBio nor REYNOLDS had the capacity to offer $100 million to acquire InVivo.

<u>Manipulation of the Price and Trading Volume Of PixarBio Stock</u>

28.     Beginning in or about October 2016, and continuing until on or about January 23, 2017, Herod and Stromsland, while in close communication with REYNOLDS, and at times acting at the direction of REYNOLDS, engaged in manipulative trading of PixarBio shares in an effort to simulate market interest in the stock and artificially inflate the share price and trading volume. These trades included overlapping orders to buy and sell PixarBio stock at the same price per share (a manipulative trading practice sometimes referred to as "matched trading"), small purchases to boost the trading price submitted shortly before trading closed at 4:00 p.m. (a manipulative practice sometimes referred to as "marking the close"), and orders to buy at a price much higher than the price of the preceding market transaction.

29.     For example, on or about Friday, November 11, 2016, after the trading price of PixarBio stock fell from $14 to $10 per share, REYNOLDS called Stromsland and told Stromsland to buy shares of PixarBio in order to keep the stock's price up over the weekend.

7

30. That same day, at approximately 3:05 p.m., Stromsland called his broker and placed an order to buy 100 shares of PixarBio at $14.25 per share.

31. While still on the phone with his broker, Stromsland checked the OTC website and asked, "How come . . . the last price still says $10?"

32. When the stockbroker explained that Stromsland's purchase had been marked out of sequence and did not affect the publicly quoted price of PixarBio stock, Stromsland said, "Yeah, but I need it to be in sequence" and "yeah, but that's not what I wanted . . . So anybody looking to buy this now just sees $10 and doesn't know that it's $14.25 is the last trade." He also asked: "Is there any way to fix it?"

33. Stromsland then called customer service at OTC Markets, the entity that runs OTC Link, but his purchase at $14.25 per share still did not appear on OTC's public website.

34. At approximately 3:42 p.m., Stromsland called his broker again and said, "I need to buy 100 shares at $14.25 of PXRB . . . real quick [and] right now." Stromsland's second purchase of 100 shares at $14.25 per share was executed at approximately 3:55 p.m. The stock closed that day at $14.50.

35. After trading closed at 4:00 p.m., Stromsland called REYNOLDS to update him on his trading.

36. At approximately 4:40 p.m., REYNOLDS instructed PixarBio's controller that Stromsland was entitled to a $27,500 "bonus."

37. On or about November 17, 2016, at approximately 3:56 p.m., after the price of PixarBio stock had again decreased to $10 per share, Stromsland bought 100 shares at $12.50 per share.

8

38. On or about November 17, 2016 at approximately 3:56 p.m., when the trading price of PixarBio was again down to $10 per share, Stromsland bought 100 shares at $12.50 per share.

39. On or about December 5, 2016, Herod made three so-called "matched" trades in which he placed orders to buy and sell 100 shares of PixarBio at the same time and at the same price. In little more than one hour, his trades, executed at escalating prices, drove the price of the stock from $5.44 per share to $5.70 per share.

40. On or about December 6, 2016, Herod made additional matched trades in which he bought and sold 100 shares at the same time and at the same price and thereby drove the price of the stock from $4.75 per share to $5.65 per share.

41. On or about December 20, 2016, as PixarBio's share price fell close to $4.00 per share, Herod and Stromsland made several purchases of PixarBio shares above the most recent price, in an effort to move the share price back up. For example:

   a. At 12:21:06 p.m., just minutes after selling 1,810 shares at $4.06 per share, Herod submitted an order to buy 100 shares at $4.20 per share, thereby moving the price from $4.00 to $4.20 per share.

   b. At 12:30:22 p.m., Stromsland bought 170 shares at $4.09 per share, above the most recent price of $4.00 per share.

   c. At 12:58:34 p.m., Herod purchased 100 shares at $4.50 per share, which was at least 31 cents higher than the most recent price.

42. On or about December 21, 2016, when PixarBio's share price was $4.10, and with less than ten minutes before the market closed, Herod placed an order to sell 630 shares at $4.05 per share. Less than one minute later, Herod placed an order to buy 100 shares at $5.00 a share. The 100 shares he purchased were among the 630 he had offered to sell minutes earlier.

9

As a result of these nearly simultaneous buy and sell orders, the share price temporarily went up to $5.00.

43.     Minutes later, after PixarBio's share price had dropped back to $4.00, Herod again placed at least four buy orders, at prices ranging from $4.89 to $5.00, which resulted in the stock closing at $4.89 per share.

44.     On or about December 27, 2016, Herod again purchased PixarBio shares above the trading price. For example, at 11:08 a.m., when the stock was trading at $4.40 per share, Herod purchased 100 shares at $4.99 per share, thereby driving the price up to $4.99.

45.     Later in the day, after price had dropped to $4.50—and approximately one minute after he himself had sold 100 shares at $4.50—Herod placed an order to buy 100 shares at $4.88 per share. The purchase order was filled with shares that he had offered to sell at $4.88 shortly before.

46.     On or about December 28, 2016, Herod made similar trades where he was both the buyer and seller of the shares, in an effort to drive up the share price.

47.     From on or about October 31, 2016 to on or about January 23, 2017, Herod sold 211,901 shares of PixarBio stock and bought 6,618 shares, often at prices higher than his own pending orders to sell, as part of an effort to artificially inflate the reported price and trading volume of PixarBio's stock.

48.     Herod earned approximately $910,000 on his sales. He directed $500,000 of the trading proceeds to PixarBio, $300,000 to REYNOLDS' spouse for the benefit of REYNOLDS, and kept the remaining proceeds for himself.

<u>Obstruction of the SEC Investigation</u>

49.     On or about various dates between January 2017 and September 2017, as part of an investigation into manipulative trading and other issues in connection with PixarBio's stock,

10

the SEC served REYNOLDS, Herod, Stromsland, and PixarBio with subpoenas requiring them to produce documents and to testify before the SEC.

### Reynolds' False Testimony and Production of a Back-dated Document

50. REYNOLDS engaged in a months-long scheme to impede and obstruct the SEC investigation, including by making multiple and repeated false statements over the course of three days of sworn testimony before the SEC, and by creating and providing to the SEC a purported loan agreement among Herod, REYNOLDS and REYNOLDS' spouse that was back-dated to make it appear as though it had been executed before the start of the SEC's investigation (the "Back-Dated Agreement").

51. For example, during his testimony before the SEC on January 26, 2017, September 19, 2017 and September 28, 2017, REYNOLDS sought to obstruct the SEC's investigation by making materially false and misleading statements about, among other things, the following:

   a. his own background, including by repeating the false claims he had previously made to potential investors regarding his achievements, his financial worth and his health – namely, that REYNOLDS had been paralyzed for years and had cured himself of the paralysis;

   b. his prior employment, including false claims about the circumstances under which his employment at InVivo was terminated;

   c. his role as inventor, including false claims that he had invented the Neuroscaffold marketed by InVivo and held all of the relevant patents;

   d. the capabilities and success of InVivo and PixarBio products, including falsely characterizing the results of clinical trials;

   e. the development and funding of companies with which he was associated, including PixarBio and InVivo, including the false claim that a major pharmaceutical company had committed to provide him with millions of dollars in financing, and false claims about how PixarBio raised money and whether it had paid commissions;

11

  f. the progress and timelines for development of PixarBio products, including the progress and prospects for the company's efforts to obtain FDA approvals for NeuroRelease;

  g. the nature and truth of the claims REYNOLDS had made and caused to be made to investors in PixarBio, including those set forth in paragraphs 11-27 above;

  h. the manipulative trading in PixarBio shares, including the false assertion that REYNOLDS did not discuss Stromsland's or Herod's trading with them in the fall and winter of 2016 and did not know the nature of their trading in that time period; and

  i. the timing and circumstances of the creation of the Back-Dated Agreement, including false statements about when and why the agreement was created.

### REYNOLDS' Instruction to Stromsland to Testify Falsely

52. REYNOLDS informed Stromsland about REYNOLDS' false testimony and induced Stromsland to falsely corroborate it when Stromsland testified.

53. For example, on or about February 15, 2017, REYNOLDS told Stromsland that he had testified that he had no knowledge of Stromsland's purchases of PixarBio shares in the fall of 2016, despite the fact that REYNOLDS not only knew about the trading but had directed and encouraged it in an effort to stimulate market interest in the stock and artificially inflate the share price and trading volume.

54. In his own SEC testimony the following day and again on April 27, 2017, Stromsland falsely denied that he had traded PixarBio shares in an effort to affect the share price.

55. Similarly, on or about May 24, 2017, Stromsland again met with REYNOLDS to discuss REYNOLDS' SEC testimony and, in particular, what questions Stromsland might be asked in another round of testimony the following day.

56. In testimony the following day, May 25, 2017, Stromsland again falsely denied that he had purchased shares of PixarBio in November 2016 in an effort to keep the stock price up.

### Reynolds' Instruction to Herod to Testify Falsely

57.     REYNOLDS also induced Herod to testify falsely before the SEC as to whether REYNOLDS was involved in Herod's trading and to provide the Back-Dated Agreement to the SEC.

58.     After REYNOLDS' first day of testimony before the SEC on January 26, 2017, REYNOLDS told Herod that they needed to have a signed agreement regarding the $300,000 that Herod had provided to REYNOLDS and arranged for HEROD to sign the Back-Dated Agreement with a date of about a month earlier.

59.     At REYNOLDS' direction, Herod produced to the SEC the Back-Dated Agreement, dated December 29, 2016, that purported to be a letter agreement among Herod, REYNOLDS, and REYNOLDS' spouse. The letter, which had been drafted by REYNOLDS, stated that Herod had provided $300,000 to REYNOLDS in exchange for a 10 percent interest in REYNOLDS' future recovery from a litigation settlement. In fact, as both REYNOLDS and Herod knew, the letter had been prepared on or about January 27, 2017, in anticipation of Herod's SEC testimony, and in an effort to provide a false cover story for the $300,000 Herod had provided to REYNOLDS from Herod's manipulative trading.

60.     In his SEC testimony on or about February 8, 2017, HEROD sought to mislead the SEC and claimed that he signed the written agreement a week or so after the date of the $300,000 check - December 28, 2016.

61.     In testimony on or about February 8, 2017, Herod, acting at REYNOLDS' direction, also falsely denied that his own trading in PixarBio was intended to influence the price of the stock, and that he had discussed that strategy with REYNOLDS.

## COUNT 1
Securities Fraud; Aiding and Abetting
(15 U.S.C. §§ 78j(b) & 78ff(a); 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2)

The Grand Jury charges:

62. The Grand Jury re-alleges and incorporates by reference paragraphs 1-61 of this Superseding Indictment.

63. From at least 2015 until at least April 2018, in the District of Massachusetts and elsewhere, the defendant,

**FRANCIS M. REYNOLDS,**
a/k/a "Frank Reynolds,"

did knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the U.S. Securities and Exchange Commission, and did (a) employ a device, scheme and artifice to defraud, (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon any person in connection with the purchase and sale of securities, to wit, shares of PixarBio.

All in violation of Title 15, United States Code, Sections 78j(b) & 78ff(a); Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

<u>COUNT 2</u>
Obstruction of an Agency Proceeding
(18 U.S.C. § 1505)

The Grand Jury further charges:

64. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 61 of this Superseding Indictment.

65. From in or about January 2017 through in or about September 2017, in the District of Massachusetts, the defendant,

FRANCIS M. REYNOLDS,
a/k/a "Frank Reynolds,"

did corruptly influence, obstruct and impede and endeavor to influence, obstruct and impede the due and proper administration of the law under which a pending proceeding was being had before a department and agency of the United States, to wit: the SEC, by repeatedly making false and misleading statements, including those set forth in paragraph 51 above, during testimony before the SEC on January 26, 2017, September 19, 2017 and September 28, 2017, and by providing and causing PixarBio to provide the Back-Dated Agreement to the SEC.

All in violation of Title 18, United States Code, Section 1505.

15

## COUNT 3
## Obstruction of an Agency Proceeding
## (18 U.S.C. § 1505)

The Grand Jury further charges:

66. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 61 of this Superseding Indictment.

67. From in or about January 2017 through in or about May 2017, in the District of Massachusetts, the defendant,

**FRANCIS M. REYNOLDS,**
a/k/a "Frank Reynolds,"

did corruptly influence, obstruct and impede and endeavor to influence, obstruct and impede the due and proper administration of the law under which a pending proceeding was being had before a department and agency of the United States, to wit: the U.S. Securities and Exchange Commission, by inducing Stromsland to testify falsely before the SEC.

All in violation of Title 18, United States Code, Section 1505.

<u>COUNT 4</u>
Obstruction of an Agency Proceeding
(18 U.S.C. § 1505)

The Grand Jury further charges:

68. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 61 of this Superseding Indictment.

69. From in or about January 2017 through in or about February 2017, in the District of Massachusetts, the defendant,

**FRANCIS M. REYNOLDS,**
a/k/a "Frank Reynolds,"

did corruptly influence, obstruct and impede and endeavor to influence, obstruct and impede the due and proper administration of the law under which a pending proceeding was being had before a department and agency of the United States, to wit: the U.S. Securities and Exchange Commission, by instructing Herod to testify falsely before the SEC, and to sign the Back-Dated Agreement and provide it to the SEC.

All in violation of Title 18, United States Code, Section 1505.

CRIMINAL FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461(c))

The Grand Jury further finds that:

70. Upon conviction of the offense in violation of Title 15, United States Code, Sections 78j(b) & 78ff(a) set forth in Count One of this Superseding Indictment, the defendant,

FRANCIS M. REYNOLDS,
a/k/a "Frank Reynolds,"

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of such offenses.

71. If any of the property described in Paragraph 70 as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), as a result of any act or omission by the defendants --

  a. cannot be located upon the exercise of due diligence;

  b. has been transferred or sold to, or deposited with, a third party;

  c. has been placed beyond the jurisdiction of this Court;

  d. has been substantially diminished in value; or

  e. has been commingled with other property which cannot be divided without difficulty,

it is the intention of the United States, pursuant to Title18, United States Code, Section 982(b) and Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of all other property of the defendants up to the value of the property described in paragraph 70 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____
FOREPERSON OF THE GRAND JURY
(Deputy)

_____
SARA MIRON BLOOM
Assistant U.S. Attorney

DISTRICT OF MASSACHUSETTS, February 26, 2019
Returned into the District Court by the Grand Jury Foreperson and filed.

_____
DEPUTY CLERK

3:32 P.

19