## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 1:18-cr-10154-DPW-1 |
|  | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| FRANCIS M. REYNOLDS, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## DEFENDANT FRANCIS M. REYNOLDS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS COUNT ONE OF THE SUPERSEDING INDICTMENT

Defendant Francis M. Reynolds ("Defendant") respectfully moves the Court, pursuant to Federal Rule of Criminal Procedure 12(b)(3), to dismiss Count One of the Superseding Indictment (the "Indictment"). Count One is duplicitous. It also fails to state the essential elements of market manipulation. Accordingly, Count One is constitutionally infirm and must be dismissed.

## I.    FACTUAL BACKGROUND[1]

Count One of the Indictment charges Defendant with securities fraud, including on an aiding and abetting theory, in violation of 15 U.S.C. §§ 78j(b) and 78ff(a), 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2. The Indictment alleges that Defendant served as the founder, President, Chief Executive Officer, Chief Financial Officer, Chief Science Officer and Chair of the Board of Directors of PixarBio Corporation ("PixarBio"), a company headquartered in Medford, Massachusetts. (¶¶ 1, 4.) PixarBio focused primarily on developing NeuroRelease, a

---

[1]    This Factual Background section is drawn from the Indictment's factual allegations, which are accepted as true solely for purposes of this motion. *See United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015) (On a motion to dismiss, the court must "take the facts alleged in the indictment as true. . . . ").

method of delivering a non-opiate painkiller, carbamazepine, to treat post-operative pain and other conditions. (¶ 4.) Kenneth Stromsland joined PixarBio as Chief Information Officer in December 2015, was promoted to Vice President of Investor Relations in July 2016, and invested in the company. (¶ 3.) M. Jay Herod invested in PixarBio but never worked for the company. (¶¶ 2-3.)

The Indictment further alleges that beginning at least in 2015, Defendant engaged in a scheme to defraud PixarBio investors by (1) "making and causing to be made false and misleading statements about the company, its prospects, its financing, and the background and track record" of Defendant; and (2) "engaging in manipulative trading of PixarBio shares in an effort to simulate market interest in the stock and to artificially inflate the share price." (¶ 9.) The Indictment then details the purported manner in which Defendant engaged in a scheme to defraud.

###### A.    *Purportedly False Statements*

With respect to the purportedly false statements, the Indictment sparsely alleges that Defendant made false and misleading claims "from at least December 2015 until at least April 2018." (¶ 10.) These purportedly false and misleading claims related to the company's (1) products; (2) timelines to product approvals and commercial launches; (3) financial status and financing; and (4) scientific successes. (*Id.*) The Indictment also alleges that Defendant lied about his past, including his personal, business, and scientific successes, as well as why he left his previous employment. (*Id.*)

###### B.    *Alleged Market Manipulation*

With respect to the purported market manipulation, the Indictment asserts that PixarBio's shares started trading publicly under the ticker symbol PXRB on October 31, 2016. (¶ 7.) The Indictment generally alleges that from October 31, 2016 and continuing until January

23, 2017 (the "Relevant Period"), Herod and Stromsland, "while in close communication with REYNOLDS, and at times acting at the direction of REYNOLDS," engaged in market manipulation on eight specific days. (¶¶ 28-46.) The Indictment does not assert that Herod and Stromsland coordinated their trading with each other.

The Indictment alleges that Herod manipulated the market on six days. (¶¶ 28-46.) It asserts that Herod sold 211,901 PXRB shares and bought 6,618 PXRB shares over the Relevant Period, but alleges that he traded less than approximately 10,000 shares as part of a manipulative scheme – a small fraction of his total trading activity.[2] (*Id*.) The Indictment contends that Stromsland manipulated the market on only three days during the Relevant Period and concerning only 470 shares. (¶¶ 29-41.)

The Indictment generally accuses Defendant of communicating with and directing this above-described trading but provides only one example of such direction and in vague terms. (¶¶ 28-29.) It alleges that Defendant instructed Stromsland to buy PXRB shares on November 11, 2016, but does not detail whether Defendant directed Stromsland to purchase shares at a specific price, size, or time. (¶¶ 29-36.) Nor does it specify whether Defendant provided such instructions on the other two days that Stromsland purportedly manipulated the market. (¶¶ 37, 41.) Moreover, it is strikingly silent on whether Defendant ever communicated with Herod about his trading, including on the six days that Herod purportedly manipulated the market.

The Indictment generally asserts that Defendant, Herod, and Stromsland intended to simulate market interest in PixarBio stock by artificially inflating its share price and trading

---

[2]     Based on the Indictment, it is not possible to discern the specific number of shares that Herod allegedly traded as part of his manipulative scheme because the Indictment does not specify the number of trades at issue. For example, the Indictment alleges that on December 28, 2016, "Herod made similar trades where he was both the buyer and seller of the shares, in an effort to drive up the share price." (¶ 46.)

volume. (¶ 28.) These purportedly manipulative trades included (1) matched trading; (2) marking the close; and (3) bids to buy at a price "much higher" than the price of the previous market transaction. (*Id*.)

On November 11, 2016, for example, after PXRB stock fell from $14 to $10 per share, Defendant purportedly called Stromsland and instructed him to purchase PXRB shares "in order to keep the stock's price up over the weekend." (¶ 29.) On this same day, Stromsland placed a bid to buy 100 PXRB shares at $14.25 and, later that afternoon, purchased another 100 shares at $14.25. (¶¶ 30, 34.) The Indictment asserts PXRB stock closed at $14.50 that day – 25 cents higher than the executed price of Stromsland's trades. (¶ 34.) Stromsland allegedly then called Defendant to "update" him on Stromland's trading and, at approximately 4:40 p.m., Defendant purportedly instructed PixarBio's controller that Stromsland was entitled to a $27,500 "bonus." (¶ 36.)

The allegations concerning the seven other days on which Stromsland or Herod purportedly manipulated the market are set forth in paragraphs 38 through 48 of the Indictment. (¶¶ 38-48). The allegations in these paragraphs say nothing about Defendant's involvement at all with the trading activity alleged.

## II. ARGUMENT

Count One of the Indictment (1) is impermissibly duplicitous, and (2) fails to state the essential elements for market manipulation. It should therefore be dismissed.

### A. *Motion to Dismiss Count One as Duplicitous*

An indictment must contain a separate count for each offense. The inclusion of various offenses in a single count of an indictment makes that count duplicitous and mandates its dismissal. *See United States v. Verrecchia*, 196 F.3d 294, 297 (1st Cir. 1999); *United States v. Kushner*, 256 F. Supp. 2d 109, 112 (D. Mass. 2003); *United States v. Munoz-Franco*, 986 F.

Supp. 70, 72 (D.P.R. 1997). Duplicitous counts also raise serious constitutional and policy concerns. The First Circuit has explained that "[t]he prohibition against duplicitous indictments arises primarily out of a concern that the jury may find a defendant guilty on a count without having reached a unanimous verdict on the commission of any particular offense." *United States v. Valerio*, 48 F.3d 58, 63 (1st Cir. 1995); *see also* U.S. CONST. AMENDS. V, VI. A duplicitous count also poses the "danger that the defendant may be prejudiced in a subsequent double jeopardy defense" and that a "court may have difficulty determining the admissibility of evidence." *United States v. Schlei*, 122 F.3d 944, 977 (11th Cir. 1997) (quoting *United States v. Wiles*, 102 F.3d 1043, 1061 (10th Cir.1996)); *see also United States v. Gagalis*, No. 04-cr-126-01/06-PB, 2006 U.S. Dist. LEXIS 18537, *3 (D.N.H. Apr. 7, 2006) (adopting *Schlei*).

To determine whether an indictment is duplicitous, courts first assess the appropriate "unit of prosecution" under the relevant statute. *Gagalis*, No. 2006 U.S. Dist. LEXIS 18537, at *3. In *Gagalis*, for example, the court explained that the proper unit of prosecution for a securities fraud claim is each distinct violation. *Id*. at *6-7. Under Federal Rule of Criminal Procedure 12(b)(3), a defendant must "raise[] by pretrial motion" any "defect in the indictment or information, including . . . joining two or more offenses in the same count (duplicity)." Fed. R. Crim. P. 12(b)(3)(B)(i).

The instant Indictment is duplicitous because it consolidates into a single count several allegations that, if proven, constitute three distinct securities law violations. Specifically, it alleges that Defendant: (1) made multiple false statements in connection with the sale of PXRB shares; (2) directed Herod's purportedly manipulative trading of PXRB shares; and (3) directed Stromsland's allegedly manipulative trading of PXRB shares. As a result, Defendant faces the risk that a general verdict will deprive him of his right to a unanimous jury verdict or to a double

jeopardy defense because it would not be clear what the jury decided for each of the three specific violations. Accordingly, Count One should be dismissed as duplicitous.

### B. Motion to Dismiss Count One for Failing to Allege the Essential Elements of Market Manipulation Under Section 10(b) and Rule 10b-5

Rule 7(c) requires that an indictment contain a "plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). An indictment is sufficient "if it contains the elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and enables him to enter a plea without fear of double jeopardy." *United States v. Yefsky*, 994 F.2d 885, 893 (1st Cir. 1993) (citing *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see also United States v. Guerrier*, 669 F.3d 1, 3 (1st Cir. 2011) (same). A well-pleaded indictment can parrot "the statutory language to describe the offense, but it must also be accompanied by such a statement of facts and circumstances as to inform the accused of the specific offense with which he is charged." *United States v. Parigian*, 824 F.3d 5, 9 (1st Cir. 2016) (quoting *United States v. Savarese*, 686 F.3d 1, 6 (1st Cir. 2012)); *see also United States v. Hillie*, 227 F. Supp. 3d 57, 72 (D.D.C. 2017) (emphasis in original and citation omitted) ("To satisfy the protections that the Sixth Amendment guarantees, *facts* are to be stated, not conclusions of law alone.").

"[W]here the definition of an offence includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition . . . it must descend to particulars." *Russell v. United States*, 369 U.S. 749, 765 (1962); *see also United States v. Troy*, 618 F.3d 27, 34–35 (1st Cir. 2010) (emphasizing that indictments must outline the general facts on which the charges rest). This requirement satisfies the Fifth Amendment's guarantee that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." U.S. CONST. AMEND. V.

The court may consider inferences reasonably drawn from the facts pled in the indictment, but "[a]n indictment that requires speculation on a fundamental part of the charge is insufficient." *United States v. Bobo*, 344 F.3d 1076, 1084 (11th Cir. 2003). As a result, broad conclusory allegations should not be credited on a motion to dismiss an indictment. *See United States v. Gabriel*, 920 F. Supp. 498, 506 (S.D.N.Y. 1996); *United States v. ORS, Inc.*, 997 F.2d 628, 631 (9th Cir. 1993).

### 1.       The Essential Elements of a Market Manipulation Charge

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative device or contrivance." 15 U.S.C. § 78j(b). It does not, however, define a "manipulative or deceptive device or contrivance." As the Supreme Court has clarified, the "fundamental purpose" of the Exchange Act is "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor*." *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 6-7 (1985). Rule 10b-5, promulgated by the U.S. Securities and Exchange Commission ("SEC") under Section 10(b), prohibits, in addition to nondisclosure and misrepresentation, any artifice to defraud or any act which operates or would operate as a fraud or deceit. *See* 17 C.F.R. § 240.10b-5(b).

To establish an offense for market manipulation, the government "must allege facts that each defendant acted with 'a mental state embracing intent to deceive, manipulate, or defraud.'" *SEC v. Durgarian*, 477 F. Supp. 2d 342, 353 (D. Mass. 2007) (quoting *Ernst & Ernst & Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). In criminal securities fraud cases, the government must prove that the defendant "willfully" violated Section 10(b); "that is, that the defendant acted with 'culpable intent.'" *Parigian*, 824 F.3d at 10 (citations omitted); *see also United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005) (defining willfulness "as a realization on the defendant's part that he was doing a wrongful act under the securities laws" and that such

act "involved a significant risk of effecting the violation that . . . occurred" (internal quotations and citations omitted)).

The high bar for establishing manipulative intent demands allegations that "plead with particular[ity] facts giving rise to a strong inference that the defendant intended to deceive investors by artificially affecting the market price of securities." *ATSI Communs., Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 102 (2d Cir. 2007). The who, what, why, where, how, when, and with what state of mind pleading standard is a critical component of both civil complaints alleging and indictments charging securities fraud. *See, e.g., Hillie*, 227 F. Supp. 2d at 72 ("The indictment is barren of factual averments regarding the what, where, or how of [defendant's] conduct, and thus, a non-clairvoyant reader cannot possibly ascertain the substance of the government's accusations from the face of the charging instrument"); *Van Ormer v. Aspen Tech., Inc.*, 145 F. Supp. 2d 101, 107 (D. Mass 2000). Indeed, as the Supreme Court has cautioned:

> To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure. For a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him.

*Russell*, 369 U.S. at 770.

Liability for aiding and abetting market manipulation attaches "if (and only if) [the defendant] (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States*, 572 U.S. 65, 71 (2014). The key requirement of the second element "is a showing that the defendant consciously shared the principal's knowledge of the underlying criminal act, and intended to help the principal." *United States v. Spinney*, 65 F.3d 231, 235 (1st Cir. 1995) (citation and internal quotations omitted); *see also United States v. Ortiz*, 966 F.2d 707, 712 (1st Cir. 1992) ("Mere association between the

principal and those accused of aiding and abetting is not sufficient to establish guilt; . . . nor is mere presence at the scene and knowledge that a crime was to be committed sufficient to establish aiding and abetting."). The defendant's knowledge "must be more than merely a general suspicion that an unlawful act may occur." *United States v. Rosario-Diaz*, 202 F.3d 54, 63 (1st Cir. 2000) (citations omitted); *see also United States v. Loder*, 23 F.3d 586, 591 (1st Cir. 1994) (citations and internal quotations omitted). The accomplice must essentially facilitate the principal's commission of the crime. *See, e.g., United States v. Medina-Roman*, 376 F.3d 1, 5 (1st Cir. 2004).

As a matter of law, Count One falls far short of this pleading standard. First, the government fails to sufficiently connect Defendant to the purportedly manipulative trading of Herod and Stromsland. Second, it fails to allege that the trading activity at issue – open market transactions – was inherently deceptive as required by the applicable securities laws. Third, Count One omits any other indicia of manipulative intent necessary to sufficiently plead the offense of market manipulation. For each of these reasons, Count One should be dismissed for failing to state the essential elements of market manipulation.

### 2. Count One Fails to Connect Defendant to the Purportedly Manipulative Trading

Courts cannot analyze the sufficiency of an indictment against one defendant based on the alleged manipulative actions ascribed to others. Rather, the indictment must specifically tie each defendant to an unlawful offense. *See United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 178-79 (6th Cir. 1992); *United States v. Boatright*, 588 F.2d 471, 475-76 (5th Cir. 1979) (indictment insufficient for failing to allege facts connecting defendant to the crime). This requires "such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged."

*United States v. Thompson-Bey*, No. 3:09-CR-64, 2010 U.S. Dist. LEXIS 48331, *3-4 (E.D. Tenn. Jan. 13, 2010).   Where there are multiple defendants, the indictment must provide reasonable notice to each about how he participated in the charge against him.  *See United States v. Fisher*, Case No. 06-CR-20415, at *3-4, 2007 U.S. Dist. LEXIS 76985, at *4 (E.D. Mich. Oct. 17, 2007); *ATSI Communs.,* 493 F.3d at 102 ("General allegations not tied to the defendants or resting upon speculation are insufficient"); *Southland Sec. Corp. v. INSpire Insur. Solutions*, 365 F.3d 353, 364 (5th Cir. 2004) (Emphasizing that Section 10(b) and Rule 10b-5 always have required plaintiffs "to identify the roles of the individual defendants, and describe their involvement.").

This specificity requirement applies with equal force to aiding and abetting theories of liability.  *See SEC v. Patel*, No. 07-cv-39-SM, 2009 U.S. Dist. LEXIS 90558, at *70 (D.N.H. Sept. 30, 2009).   The District of New Hampshire's decision in *Patel* is instructive. There, the court disregarded as inadequate the SEC's allegation that one of the defendants was liable for aiding and abetting market manipulation by "direct[ing] others to enter into transactions for the purpose of fraudulently inflating the companies' revenues. . . ."  2009 U.S. Dist. LEXIS 90558, at *73.  The court concluded that the SEC's quoted language fell far short of the specificity required to survive a motion to dismiss.  *Id*. at *73-74.  It likewise rejected allegations about conduct generally ascribed to the "defendants" rather than to specific defendants.  *Id*. at *75.

Strikingly absent from the Indictment is any specific allegation that Defendant directed Herod or Stromsland to manipulate the market.  In fact, the Indictment fails to assert any single specific fact as to how, when, or where Defendant supposedly instructed Herod to engage in manipulative trading.   Nor does it allege that Defendant had any knowledge of, or direct

involvement in, any of Herod's trading at issue. Instead, the Indictment makes the general allegation that "Herod . . . , while in close communication with Reynolds, and at time acting at the direction of Reynolds, engaged in manipulative trading of PixarBio shares . . . ." (¶ 28.) But it fails to provide specific support for this generalized allegation and details merely how Herod – and only Herod – purportedly engaged in market manipulation on six specific days.

The Indictment similarly lacks sufficient detail tying Defendant to Stromsland's trading at issue. It is silent on whether Defendant communicated with Stromsland about Stromsland's trading for all but one of the days, November 11, 2016, that Stromsland purportedly manipulated the market. And, even with respect to this one day, the Indictment fails to specify whether Defendant directed Stromsland to buy PXRB shares at a certain price, size, or time. Instead, and similar to the deficient allegations in *Patel*, Count One claims merely that Defendant "called Stromsland and told Stromsland to buy shares of PixarBio in order to keep the stock's price up over the weekend."[3] (¶ 29.) In its allegations for the two other days that Stromsland allegedly manipulated the market – November 17, 2016 and December 20, 2016 – the Indictment does not even mention Defendant. (¶¶ 38, 41.)

By failing to tie Defendant specifically to these purportedly manipulative trades, Count One falls woefully short of pleading that Defendant had the requisite scienter to sustain the offense of market manipulation – either as a primary violator or as an aider and abettor. *See* Fed. R. Crim. P. 7(c). Even if the Indictment establishes the existence of market manipulation – though it does not – it utterly fails to connect Defendant to that supposed manipulation. In essence, the government asks this Court to impermissibly speculate about Defendant's supposed

---

[3]     The Indictment asserts that on November 11, 2016 at the close of trading, Defendant coordinated for Stromsland to receive to a $27,000 "bonus." (¶ 36.) But it does not allege – nor could it – that Defendant directed the payment of this bonus in exchange for Stromsland's alleged manipulative trading.

scienter based solely on a few isolated transactions executed by others contrary to the uniform case law.

### 3.    Count One Fails to Allege Deceptive Trading Conduct[4]

The "gravamen" of manipulation is "deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *SEC v. Masri*, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007) (quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)). "Broad as the concept of 'deception' may be, it irreducibly entails some act that gives the victim a false impression." *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008). The "market is not misled when a transaction's terms are fully disclosed." *Finn v. Barney*, 471 Fed. App'x. 30, 33 (2d Cir. 2012). Indeed, violations of Rule 10b-5 must encompass "much more than illegal trading activity: they encompass the use of 'any device, scheme or artifice' or 'any act, practice, course of business' used to perpetrate a fraud on investors." *United States v. Hunt*, 05 Cr. 395 (DAB), 2006 U.S. Dist. LEXIS 64887, at *10 (S.D.N.Y. Sept. 6, 2006) (citation omitted). "In identifying activity that is outside the natural interplay of supply and demand, courts generally ask whether the transaction sends a false pricing signal to the market." *ATSI Communs.*, 493 F.3d at 100. If consumers receive exactly what they anticipated, the purported conduct is neither deceptive nor fraudulent and, as a result, is not within the ambit of Section 10(b) and Rule 10b-5. *Id.*

To impose liability for an open market transaction entered into with a willing counterparty, the government must prove that "but for the manipulative intent, the defendant would not have conducted the transaction." *Masri*, 523 F. Supp. 2d at 372; *see also United*

---

[4]     Although Herod and Stromsland have pleaded guilty to securities fraud in this case, the Indictment still must sufficiently allege every element of market manipulation or Count One is invalid. *See United States. v. Jenkins*, 675 F. Supp. 2d 647, 651 (W.D. Va. 2009).

*States v. Radley*, 659 F. Supp. 2d 803, 816 (S.D. Tex. 2009) (In the context of the Commodity Exchange Act, which mirrors the SEC's Exchange Act, the Court explained that "[a]cting in a manner that shifts the price of a commodity in a favorable direction is the business of profit-making enterprises, and if it is done without fraud or misrepresentation, it does not clearly violate the [law].").

In *ATSI Communs.*, the Court affirmed the trial court's dismissal of a market manipulation claim arising from open market transactions on grounds that the plaintiff failed to make any specific allegations that the defendants *intended* to manipulate the market and instead relied improperly on speculative inferences. 493 F.3d at 102-03. The Court emphasized that open market transactions are not actionable as market manipulation without "something more to create a false impression of how market participants value a security." *Id*. at 101. Likewise, in *United States v. Mulheren*, the Second Circuit rejected the government's theory of manipulation because: (1) the defendant conspicuously purchased the shares in the open market; and (2) the government failed to prove that the defendant purchased the shares for the sole purpose of inflating the share price rather than for his own investment reasons. 938 F.2d 364, 371 (2d Cir. 1991).

Here, like the defendants in *ATSI Communs.* and *Mulheren*, Herod and Stromsland engaged in open market transactions out of their own trading accounts. The government has put forth no evidence showing that Herod or Stromsland – much less Defendant – attempted to hide this trading activity. In light of these open market transactions, the Indictment must allege with particularity that Herod and Stromsland traded for the fraudulent purpose of artificially inflating the market value for PixarBio stock. However, despite one conclusory allegation that they intended "to simulate market interest in the stock and artificially

inflate the share price," (¶ 28), the Indictment fails to *specifically* allege, as it must, their manipulative intent for each of the eight days that Herod and Stromsland purportedly manipulated the market.

The Indictment attempts to circumvent this lack of evidence of manipulative intent by arguing in general terms that Herod or Stromsland: (1) engaged in matched trading; (2) engaged in marking the close; and (3) placed bids to buy at prices "much higher" than the preceding trade. (¶ 28.) As detailed below, each of these claims fails.

a. <u>*Matched Trading Allegations*</u>

Matched trading occurs where one or more persons submits "orders for the purchase or sale of a security . . . with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale/purchase of such security." *SEC v. Competitive Techs., Inc.*, No. 3:04-cv-1331 (JCH), 2005 U.S. Dist. LEXIS 43349, at *5 (D. Conn. July 21, 2005) (quoting *Hochfelder*, 425 U.S. at 205 n.25) (internal quotation omitted); *see also SEC v. Malenfant*, 784 F.Supp. 141, 145 (S.D.N.Y. 1992). Such trading constitutes market manipulation only if it is done for the purpose of creating a false or misleading appearance of the stock being traded. *See Competitive Techs.,* 2005 U.S. Dist. LEXIS 43349, at *15-16.

In *Competitive Techs.*, for example, the Court concluded that the SEC sufficiently stated a claim for manipulative matched trading where the SEC alleged, among other things, that (1) on at least 12 dates and times, the defendants placed buy orders identical or substantially similar to sell orders placed by the other defendants; and (2) on at least nine of these occasions, the defendants communicated by phone to coordinate their trading within an hour of executing the trades. 2005 U.S. Dist. LEXIS 43349, at *4-5, 20. Notably, the Court acknowledged that "engaging in some instances" of matched trading is not *per se* illegal and cannot serve as the

basis of liability. *Id*. at *10, n.3. It determined that the SEC's allegations sufficed because the SEC demonstrated a "pattern of trading" that included manipulative conduct beyond the matched trades. *Id*. In another example, in *Voss v. SEC*, the Court affirmed an SEC order finding manipulative matched trades where the defendant effectuated 203 wash and matched trades, typically for the purchase and sale of 3,000 to 12,000 shares, through accounts in the names of relatives and business associates. 222 F.3d 994, 997 (D.C. Cir. 2000).

In contrast to *Competitive Techs.* and *Voss*, the Indictment here alleges a few isolated instances of supposed matched trading – not a coordinated effort as part of a larger manipulative trading scheme. As a threshold matter, the Indictment does not contend that Stromsland engaged in matched trading and provides only six vague examples in which Herod purportedly did so. In each of these six alleged instances, the Indictment fails to specify the times and prices at which Herod purportedly purchased and sold the shares. It likewise fails to assert whether Herod placed his bids to buy and asks to sell at market or limit orders. (¶¶ 39-46.) And, for three of these instances, the Indictment alleges that Herod actually purchased and sold PXRB shares at different times (*e.g.*, "[l]ater in the day," "[m]inutes later," and "[l]ess than one minute after"). (¶¶ 42-43, 45.) For the sixth supposed instance of matched trading, on December 28, 2016, the Indictment alleges merely: "Herod made similar trades where he was both the buyer and seller of the shares, in an effort to drive up the share price." (¶ 46.) Such vague, conclusory allegations cannot serve as the basis for transforming otherwise open market transactions into deceptive ones.

### b. *Marking the Close Allegations*

Unlawful marking the close occurs "when an individual engages in a series of late day transactions that create actual or apparent active trading in [a] security, or rais[e] or depress[] the price of such security, for the purpose of inducing the purchase or sale of such security by

others." *SEC v. Kwak*, No. 3:04-cv-1331 (JCH), 2008 U.S. Dist. LEXIS 10201, at *3 (D. Conn. Feb. 12, 2008) (citation omitted); *see also Masri*, 523 F. Supp. 2d at 369 (emphasis added and citation omitted) (describing marking the close as "practice of ***repeatedly*** executing the last transaction of the day in a security in order to affect its closing price."). Standing alone, however, late-day trading is not unlawful. As the Court in *Masri* emphasized: "stock transactions made at the close of the day are not prohibited" and "studies have shown that trading in organized securities is heaviest just before the market closes, as traders monitor activity and their positions throughout the day before conducting their trades." 523 F. Supp. 2d at 369.

To distinguish lawful from unlawful late-day trading, the government must prove an intent to induce additional purchases or sales of the security. In *SEC v. Schiffer*, for example, the Court concluded that the SEC sufficiently demonstrated a manipulative marking the close scheme where the defendants executed a total of 124 transactions and, of that total, executed 96 shortly before the close of the market and 28 as the last trade of the day. No. 97 Civ. 5853 (RO), 1998 U.S. Dist. LEXIS 8579, at *27 (S.D.N.Y. June 11, 1998). The Court pointed to contemporaneous correspondence between the defendants in which they expressly discussed their strategy of "carefully constructed and timed transactions aimed at boosting [the stock's] perceived market value." *Id.* at *27-28. And in *Masri*, the Court determined that the SEC sufficiently alleged manipulative intent where the defendant bought 200,000 shares at an inflated price in the final minutes of trading on the date his put option was set to expire, which would have forced him to purchase 800,000 shares. 523 F. Supp. 2d at 372-73. The defendant avoided this larger purchase by inflating the share price. *Id.*

Unlike in *Schiffer* and *Masri*, the Indictment here asserts in only conclusory terms that Herod and Stromsland manipulated the market for PXRB shares by "marking the close." (¶

28.)  It details a mere three instances on November 11, 2016, November 17, 2016, and December 21, 2016, out of the entire two-and-a-half month trading span, where Herod's or Stromsland's trading occurred towards the end of the day.  (¶¶ 29-34, 42.)  This hardly amounts to a scheme of ***repeatedly*** marking the close.  Moreover, the Indictment alleges only that (1) on November 11, 2016, Stromsland expressed to his broker that he wanted to buy PXRB shares "real quick [and] right now," (¶¶ 29-34); (2) on November 17, 2016, Stromsland purchased 100 shares at approximately 3:56 p.m. (¶ 37); and (3) on December 21, 2016, Herod placed an order to sell PXRB shares "less than ten minutes before the market closed."  (¶ 42.)  Notably absent from both allegations is any assertion that Herod or Stromsland executed these trades for the purpose of boosting PXRB's perceived market value.

### c.   Allegations of Placing Orders to Buy at "Much Higher" Prices Than the Preceding Market Transaction

Under Section 10(b), it is not unlawful for a person to place bids to buy that the person thinks are fair and reasonable.  *See CFTC v. Wilson and DRW Investments, LLC*, No. 13 Civ. 7884 (RJS), 2018 U.S. Dist. LEXIS 207376 (S.D.N.Y. Nov. 30, 2018).  Nor is uneconomic trading unlawful in and of itself.  Rather, allegations of manipulative uneconomic trading generally entail defendants engaging in the uneconomic trading to artificially inflate a corresponding financial position.  *See, e.g.*, *FERC v. Barclays Bank PLC*, 105 F. Supp. 3d 1121, 1128 (E.D. Cal. 2015) (alleging that defendant engaged in manipulation by consistently engaging in uneconomic trades to benefit its corresponding financial positions); *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 239 (S.D.N.Y. 2012) (same).

Despite a lack of precedent to support the government's position, the Indictment attempts to craft a manipulation theory out of the fact that Herod and Stromsland occasionally bought shares at higher prices than the last executed trade.  Such focus is misplaced.  For

example, the Indictment alleges that on November 11, 2016, Stromsland purchased 100 shares at $14.25 despite the fact that the last trade executed at $10. (¶¶ 29-31.) But the Indictment does not specify whether $10 shares were available at the time Stromsland purchased at $14.25 – namely, whether unfilled asks for $10 existed on the market.[5] For each of the other days on which manipulation purportedly occurred, the Indictment similarly portrays Herod's and Stromsland's trades as uneconomic while omitting necessary context about the market for PXRB shares. These conclusory allegations fail to establish manipulation as a matter of law.

### 4. Count One Fails to Allege Any of the Other Hallmarks of Manipulative Intent

In cases where market manipulation is sufficiently pled, the underlying trading activity includes several indicia of manipulative intent, such as: (1) deceptive trading over the course of several months or years; (2) contemporaneous communications documenting the defendants' manipulative intent; and (3) a personal profit inuring to the defendant. *See, e.g. Schiffer*, 1998 U.S. Dist. LEXIS 8579, at *29 ("Manipulation is usually not evidence in a single transaction, requiring that a course of conduct be shown to establish an intention to interfere with the normal functioning of a particular security"); *Mulheren*, 938 F.2d at 370 ("One of the hallmarks of manipulation is some profit or personal gain inuring to the alleged manipulator"); *United States v. Koch*, 06 Cr. 902 (RWS); S1 06 Cr. 902 (RWS), 2012 U.S. Dist. LEXIS 77340 (S.D.N.Y. June 4, 2012) (manipulators obtained millions of dollars from their manipulative scheme). To analyze market manipulation allegations, courts engage in a fact-intensive inquiry

---

[5]     Notably, the Indictment specifies that the stock for PXRB closed on November 11 at $14.50 – 25 cents higher than the price at which Stromsland purchased his shares. (¶ 34.) This suggests that Stromsland actually purchased his shares at a bargain, as the market apparently valued PXRB stock at a higher price than that for which he purchased it.

that looks at the overall course of trading conduct rather than specific trades, or specific days, in a vacuum.

For example, in *Competitive Techs.,* the SEC alleged that the defendant company and broker engaged in illegal manipulation over a three-year period and traded in significantly larger volumes than the trading at issue here. 2005 U.S. Dist. LEXIS 43349, at *4-5. The SEC's complaint specifically alleged that the defendants: (1) placed late-day, successive bids to buy at increasingly high prices to simulate increased demand; (2) engaged in matched trading with each other on at least five occasions and for orders ranging from 9,000 to 10,000 shares; and (3) communicated more than 3,000 times during the relevant trading days. *Id*. at *4-5. Moreover, the complaint detailed several instances in which one defendant left messages for the other specifying the number of shares he wanted the other to buy. *Id*. at *5. More than half of the defendants' transactions took place within ten minutes of receiving this message. *Id*. Finally, the SEC also detailed two distinct motives for the defendants' trading: (1) one of the defendants believed that increasing the share price guaranteed his position as CEO of a company; and (2) the defendant held certain stock options that would vest earlier if the stock rose to a certain level. *Id*. at *5. The Court concluded that these allegations sufficiently supported the "inference that the defendants knew what they were doing and acted intentionally." *Id*. at *16-17 (citation omitted).

The underlying manipulative conduct in *Koch* is also instructive. In that case, the government presented evidence that the defendants engaged in market manipulation by, *inter alia*, bribing stock promoters to inflate the market price for a specific stock because one of the defendants held the majority of the shares. 2012 U.S. Dist. LEXIS 77340, at *8-10.

The Indictment here stands in stark contrast to these cases. The government is not alleging manipulative conduct over several months or years. Rather, it attempts to fashion a

market manipulation case *based solely* on a few trades over eight days as described above. No pattern of manipulative trading can be gleaned from these isolated instances. Moreover, the Indictment alleges only one communication between Defendant and Stromsland in which they purportedly discussed Stromsland's market manipulation and alleges no such communications between Defendant and Herod. A sole communication – between coworkers – hardly evidences Defendant's purported manipulative intent. Finally, unlike the typical market manipulation case, the Indictment here lacks any specific claim that Defendant personally profited from the trading at issue. This is not a case in which Defendant pocketed millions from the supposedly manipulative trading. Count One alleges vaguely that Herod directed $300,000 of his trading proceeds to Defendant's wife "for the benefit" of Defendant but does not say why Herod did so or how it actually benefitted Defendant. (¶ 48.) It makes no allegation that Defendant profited from Stromsland's trading. By basing its market manipulation charge on these sparse allegations, Count One falls woefully short of alleging that Defendant possessed the requisite manipulative intent.

## III.     CONCULSION

For the foregoing reasons, Count One of the Indictment should be dismissed because it is duplicitous and fails to allege the essential elements of market manipulation.

Dated:  May 6, 2019                                 Respectfully submitted,

*/s/ David L. Axelrod*
David L. Axelrod (admitted *pro hac vice*)
R. Stephen Stigall (admitted *pro hac vice*)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103-7599
T: 215.665.8500
axelrodd@ballardspahr.com
stigalls@ballardspahr.com

*Attorneys for Defendant Francis M. Reynolds*

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2019, a true copy of the above document was served via electronic means using the Court's Electronic Case Filing (ECF) system upon all registered ECF users and a true paper copy was served by first class mail on nonregistered parties.

*/s/ R. Stephen Stigall*
R. Stephen Stigall