**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 1:18-cr-10154-DPW-1 |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FRANCIS M. REYNOLDS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## **ORDER**

AND, NOW, this ___ day of _____, 2019, upon consideration of Defendant

Francis M. Reynolds' Renewed Motion for Judgment of Acquittal or, in the Alternative, Motion

for a New Trial, IT IS HEREBY ORDERED that Defendant's Motion is GRANTED.

**BY THE COURT:**

_____

**Woodlock, J.**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | No. 1:18-cr-10154-DPW-1 |
| v. | ) | |
| | ) | |
| FRANCIS M. REYNOLDS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT FRANCIS M. REYNOLDS' RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL

Defendant Francis M. Reynolds renews his pending motion before this Court for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. Dkt. No. 218. Alternatively, Reynolds, through undersigned counsel, asks this Court to grant a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. This Court should grant this Motion for two distinct reasons. First, the government failed to introduce sufficient evidence to sustain a conviction on any count. This alone warrants a judgment of acquittal or, in the alternative, an order granting a new trial. Second, the government's *Giglio* violation relating to Herod's insider trading entitles Reynolds to a new trial.

## I.      BACKGROUND

On February 26, 2019, the grand jury returned a superseding indictment that charged Reynolds with one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff(a), and 17 C.F.R. § 240.10b-5, and three counts of obstruction of an agency proceeding, in violation of 18 U.S.C. § 1505. The government's case against Reynolds was based on two alleged schemes: (1) that Reynolds committed securities fraud by making material misstatements to potential investors in PixarBio and engaging in a scheme to manipulate the publicly-traded stock of PixarBio; and (2)

that Reynolds obstructed the SEC investigation by giving false testimony and inducing two co-defendants – Kenneth Stromsland and M. Jay Herod – to also give false testimony.

This case proceeded to trial on October 7, 2019. The government presented 11 days of testimony and rested its case on October 22, 2019. Reynolds then moved the Court to direct a verdict in his favor on grounds that the government failed to introduce sufficient evidence as to all counts charged in the Superseding Indictment. Dkt. No. 218. This Court reserved judgment on this Motion[1] and charged the jury on October 25, 2019 following the conclusion of the defense case. On October 28, 2019, the jury returned a verdict of guilty on all four counts. Dkt. No. 229.

## II.    LEGAL STANDARD

Rule 29 of the Federal Rules of Criminal Procedure provides that, upon the motion of a defendant, a district court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The district court may, as here, "reserve decision on the motion, proceed with the trial . . . , submit the case to the jury, and decide the motion . . .  after it returns a verdict of guilty." Fed. R. Crim. P. 29(b). And, "[i]f the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved." *Id*. District courts must grant Rule 29 motions "where the evidence adduced at trial is so insufficient that no rational trier of fact can find proof beyond a reasonable doubt." *United States v. Nippon Paper Indus. Co.*, 62 F. Supp. 2d 173, 179 (D. Mass. 1999).

Simply because the evidence allows for a permissible inference does not mean that it is a reasonable inference. Courts "can determine whether the inferences the government asks the jury to draw are reasonable, or rather inappropriately 'piling inference upon inference.'" *Id.* (quoting

---

[1]     As discussed *infra*, the Court ruled on discrete aspects of Reynolds' initial Rule 29 Motion for purposes of permitting or precluding the government to make certain arguments in its closing.

*United States v. DeLutis*, 722 F.2d 902, 907 (1st Cir. 1983)). They also must "take a hard look at the record and [reject] those evidentiary interpretations . . . that are unreasonable, insupportable, or overly speculative. This function is especially important in criminal cases, given the prosecution's obligation to prove every element of an offense beyond a reasonable doubt." *United States v. Spinney*, 65 F.3d 231, 234 (1st Cir. 1995)). "'The evidence must be sufficient to prove the fact at issue beyond a reasonable doubt.'" *United States v. Pappathanasi*, 383 F. Supp. 2d 289, 290 (D. Mass. 2005) (quoting *United States v. Sampson*, 335 F. Supp. 166, 201 (D. Mass. 2004)); *see also United States v. Czubinski*, 106 F.3d 1069, 1075-76 (1st Cir. 1997) (reversing wire fraud conviction because no evidence supported "deprivation of intangible property" theory of crime).

In *United States v. Mora*, the First Circuit found that a Rule 29 motion should have been granted concerning the defendant's conviction for conspiracy to import a controlled substance. 598 F.2d 682, 683 (1st Cir. 1979). The Court concluded that no evidence presented at trial linked the defendant to the substantive crime and that, as a result, there was insufficient evidence for the jury to convict him of conspiracy. *Id.* at 684. It explained: "[i]t is true that the jurors may draw legitimate inferences from the evidence but that does not mean that they have license to let their imaginations run rampant along the lines suggested by the prosecutor in this case." *Id*; *see also United States v. Coriaty*, No. 99-cr-1251, 2001 U.S. Dist. LEXIS 9870, at *25 (S.D.N.Y. July 16, 2001) (finding insufficient evidence for securities fraud conviction where no evidence showed that the defendant misled as to the nature or value of the securities and thus no evidence that misrepresentations were made "in connection with" the sale of securities).

And in *United States v. Hernandez*, 301 F.3d 886 (8th Cir. 2002), the Eighth Circuit upheld a Rule 29 judgment of acquittal concerning charges that the defendant aided and abetted the possession with intent to distribute methamphetamine. *Id.* at 890. The district court granted the

defendant's motion because no evidence: (1) established that the defendant knew her boyfriend possessed or delivered methamphetamine to anyone; (2) showed that she knowingly aided her boyfriend in committing the crime or that she intended for the drug to be delivered to another person; (3) established that the defendant was more than merely present at the scene of a criminal event; or (4) demonstrated more than mere conjecture of guilt, not an inference of guilt reasonably drawn from the facts. *Id*. In upholding this decision, the Court emphasized:

> When the government's evidence is viewed in its entirety, [the defendant's] activities may be sufficient to raise speculation that she shared [her boyfriend's] criminal intent. However, there is a critical line between suspicion of guilt and guilt beyond a reasonable doubt . . . [E]ven looking at the government's case in the most favorable light possible, the government has not transcended the realm of speculation to the realm of certainty beyond a reasonable doubt.

*Id*. at 893.

Rule 33 of the Federal Rules of Criminal Procedure permits the court, upon the defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "A Rule 29 motion challenges the legal sufficiency of the evidence, while a Rule 33 motion asks the court to determine whether, as the court perceives it, the weight of the evidence preponderates against the verdict, such that 'the interest of justice' requires a new trial." *United States v. Olbres*, 881 F. Supp. 703, 710 (D.N.H. 1994), *reversed on other grounds*. "In contrast to an analysis under Rule 29, in deciding a Rule 33 motion for a new trial, the court may weigh the evidence, evaluate the credibility of the witnesses, and order a new trial if the evidence predominates heavily against the verdicts and allowing them to stand would result in a miscarriage of justice." *United States v. Dimasi*, 810 F. Supp. 2d 347, 350 (D. Mass. 2011).

## III.   ARGUMENT

The jury's verdict cannot stand for two independent reasons. First, the government failed to present sufficient evidence to sustain a conviction. Instead, the weight of the evidence at trial

preponderates against the jury's verdict. This standing alone demands a judgment of acquittal or, in the alternative, an order granting a new trial. Second, the interest of justice requires a new trial because of the government's intentional derogation of its *Giglio* obligations.

**A.** **The Court Should Grant Reynolds' Motion for Acquittal Because the Government Introduced Insufficient Evidence to Sustain a Conviction or, in the Alternative, Order a New Trial Because the Weight of the Evidence Preponderates Against the Jury's Verdict.**

As set forth below, the government fell far short of introducing sufficient evidence to sustain a conviction against Reynolds for securities fraud and obstruction of justice. First, the Superseding Indictment alleges a variety of core material misstatements that Reynolds allegedly made. But the government failed at trial to introduce sufficient evidence to prove that these statements were (1) false and (2) material.[2] Second, the government failed to establish that Reynolds engaged in market manipulation. Third, the government did not prove that Reynolds obstructed the SEC investigation or induced Stromsland and Herod to obstruct the SEC investigation. Consequently, this Court should grant this motion for an acquittal or, in the alternative, a new trial.

**1.** **The Government Has Failed to Introduce Sufficient Evidence to Establish that Reynolds is Guilty of Count One.**

Count One of the Superseding Indictment charges Reynolds with securities fraud, including on an aiding and abetting theory, in violation of 15 U.S.C. §§ 78j(b) and 78ff(a), 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2. The Superseding Indictment alleges that beginning at least in 2015, Reynolds engaged in a scheme to defraud PixarBio investors by (1) "making and causing

---

[2]     After the government concluded its case, the Court granted Reynolds' Rule 29 Motion with respect to the government's allegations concerning: (1) PixarBio's $1 billion valuation in December 2015; (2) Reynolds' role in inventing the NeuroScaffold; and (3) PixarBio's January 3-4, 2017 bids to acquire InVivo Therapeutics.

to be made false and misleading statements about the company, its prospects, its financing, and the background and track record" of Reynolds; and (2) "engaging in manipulative trading of PixarBio shares in an effort to simulate market interest in the stock and to artificially inflate the share price." Superseding Indictment ¶ 9.

With respect to the purportedly false statements, the Superseding Indictment alleges that Reynolds made false and misleading claims "from at least December 2015 until at least April 2018." *Id.* ¶ 10. These purportedly false and misleading claims related to the company's (1) "products," including "a product that would end 'thousands of years of morphine and opioid addiction'"; (2) timelines to product approvals and commercial launches; (3) financial status and financing; and (4) scientific successes. *Id.* The Superseding Indictment also alleges that Reynolds lied about his past, including his personal, business, and scientific successes, as well as why he left his previous employment. *Id.*

With respect to the purported market manipulation, the Superseding Indictment generally alleges that from October 31, 2016 and continuing until January 23, 2017, Herod and Stromsland, "while in close communication with REYNOLDS, and at times acting at the direction of REYNOLDS," engaged in market manipulation on eight specific days. *Id.* ¶¶ 28-46. It asserts that Reynolds, Herod, and Stromsland intended to simulate market interest in PixarBio stock by artificially inflating its share price and trading volume. *Id.* ¶ 28. It describes these purportedly manipulative trades executed by Herod and Stromsland – and not Reynolds – as: (1) matched trading; (2) marking the close; and (3) bids to buy at a price "much higher" than the price of the previous market transaction. *Id.*

The Court should grant this Motion with respect to Count One because, as described below, the government failed to present sufficient evidence that Reynolds committed several illegal acts

that, as a whole, comprised a securities fraud scheme. As a threshold matter, during trial the Court precluded the government from arguing that Reynolds aided and abetted securities fraud. And by failing to introduce sufficient evidence that Reynolds (1) committed the core material misstatements alleged in the Superseding Indictment and (2) participated in the manipulative scheme asserted, the government's theory for Count One, as returned by the Grand Jury, has been exposed at trial to be a house of cards that cannot stand. This renders Count One insufficient as a matter of law.

<blockquote>
a.   <u>The government's evidence that Reynolds made material misrepresentations to PixarBio investors is insufficient to sustain a securities fraud conviction.</u>
</blockquote>

The government at trial failed to establish sufficient evidence that the supposed misrepresentations made by Reynolds were false. In fact, this Court prohibited the government from arguing in its closing that the following statements were material misrepresentations: (1) that PixarBio was valued at $1 billion; (2) that Reynolds lied about his patent applications; and (3) that PixarBio was bidding to acquire InVivo Therapeutics in January 2017. Without these three core allegations, the government's theory about Reynolds' supposed misrepresentations was reduced to a few statements that Reynolds undermined at trial. Moreover, this represented a significant variance from the theory alleged in the Superseding Indictment.

Indeed, the version of the Superseding Indictment that went to the jury was drastically altered from the version returned by the grand jury. *See United States v. Cianci*, 378 F.3d 71, 93 (1st Cir. 2004) (Describing an amendment of the indictment as occurring when its charging terms are altered, either literally or in effect, by the prosecutor after the grand jury has returned an indictment). Amending the indictment is considered prejudicial per se and demands reversal. *Id.* (citation omitted). And a material variance occurs where, as here, "the proof differs from the indictment's allegations . . . ." *United States v. Munoz-Franco*, 487 F.3d 25, 64 (1st Cir. 2007)

(citation omitted). Accordingly, the Court should grant this Motion with respect to the government's misrepresentation allegations.

> i. *The government failed to introduce sufficient evidence showing that Reynolds misrepresented information regarding PixarBio's September 30, 2015 meeting with the FDA.*

The government failed to introduce evidence showing that Reynolds misrepresented information about PixarBio's estimated timeline for achieving FDA approval of NeuroRelease. More specifically, it did not introduce any evidence that Reynolds lied when he stated that the FDA lowered hurdles and confirmed PixarBio's IND package. The government failed to call a single witness – from the FDA or even from PixarBio – who attended PixarBio's meeting with the FDA on September 30, 2015 or was involved in communicating with the FDA regarding PixarBio's submissions to the agency.

At trial, the government argued that Exhibit 36, the FDA minutes from this meeting, sufficiently established that the FDA did not lower hurdles during this meeting. These minutes are the government's sole source of support for its claim that Reynolds lied about this pre-IND meeting. And, contrary to the government's representations, these minutes document the parties' extensive discussion about PixarBio's plan to pursue the 505(b)(2) regulatory pathway. Indeed, the FDA wrote in its minutes that "since the Sponsor intends to pursue the 505(b)(2) regulatory pathway[,] the Sponsor may be able to leverage some of the existing nonclinical data in the labels for the oral carbamazepine products . . . ." Ex. 36 at 9. As a result, these minutes actually demonstrate that Reynolds did *not* misrepresent PixarBio's communications with the FDA and instead show his good faith belief that the FDA meeting *did* lower hurdles. Moreover, the government's own witness, Steven Chartier, testified that the FDA provides guidance to companies at pre-IND meetings. *See* S. Chartier Oct. 11, 2019 Tr. at 114:18-21. Such regulatory

guidance could reasonably lead Reynolds to believe that PixarBio's hurdles were lowered. Accordingly, there is insufficient evidence for the jury to find that these statements were material misrepresentations.

> ### ii. *The government failed to introduce sufficient evidence to establish that Reynolds lied about the funds that PixarBio anticipated receiving in its August 2016 Offering.*

The government also failed to prove that Reynolds lied in PixarBio press releases about the funds that PixarBio *anticipated* receiving in its August 2016 private offering. The Superseding Indictment sets forth the following allegations:

- "On or about August 22, 2016, REYNOLDS caused PixarBio to issue a press release announcing that a private offering that was underway at the time was 'oversubscribed,' and that the maximum offering amount would be increased from $20 million to $30 million." Superseding Indictment at ¶ 17; Ex. 6.

- "On or about October 20, 2016, REYNOLDS caused PixarBio to issue a press release announcing that the maximum offering amount would be increased from $30 million to $40 million. Once again, as REYNOLDS knew, the offering had not raised even $10 million." Superseding Indictment at ¶ 18; Ex. 7.

These allegations fundamentally mischaracterize both press releases and underscore the government's fast and loose approach to this case. Contrary to the government's assertions in the Superseding Indictment and at trial, Reynolds and PixarBio did not claim in these press releases that the company *already had raised* $20 million and later $30 million. Instead, both press releases announced what PixarBio *anticipated* raising. This distinction in language is critical.

In fact, the Superseding Indictment actually misquotes the August 22, 2016 press release. Nowhere in the actual press release did PixarBio announce that it was "oversubscribed" - indicating that it already had secured $20 million in funding. *See* Ex. 6. Instead, the press release announced that it "*expect[ed] to close* the oversubscription up to $30 million." *Id*. (emphasis added.) Likewise, the October 20, 2016 press release made clear that the company had not yet received a final count on funds raised and was still accepting investments because it extended the

closing "in order to allow for investor diligence." Ex. 7 at 1. Moreover, this second press release included clear, express language cautioning that the press release included forward-looking statements "based upon the current beliefs and expectations of PixarBio management and are subject to significant risks and uncertainties." *Id*. at 2. This forward-looking language about what PixarBio *anticipated* raising is consistent with the evidence presented at trial that Reynolds had a good faith belief that the company would raise over $30 million. Indeed, even the government's own cooperator, Stromsland, admitted during his testimony that the company received commitments from brokers of up to $30 million. *See* Stromsland Oct. 9, 2019 Tr. at 39:13-15 ("I think Craig Pierson and there's another gentleman who described, yes, they were going to raise -- you know, help us raise 20 to $30 million.").

> iii. *The government failed to introduce sufficient evidence showing that Reynolds misrepresented information regarding his educational background.*

The government likewise failed to establish that Reynolds misrepresented his educational background. The government merely elicited testimony from two witnesses that they did not recall Reynolds ever stating that he held a PhD. This is the extent of the government's "evidence" to support this allegation. It also failed to put up any witnesses with actual knowledge of Reynolds' education credentials. The government essentially is seeking to establish this allegation by "piling inference upon inference." *DeLutis*, 722 F.2d at 907. Accordingly, the government has not provided sufficient evidence – or any credible evidence – that Reynolds made any misrepresentations regarding his educational background.

> iv. *The government failed to introduce sufficient evidence showing that Reynolds misrepresented information regarding his paralysis.*

The government also failed to present sufficient evidence that Reynolds made material misrepresentations regarding his paralysis. Tellingly, the government did not introduce any of

Reynolds' medical records or call as witnesses any doctors that actually treated Reynolds and had first-hand knowledge of his extensive spinal cord injury at the time of the injury. Instead, it sought to support this allegation by eliciting questionable testimony from a few of Reynolds' coworkers, his friend, and his medical malpractice attorney concerning their perceptions of his health over a decade after his spinal cord injury. Joseph Messa, Reynolds' medical malpractice attorney for the surgery that caused Reynolds' significant spinal cord injury, testified that he did not specify Reynolds was paralyzed in a legal document. Such evidence hardly proves that Reynolds lied about his spinal cord injury. Moreover, these witnesses also acknowledged that Reynolds continued to have significant mobility issues when they met him well over a decade after his injury. For example, Herod stated that Reynolds could not bend over and Messa testified that Reynolds had a back brace and spent large portions of his day in bed. Although paralysis is not a legally defined or precise term, courts within the First Circuit have defined paralysis as a "loss or impairment of motor function in part due to lesion of the neural or muscular mechanism." *Rivera v. Centro Medico Del Turabo, Inc.*, No. 15-1538 (GAG), 2017 U.S. Dist. LEXIS 151189, *15-16 (D. P. R. Sept. 18, 2017).[3] Notably, the government's witnesses actually described Reynolds' condition in terms that are consistent with this definition. And they certainly did not establish that Reynolds materially misstated his spinal cord injury.

During its case in chief, the defense introduced Reynolds' medical records from the 1990s documenting the scope and severity of his spinal cord injury. *See* Ex. 407 at 14 ("He has been practically immobilized by back pain."); *id*. at 17 ("Still spends most of his day in bed due to pain.

---

[3]     As noted in Reynolds' Third Motion *in Limine* to Take Judicial Notice of the Definition of Paralysis filed on October 21, 2019, Dkt. No. 211, the Cleveland Clinic, a non-profit academic medical center that is a leader in research, education and health information, defines paralysis to include *partial* paralysis.

Usually 18-20 hours a day.”); *id*. at 23 (“This has resulted in very depressed mood since & feels he’s doomed to spend the rest of his life in bed.”). Because the government failed to introduce sufficient evidence demonstrating that Reynolds lied about his spinal cord injury, the Court should issue a judgment of acquittal. Alternatively, and in light of the defense’s compelling evidence revealing the severity of Reynolds’ spinal cord injury, the Court should grant Reynolds a new trial.

        b.    <u>The government failed to present sufficient evidence to allow a jury to conclude beyond a reasonable doubt that Reynolds engaged in market manipulation.</u>

In the Superseding Indictment, the government alleges that Herod and Stromsland, “while in close contact with REYNOLDS, and at times acting at the direction of REYNOLDS,” engaged in manipulative trading. Superseding Indictment ¶ 28. It described this manipulative trading as matched trading, marking the close, and “orders to buy at a price much higher than the price of the preceding market transaction.” *Id*. ¶ 29. Notably, and as a threshold matter, the government deleted these specific manipulation allegations after its own witnesses, including Herod and John McCann, undermined its manipulation theory by testifying that: (1) Herod in fact made several purchases that actually decreased the price of PixarBio stock; and (2) Reynolds had no knowledge that his co-defendants engaged in matched trading, marking the close, or buying shares at a higher price than the previous transaction. Similar to the government’s amendments to its material misrepresentation allegations, these deletions constitute a material variance from the theory alleged in the Superseding Indictment and warrant reversal. *See, e.g.*, *Cianci*, 378 F.3d at 93.

In criminal securities fraud cases, the government must prove that the defendant “willfully” violated Section 10(b); “that is, that the defendant acted with ‘culpable intent.’” *United States v. Parigian*, 824 F.3d 5, 10 (1st Cir. 2016) (citations omitted); *see also United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005) (defining willfulness “as a realization on the defendant’s part that he

was doing a wrongful act under the securities laws" and that such act "involved a significant risk of effecting the violation that . . . occurred" (internal quotations and citations omitted)).

The "gravamen" of manipulation is "deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *SEC v. Masri*, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007) (quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)). "Broad as the concept of 'deception' may be, it irreducibly entails some act that gives the victim a false impression." *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008). The "market is not misled when a transaction's terms are fully disclosed." *Finn v. Barney*, 471 F. App'x 30, 33 (2d Cir. 2012). And "[i]n identifying activity that is outside the natural interplay of supply and demand, courts generally ask whether the transaction sends a false pricing signal to the market." *ATSI Communs., Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 100 (2d Cir. 2007). If consumers receive exactly what they anticipated, the purported conduct is neither deceptive nor fraudulent and, as a result, is not within the ambit of Section 10(b) and Rule 10b-5. *Id.* (emphasizing that open market transactions are not actionable as market manipulation without "something more to create a false impression of how market participants value a security").

This case law makes clear that the government woefully failed to introduce sufficient evidence that would allow a jury to conclude beyond a reasonable doubt that Reynolds willfully engaged in market manipulation. As a threshold matter, Stromsland's trading activity was not unlawful.  His testimony and trading records establish that he bought small amounts of stock in his own name and own account, that represented a tiny portion of the overall volume, at the price the market was willing to bear by purchasing PixarBio shares at the ask price. As a result, he sent no false signal to the market and his trades were not manipulative as a matter of law.

With respect to Herod's trading, he repeatedly testified that Reynolds did not even know – much less direct him – to engage in the manipulative trading described in the Superseding Indictment. Herod admitted in his testimony that Reynolds never directed him to buy PixarBio shares, nor that Reynolds instructed Herod to buy such shares at a specific price, time, and size. Instead, Herod testified that he *assumed* that Reynolds wanted him to purchase stock and that Herod ultimately purchased PixarBio shares *based on this assumption*. He also testified that he never informed Reynolds of the details of his stock purchases. This testimony makes clear that Reynolds lacked the willful intent required by law for criminal liability to attach. As a result, the government failed to show at trial that Reynolds engaged in market manipulation, and the Court should grant this Motion with respect to the government's market manipulation allegations.

> **2.      The Government Has Failed to Introduce Sufficient Evidence to Sustain Convictions on Counts Two, Three, and Four.**

The government likewise failed to introduce sufficient evidence to prove that Reynolds obstructed an SEC proceeding. In its Superseding Indictment, the government alleges that Reynolds: (1) made material misstatements to the SEC; and (2) "instructed" or "directed" Stromsland and Herod to make material misstatements to the SEC. Superseding Indictment ¶¶ 50-61.

To prove Reynolds guilty of § 1505, the government must establish three elements beyond a reasonable doubt: (1) that on or about the dates set forth in the Superseding Indictment, a proceeding was pending before an agency of the United States; (2) that Reynolds knew that a proceeding was pending before an agency of the United States, specifically the SEC; and (3) that Reynolds *corruptly* endeavored to influence, obstruct or impede the due and proper administration of the law under which the proceeding was being conducted. *See United States v. Quattrone*, 441 F.3d 153, 176-77 (2d Cir. 2006). "'Corruptly' in the context of § 1505 means 'knowingly and

dishonestly, with the specific intent to subvert or undermine the due administration of justice.'" *United States v. Kay*, 513 F.3d 432, 454 (5th Cir. 2007). By contrast, under 18 U.S.C. § 1001, "[t]he requirement that the false representation be made 'knowingly and willfully' is satisfied if the defendant acts deliberately and with the knowledge that the representation is false." *United States v. Guzman*, 781 F.2d 428, 431 (5th Cir. 1986). Accordingly, the generalized *mens rea* required to violate § 1001 is not sufficient to prove the more specific *mens rea* required to violate § 1505. *See United States v. Kim*, 95 F. App'x 857, 862 (9th Cir. 2004).

Moreover, § 1505 requires a "nexus," or a "relationship in time, causation, or logic," between "the defendant's conduct and [the] administrative proceeding." *Marinello v. United States*, 138 S. Ct. 1101, 1109 (2017) (quoting and comparing *United States v. Aguilar*, 515 U.S. 593, 599 (1995), which concerned § 1503). Absent direct obstruction, a defendant can violate the statute only by "endeavoring" to obstruct, which requires "a purpose to obstruct and some step in that direction." *United States v. Brady*, 168 F.3d 574, 578 (1st Cir. 1999) (discussing § 1503). "[N]either obstruction nor an endeavor to obstruct violates the statute unless there is a 'corrupt'"— that is, "improper"—"purpose." *Id.*

With respect to the alleged misstatements to the SEC made by Reynolds, Stromsland, and Herod, the government did not introduce any evidence to establish that these purported misstatements were material because it called no SEC witnesses that were actually involved in the investigation. The government similarly failed to introduce any evidence describing the SEC's investigation. As a result, the government essentially asked the jury to infer what the SEC employees investigating Reynolds would have found to be material misstatements. Without these critical facts, the jury had no basis to conclude that Reynolds obstructed the SEC's investigation or attempted to obstruct it.

Nor did the government establish that Reynolds is guilty of obstruction with respect to Stromsland's or Herod's testimony. Neither Stromsland nor Herod testified that Reynolds actually instructed them to lie to the SEC. Instead, they testified that they *assumed* that Reynolds wanted them to testify falsely based on his discussion with each about Reynolds' own testimony. This falls far short of satisfying the high evidentiary bar to sufficiently prove that Reynolds possessed the corrupt intent required by § 1505 to be guilty of obstruction. As a result, the Court should grant this Motion with respect to the three obstruction of justice charges against Reynolds.

### B.  The Government's *Giglio* Violation Constitutes Grounds for a New Trial.

In the alternative, this Court should grant a new trial because the government's failure to investigate the insider trading allegation against Herod amounted to a *Giglio* violation that significantly prejudiced Reynolds. The government turned a blind eye to a credible allegation it received about one of its cooperators. The fact that the government included the allegation in a production to Reynolds – without any explanation or even mention of the allegation and along with numerous other documents – does not make the government's conduct any less outrageous. As described below, this utter failure to investigate the allegation significantly prejudiced Reynolds and warrants a mistrial.

"Suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). This kind of due process violation constitutes grounds for a new trial. *United States v. Brimage*, No. 95-10046, 1996 U.S. Dist. LEXIS 11683, at *10-11 (D. Mass. July 15, 1996) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)). A *Brady* violation occurs when (1) the evidence is favorable to the defense, either because it is exculpatory or impeaching; (2) the evidence has been suppressed by

the government, either willfully or inadvertently; and (3) prejudice has ensued. *United States v. Turner*, No. 99-10098, 2005 U.S. Dist. LEXIS 3262, at *19 (D. Mass. Mar. 3, 2005) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). "Indeed, in Massachusetts, a new trial based on non-disclosure of impeachment evidence will be warranted, if 'the undisclosed evidence is more credible than any other evidence on the same factual issue and bears directly on a crucial issue before the jury, such as the credibility of an important prosecution witness.'" *Norton v. Spencer*, 253 F. Supp. 2d 65, 74 (D. Mass. 2003) (quoting *Commonwealth v. Tucceri*, 589 N.E.2d 1216, 1224 (Mass. 1992)).

The First Circuit has made clear that "an Assistant United States Attorney using a witness with an impeachable past has a constitutionally derived duty to search for and produce impeachment information requested regarding the witness," and this duty is not discharged until "all those in the government in a position to know of such information have been canvassed." *United States v. Osorio*, 929 F.2d 753, 761-62 (1st Cir. 1991). "The duty to disclose extends to evidence 'reasonably available' to the prosecutor." *Brimage*, 1996 U.S. Dist. LEXIS 11683, at *14 (quoting *United States v. Stuart*, 923 F.2d 607, 612 (8th Cir. 1991)).

If the government has withheld evidence in violation of its duties under *Brady*, "'a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal.'" *Brimage*, 1996 U.S. Dist. LEXIS 11683, at *15 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). Rather, "favorable evidence is material and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles*, 514 U.S. at 433-34 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "[A] defendant 'need not demonstrate that after discounting

the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict,' but rather whether in the overall context of the trial, 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Turner*, 2005 U.S. Dist. LEXIS 3262, at *21 (quoting *Kyles*, 514 U.S. at 434-35).

On July 3, 2019, the FBI received a credible allegation that Herod engaged in insider trading in the summer of 2013 – prior to the conduct alleged in the Superseding Indictment. Specifically, the wife of David Kazis, a friend of Herod, notified the FBI that: "[w]hen Reynolds was fired and before it was publicly known, Jay Herod told David Kazis to sell his stock at InVivo. As a result, David made a lot of money. Herod divulged inside information to Mr. Kazis about InVivo." The government produced this allegation to the government on July 26, 2019 but did not produce or disclose any other information about this allegation to the defense. At trial, Reynolds' counsel questioned Herod about this allegation and the government strenuously objected to this line of questioning. Initially, having not been previously informed by the government about the allegation, the Court sustained the government's objection. *See* Herod Oct. 17, 2019 Tr. at 118:4-120:4. After trial convened for the day, the government admitted under questioning that it never asked Herod about this allegation despite conducting *three more interviews of him* after receiving the tip. In light of this shockingly belated disclosure by the government – one that it made only after Reynolds' counsel raised his concerns with this Court – the Court ordered Herod's deposition for later that day. In this deposition, Herod admitted that he engaged in insider trading with Kazis in the summer of 2013.

During the next day of trial, Reynolds' counsel concluded his cross-examination of Herod – the majority of which he conducted the prior day – and was permitted to question Herod about the insider trading. Herod testified that Reynolds vented to him about his struggles at InVivo and

his concern that he would be fired that summer. Herod subsequently revealed this information to Kazis, knowing that Kazis held InVivo shares. Kazis, in turn, used this insider information to sell his InVivo shares and avoid significant losses. *See* Herod Oct. 18, 2019 Tr. at 3:14-4:22. Herod testified that he never told Reynolds about this insider trading. *Id.* at 19:19-22. Herod also testified that the government never questioned him about his insider trading. *Id.* at 4:23-5:5.

The government's failure to investigate this insider trading allegation – which Herod later admitted to be true – constitutes a constitutional violation that significantly prejudiced Reynolds' defense in a variety of ways. Had the government investigated the allegation when it received it in July 2019, the government would have learned that Herod committed insider trading in the summer of 2013. The fact that Herod committed another felony unrelated to the alleged scheme at trial further undermines – and essentially destroys – his credibility. There is a reasonable probability that, had the government investigated this allegation consistent with its constitutional obligations, the government would have been forced to alter its strategy. Specifically, the government would have had to decide whether to call Herod as a witness and whether to have Herod plead guilty to this additional crime. Given this, there is a significant probability that a jury would not have convicted Reynolds.

If the government chose to call Herod, it would have faced a near-impossible battle convincing the jury to believe anything that he said on the stand. And if it chose *not* to call him, it would have been forced to rely solely on the testimony of Stromsland who, as the trial record makes clear, repeatedly lied on the stand. *See, e.g.*, Stromsland Oct. 10, 2019 Tr. at 90:15-16 ("My intention was not to call [Reynolds] from my work phone because I didn't want to leave a trail on my work phone."); *id.* at 120:15-25 (Claiming that he did not recall telling the government his trades were wrong "in hindsight" and that he "knew what [he] was doing was wrong" at the time

he executed trades.). Two cooperating co-defendants pointing the finger at Reynolds is significantly more compelling than only one, let alone one as compromised as Stromsland.

The defense likewise would have significantly revised its strategy. The crux of the government's market manipulation allegation against Reynolds was that he acted as a puppet master and pressured his otherwise law-abiding co-defendants to engage in manipulation. The government did not allege that Reynolds actually engaged in manipulative trading himself.  Indeed, he did not engage in *any* PixarBio trading. Specifically, the defense would have pointed to the fact that Herod had previously engaged in criminal securities fraud *without any pressure from (or even to the knowledge of) Reynolds*. This would have compellingly undermined the government's allegation that Reynolds convinced Herod to commit a crime he otherwise would not have committed. It also would have buttressed Reynolds' argument at trial that Reynolds had no knowledge of Herod's PixarBio trading. Moreover, the majority of defense counsel's cross-examination of Herod transpired *before* Herod admitted to the insider trading in his deposition. If Herod's prior securities fraud had been investigated and disclosed to the defense before his cross-examination began, Reynolds' counsel would have focused on this prior conduct from the outset – and in significant detail – to frame Herod's subsequent trading of PixarBio shares. The government's utter and shocking failure to uphold its constitutional duties effected a miscarriage of justice and warrants a new trial.

## IV.    CONCLUSION

For the foregoing reasons, Reynolds respectfully requests that the Court grant his Renewed Motion for a Judgment of Acquittal Pursuant to Federal Rule of Criminal Procedure 29 as to all Counts charged in the Superseding Indictment *or, in the alternative,* grant his Motion for a New Trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

Dated:  November 12, 2019

Respectfully submitted,

*/s/ David L. Axelrod*
David L. Axelrod (admitted *pro hac vice*)
Mary K. Treanor (admitted *pro hac vice*)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103-7599
T: 215.665.8500
axelrodd@ballardspahr.com
treanorm@ballardspahr.com

*Attorneys for Defendant Francis M. Reynolds*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 12, 2019, a true copy of the above document was served via electronic means using the Court's Electronic Case Filing (ECF) system upon all registered ECF users.

<u>*/s/ Mary K. Treanor*</u>
Mary K. Treanor