UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>FRANCIS M. REYNOLDS,<br><br>     Defendant | No. 18-CR-10154-DPW |

GOVERNMENT'S CORRECTED SENTENCING MEMORANDUM
LEAVE TO FILE GRANTED ON FEBRUARY 13, 2020

The United States respectfully submits this memorandum in support of its sentencing recommendation for the Defendant Francis M. Reynolds ("Reynolds") of incarceration for ten years, supervised release for three years, a fine within the Sentencing Guidelines range, a special assessment of $400, and restitution to the victims in the amount of $10,278,988. Reynolds' serious crimes, his history and characteristics, the harm to the victims and the securities markets, and the need for specific and general deterrence all weigh in favor of such a serious sentence.

I.     STATEMENT OF OFFENSE

On October 28, 2019, after a three-week trial, a jury convicted Reynolds on count one of securities fraud pursuant to a special verdict form whereby the jury found that Reynolds had committed securities fraud both by (1) making false and misleading claims and (2) market manipulation. Reynolds was convicted on count two for obstructing the SEC proceeding by testifying falsely before the SEC on January 26, 2017, September 19, 2017, and September 28, 2017, and by providing and causing PixarBio to provide the Back-Dated Agreement (as defined in the indictment) to the SEC. Reynolds was also convicted on count three for inducing co-defendant Kenneth Stromsland to testify falsely before the SEC, and on count four for causing co-defendant

M. Jay Herod to testify falsely before the SEC and to sign and provide to the SEC the Back-Dated
Agreement.

II.     GOVERNMENT'S POSITION ON CALCULATION OF THE  SENTENCING
        GUIDELINES

   A.   Calculation of Loss under USSG § 2B1.1

        1.   *Actual Loss Is at Least the $10.3 Million Lost by the Private Sale Investors.*

   The loss under USSG § 2B1.1 is at least the approximately $10.3 million invested by third-
party investors in the PixarBio private securities offerings induced by Reynolds' fraudulent claims.
*See* Att. A (list of private sale shareholders – excluding the defendants and their immediate family
members – extracted from PixarBio records with amounts invested totaling $10,278,988, provided
to Probation in native format).   As explained in the Affidavit of John McCann, Att. B, these
unregistered shares are worthless.   Thus, the loss is least this amount of the private sale investments
induced by Reynolds' fraud.[1]

        (a)   The Private Sale Investors' Purchases Were Induced by Fraud.

   The 195 private sale victims all purchased their shares during or after December 2015,
when Reynolds began circulating false statements to potential investors to induce investments in
PixarBio.   *See* Atts. A and D-G (Trial Exs. 4-5).   As demonstrated at trial, the materials circulated
to potential investors included false statements about Reynolds' own track record, personal history,
and the potential and prospects for PixarBio's drug.   They included false claims that the drug
would replace morphine and end opioid addiction as well as about the timeline for FDA approval
of the drug.   They also included false claims about the status of PixarBio's financing.   As witnesses

---

[1] The United States has not calculated an additional loss amount from the publicly traded
stock portion of the securities fraud scheme.   Not only are the losses difficult to calculate from this
part of the scheme, but they would likely not change the guideline range in any event.

testified at trial, these false statements, made in writing and in oral presentations, continued throughout Reynolds' promotion of these private sales. *See, e.g.*, Atts. D, G, H-M (Trial Exs. 4-8, 43, 69, 70); Att. S (Stromsland at 16-30).  Witnesses also testified at trial about the significance and materiality of Reynolds' false claims.  For example, Robert Abrams, who invested himself and was on the committee at Newbridge Securities that approved the investment for Newbridge's clients, testified about these false representations and that they were significant.  *See* Att. N (Abrams at 2-3, 6-15).[2]

In addition, victim impact statements describe the false statements as inducing their investments.  *See, e.g.*, Att. O (Victim Impact Statement ("VIS") 5778650) (describing fraudulent statements that induced investment and noting that $200,000 worth of shares are now "worthless"); Att. P (VIS 5778321) (victim who invested $30,000 noting "everything I was told was not only a lie, but an outright fraud"); Att. W (VIS 5778325) ("I was made to believe that my $1,000 was going towards a business to help with the opioid epidemic and to someone that made me believe they had already cured their own paralysis . . . my investment was made under statements about the company that ended up being false . . . Information about clinical trials and how far along the company was timeline wise made the company seem more inviting to investment when these things were also false information.").

---

[2] *See also* Att. F (Tilley at 30-32) (agreeing that he and others at PixarBio were frustrated that Reynolds made statements in press releases that were not true, including intentional misrepresentations about PixarBio's  funding, noting, "we felt like we were misled"); Att. Q (Lovett at 13-14) (stating that the amount of money PixarBio raised was directly relevant to the company's ability to continue developing its drug); Att. R (Chartier at 34-35) (on the significance of fund raising in 2016); Att. S (Stromsland at 47) (on the significance of lack of funding.); *id.* at 28 (on why Reynolds' medical history was significant to investors).

(b) <u>Loss Is the Total Amount of the Investments Induced by Fraud.</u>

"The guidelines make it clear that the gross amount of victims' funds lost by reason of a defendant's course of criminal conduct can be an appropriate measure of the amount of loss for sentencing purposes." *United States v. Tardiff*, 969 F.2d 1283, 1288 (1st Cir. 1992). In *Tardiff*, the defendant defrauded his investors by getting them to invest in an investment pool through which they ultimately lost all of their money. *Id.* at 1285-88. The First Circuit upheld the determination of loss based upon the gross loss of the investors' funds, even though the defendant had an actual business with actual investments. *Id. See also United States v. Ihenacho*, 716 F.3d 266, 278 (1st Cir. 2013) ("[L]oss should be calculated using the entire price paid for the product, unreduced by any offsetting value," if "the product misrepresented by the defendant is worthless.") (citations omitted). Where, as here, an investment is induced by fraud that goes to the heart of the investment, the loss is the total amount of the lost investment. As the Sixth Circuit in *United States v. Jackson*, 662 F. App'x 416 (6th Cir. 2016), explained:

> The testimony presented at trial indicated that Jackson began making fraudulent misrepresentations very near the time he began soliciting investments . . . Upon finding that the fraud permeated the entire enterprise from its inception, it was within the district court's discretion to find that the amount of loss included every amount that was invested into the enterprise.

*Id.* at 426-27 (citations omitted). *See also United States v. Newton*, 559 F. App'x 902, 914 (11th Cir. 2014) (upholding loss calculation where "the District Court found that the Pension Plan would not have bought the stock at all in the absence of the fraud, and found that, in light of the fraud, the Pension Fund held stock that was essentially worthless"); *United States v. Allmendinger*, 706 F.3d 330, 341-43 (4th Cir. 2013*)* (holding, in wire and securities fraud case, that loss was amount of investments induced by fraud as to the success and safety of the defendant's business, awarding "total amount lost by investors less amount recovered by the date of sentencing"); *United States v.*

4

*Olis*, 429 F.3d 540, 546 (5th Cir. 2005) ("In cases where defendants promoted worthless stock in worthless companies, measuring the loss as the entire amount raised by the schemes is neither surprising nor complex, and is fully consistent with civil loss.").

The First Circuit has made clear that the calculation of loss need only be based upon a reasonable estimate of the financial harm to the victims resulting from the criminal conduct. This need not be an individualized determination as to each victim or an exact calculation. It can even be based upon an average loss and an approximate number of victims where, unlike here, the exact amount of loss to each victim is not known. As the Court in *United States v. Curran*, 525 F.3d 74 (1st Cir. 2008), explained:

> Determination of actual loss need not be precise; [t]he court need only make a reasonable estimate of the range of loss, given the available information. A court may base a loss estimate on factors including [t]he approximate number of victims multiplied by the average loss to each victim . . . T]he district court may rely on the [Presentence Report], affidavits, documentary exhibits, and submissions of counsel.

*Id.* at 78-79 (internal quotations and citations omitted). The Court in *Curran* upheld using the total amount of payments for defendants' fraudulent health services as losses and found no need for more individualized evidence even where 56 former clients submitted letters through defense counsel expressing satisfaction with the treatments. *Id.*

Here, the amount of the private sale investments is known from PixarBio's own records of its shareholders and their investments. Att. A. As the First Circuit has noted, "[t]he guideline application notes instruct that in cases involving pledged collateral, 'the amount the victim has recovered *at the time of sentencing* from disposition of the collateral, or . . . the fair market value of the collateral *at the time of sentencing*' should be credited against the loss." *United States v. McCoy*, 508 F.3d 74, 79 (1st Cir. 2007) (emphasis added). But where such value is zero, there is no credit against loss. *See United States v. Donahue*, 726 F. App'x 333, 354-58 (6th Cir. 2018)

(upholding district court's conclusion that there was no evidence that the shares still held by the investors had any value at the time of sentencing and therefore refusing to give any credit against loss under Application Note 2(E)(ii) [now Application Note 3(E)(ii)]).

Here, however, the private shares held by the 195 private sale victims were never registered. Thus, according to their terms, the shares could not be sold or traded.[3] The First Circuit recognized in *United States v. Prange*, 771 F.3d 17 (1st Cir. 2014), that such untradeable shares have even less value than a company's publicly tradeable shares. *Id.* at 36-37 ("Of course, restricted shares may be less valuable than common shares because they are not freely transferable."). Reynolds points to the price of the shares prior to the SEC trading suspension as evidence of their value but that is a price that was propped up by Reynolds' fraud – both his false statements and the manipulative trading. The actual value, if any, is the value of the shares once the relevant information – regarding the company and its product – was fully disclosed.

In this case, even the publicly held shares are now worth $0.00, according to publicly available stock market price reporting. See Att. B. In fact, the price of PixarBio publicly traded stock, albeit very thinly traded, dropped to less than 25 cents per share in May 2017, in the months following the SEC's trading suspension, and then to around 6 cents per share after the criminal charges were filed in April 2018. Att. X (PixarBio OTC Stock Price Chart). The share price has been at $0.00 for almost a year. *Id.* The approximately 13 million unregistered shares held by the private sale victims (*see* Att. U), which cannot be sold, and have no realistic prospects to be

---

[3] *See* Att. C (Phelan at 38-39) (explaining that the shares were never registered and that the SEC sent objections to the S-1 Registration Statement submitted by PixarBio); Att. D (Trial Ex. 5 at 12) (subscription agreement reflecting that the subscriber cannot "offer for sale, sell, or otherwise transfer the Shares without registration under the Securities Act"). *See also* Att. E (VIS 5778657) (explaining that early investors were not able to sell and have seemingly lost it all); Att. F (Tilley at 56) (noting that he understands that PixarBio stock options are worth nothing).

tradeable in the future, can certainly be found to be worthless based upon all of these circumstances.

2. _Intended Loss Is at Least the $10.3 Million in Private Sale Investments._

The amount of intended loss from Reynolds' fraud is also at least the approximately $10.3 million in private sale investments.  The Guidelines define "loss" as "the greater of actual or intended loss."  USSG § 2B1.1, Application Note 3(A).  The First Circuit has made clear that the focus with intended loss is not whether the defendant set out planning to lose money but whether he put the victims at the risk of those losses, that is "the total degree of loss that the defendant could have reasonably expected to occur."  _United States v. Appolon_, 695 F.3d 44, 67 (1st Cir. 2012) (citing _United States v. Bonanno,_ 146 F.3d 502, 509-10 (7th Cir. 1998) ("[T]he relevant inquiry is ... 'How many dollars did the culprits' scheme put at risk?'")).  _See also United States v. Tartareanu_, 884 F.3d 741, 745 (7th Cir. 2018) ("[T]he amount of the intended loss, for purposes of sentencing, is the amount that the defendant placed at risk by misappropriating money or other property"); _United States v. Smith_, 46 F. App'x 225, *5 (5th Cir. 2002) ("[I]n determining intended loss, the court should consider the amount the defendant puts at risk.").  Whatever Reynolds hopes, the loss of the entire investment because the product and the company were not what he claimed was a reasonably foreseeable result and risk to which he exposed the investors when he induced their investments by fraud that went to the heart and viability of the investment.  Accordingly, this Court can find intended loss based upon the $10.3 million that Reynolds raised from investors and deliberately put at risk in his scheme.

Thus, whether on an actual loss or intended loss theory, the loss under USSG § 2B1.1 is at least the losses to the private sale victims of $10,278,988.  Under USSG § 2B1.1(b)(1)(K), this

results in an increase of 20 levels because the loss is more than $9,500,000 but not more than $25,000,000.

B.   The Evidence Demonstrates More Than Ten Victims.

The evidence at trial also demonstrated that there were more than ten victims in this case. As described above, there were approximately 195 private sale investors who lost more than $10 million.  *See* Att. A; Att. U (Trial Ex. 117) (PixarBio S-1 Registration Statement).  Moreover, Abrams testified regarding the 40 victims brought in through Newbridge who invested over $2.5 million.  Att. N (Abrams at 14-15); Att. T (Trial Ex. 101).  At least 23 victims have already submitted victim impact statements.  A two-level enhancement for more than ten victims pursuant to USSG § 2B1.1(b)(2) is therefore appropriate.

C.   Reynolds Used Mass Marketing to Disseminate His False Statements.

In addition, the evidence demonstrated that Reynolds posted the press releases containing false claims onto Business Wire and the PixarBio website.  *See, e.g.*, Atts. H-I (Trial Exs. 6-7); Att. S (Stromsland at 35-36).  Thus, the crime involved the use of methods of mass marketing, rendering a two-level enhancement pursuant to USSG § 2B1.1(2)(A) appropriate on this alternative basis as well.  *See United States v. Zafar*, 291 F. App'x 425, 428-29 (2d Cir. 2008) (holding that defendant's solicitation of securities sales through the internet "to reach countless persons with materially misleading information about stocks" constituted mass-marketing); *United States v. Kieffer*, 621 F.3d 825, 835 (8th Cir. 2010) (finding mass marketing where defendant's websites advertising his fraudulent scheme were "accessible  to millions of persons worldwide via the Internet," which is equivalent to a "billboard on the information superhighway'") (internal quotations and citations omitted); *United States v. Tibor*, 397 F. App'x 242, 245 (7th Cir. 2010) (holding that use of a single website to solicit victims warrants the mass marketing adjustment).

D.   <u>The Evidence and Jury's Verdict Make Clear That Reynolds Was an Organizer/ Leader.</u>

Reynolds objects to the two-level enhancement found by Probation for organizer and/or leader under USSG § 3B1.1(c).  This objection, however, is contrary to the overwhelming evidence at trial.  It is also contrary to what the jury must have found to reach its verdict.  The jury concluded that Reynolds had carried out securities fraud, *inter alia*, by market manipulation.  The evidence demonstrated that he did not do so by trading himself, but by causing Herod and Stromsland to do so.  It does not matter in what way he caused them to do so – whether with direct commands or a drumbeat-like prodding.  For the jury to have found Reynolds guilty of market manipulation, they had to have found that he caused others to do the manipulation and thus was an organizer and leader of the criminal activity.  Moreover, for the jury to find Reynolds guilty on counts three and four, the jury had to find that he also directed the obstruction by Herod and Stromsland – which is further evidence of the jury's conclusion as to Reynolds' role as the organizer and leader of the criminal activity.

E.   <u>Guideline Calculation</u>

Accordingly, the government calculates the Sentencing Guidelines as follows:

| | |
|---|---|
| Base offense level (§ 2B1.1(a)(1)) | 7 |
| Loss (§ 2B1.1(b)(1)(K)) | +20 |
| More than 10 victims (§ 2B1.1(b)(2)) *(or, alternatively, mass marketing (§2B1.1(2)(A)))* | +2 |
| Securities law violation by officer of public company (§ 2B1.1(b)(19)) | +4 |
| Organizer, leader, manager (§ 3B1.1(c)) | +2 |

| Obstruction (§ 3C1.1) | +2 |
| Total offense level | 37 (210-262 months) |

III.     SECTION 3553(a) FACTORS

The Guidelines "serve as the starting point for the district court's decision and anchor the court's discretion in selecting an appropriate sentence." *United States v. Molina-Martinez*, 136 S. Ct. 1338, 1349 (2016). Once the sentencing court has established the Guidelines sentencing range (including a consideration of any applicable departures), it must then evaluate the sentencing factors set out in 18 U.S.C. § 3553(a). *United States v. Dixon*, 449 F.3d 194, 204 (1st Cir. 2006). The goal is to fashion "a sentence sufficient, but not greater than necessary," for the achievement of the legitimate objectives of sentencing. 18 U.S.C. § 3553(a); *Dixon*, 449 F.3d at 204. A sentencing court may not "presume that a sentence within the applicable Guidelines range is reasonable," but must consider the § 3553(a) factors. *Nelson v. United States*, 555 U.S. 350, 352 (2009). In this case, the United States submits that the Guidelines sentencing range of seventeen to twenty-one years is not consistent with the sentences imposed on defendants who engaged in similar investment and securities fraud schemes and is greater than necessary to meet the goals of sentencing. Accordingly, and considering all of the 3553(a) factors, the United States recommends a serious, but below-Guidelines sentence of imprisonment for ten years.

A.   Nature, Circumstances, and Seriousness of the Offenses

Reynolds' crimes are serious. He was the CEO of a publicly-traded biotech start-up. In that position, he committed securities fraud by making materially false statements to investors and by causing Herod and Stromsland to manipulatively trade the company's stock.

The securities markets and private investment capital are at the core of the vibrant biotech industry that develops new medical treatments. There are plenty of seemingly great but unproven

ideas for new drugs.  The science behind these ideas is complicated and difficult for those outside the company to assess.  For the capital markets to work effectively, and allocate capital to ideas that have a realistic chance of success, investors need to receive and be confident that they are receiving accurate information.  Thus, a flagrant fraud on these markets such as that perpetrated by Reynolds is serious not just for its impact in this case, but due to the potential effect of undermining the effectiveness of, and confidence in, the markets that are needed to develop viable and important new drugs and medical treatments.

Reynolds' crimes are also serious because of the significant impact, both financial and personal, on the many victims.  Reynolds did not just prey on victims' wish to make money.  No, he was a master at playing on the sympathies of those who cared about public health issues and/or believed his inspirational story of inventing a cure for his own paralysis.  He did not hesitate to use the claim that he had been bedridden and unable to walk for seven years to try to gain the trust and motivation of his employees as well as investors' money.  He took advantage of almost anyone he came into contact with to get them to put money into his company – from the notary who notarized documents for him, to the driver who drove him around New York City, to the videographer he hired to produce company videos.  He targeted people who suffered from chronic pain and/or paralysis and dreamed of a cure.  As set forth in the victim impact statements, Reynolds' victims lost money – some a lot of money – which was significant to them.  But they lost more than their money.   Reynolds also betrayed their trust and idealism and their vulnerabilities as people whose lives have been affected by illness.  As one victim explained:

> I cannot sit or stand for long periods of time which is why I am unable to be present in the courtroom.  I am currently on an opioid pain management regimen which has horrible side effects.  This research was going to be my saving grace.  I am not a wealthy person, and the $30,000 I invested was a large portion of my savings due to the fact that I can no longer work.  Not only has this hurt me financially, but mentally as well, as I had high hopes for a non opioid, non-invasive, non-addictive

treatment to chronic pain.  Needless to say, everything I was told was not only a lie, but an outright fraud.

Att. P (VIS 5778321).  Another victim wrote the following:

> I had previously been invested in NVIV, where Mr. Reynolds was involved with due to his claims of being wheel chair bound and having created a method to be able to walk again. .. I received a message from Frank or the company PXRB, stating there was an opportunity to get in on an opportunity that would be life changing.   …. Having close family member with an opioid addiction issue, I was more than elated when I received another "friends and family" opportunity…. [I invested again in October 2017] especially given the talk of things moving fast and the promise of a cure for opioid addiction. … I sincerely believed I was investing in a legitimate opportunity to not only make a life changing investment, but to be involved with a company who would change the way managing pain would be treated. Over the past few years, I've had a grandson developed type one diabetes at the age of 14. I was unable to help as much as I should have been able. . . . I can't describe how, at the age of 68, embarrassed and foolish I feel for being duped like this.   [T]hose feelings will never go away.

Att. E (VIS 5778687).  *See also* Att. W (VIS 5778325) (victim who invested $1,000 stating: "[t]his was a significant amount of money at the time and it has created an emotional toll and has frightened me from investing in a company ever again").

Reynolds' obstruction of the SEC investigation exacerbated his crimes and warrants a more serious sentence than the securities fraud alone.  Reynolds went into the SEC and lied repeatedly under oath, on three separate days, over a nine-month period of time.  Not only did he lie repeatedly, he cursed out the questioners, stormed in and out of the room, and otherwise did his best to disrupt the proceedings and intimidate and misdirect the SEC.  But that was not all.  He also created a false document to try to cover up why Herod had given him $300,000 of the proceeds of his manipulative trading.  Reynolds created the Back-Dated Agreement immediately after his first day of testimony and had his wife and Herod sign in.  He then got Herod to lie about what had happened as well.  The jury's verdict makes clear that they credited what is obvious from the facts – and what both Stromsland and Herod testified to – that Reynolds got both of these "friends" to manipulatively trade and then to obstruct the SEC investigation to, among other things, protect Reynolds.

The SEC serves a vital function in protecting our public and private markets and the investors who participate in them.  There is a significant distinction between those who violate the securities laws but deal honestly with an investigation into the violations and those who do not, and Reynolds' sentence should reflect the seriousness of both his flagrant securities fraud and his blatant and repeated obstruction.

B.  <u>History and Characteristics of the Defendant</u>

Reynolds' history and characteristics demonstrate many years of fraudulent conduct and abusive behavior towards those who tried to stop him.  Reynolds' conduct in connection with PixarBio is not aberrational.  To the contrary, Reynolds engaged in very similar deceptive conduct at his prior company, InVivo Therapeutics ("InVivo").  The government is not arguing that this is relevant conduct under the Sentencing Guidelines.  At sentencing, however, Reynolds' conduct at

InVivo is something the Court can consider in assessing his history and characteristics.  In fact, what happened at InVivo is remarkably similar to what happened at PixarBio.

At InVivo, Reynolds made representations to investors about, among other things, how quickly InVivo would be able to begin clinical trial of its product, the NeuroScaffold, to treat paralysis.  The senior scientist at InVivo, however, knew that Reynolds' timeline was impossible and he ultimately provided that information, over Reynolds' objection, to the InVivo Board of Directors.  *See* Atts. 1-4 (filed under seal).  When the Board resisted Reynolds' repeated and escalating demands for more compensation, he threatened to sue and/or resign from the company, make public statements against the Board and the company, and otherwise cause the company to be "in ruins." *See* Atts. 1-9 (filed under seal).[4]  This history demonstrates Reynolds' real motives to make money for himself and that he did not hesitate to hurt the company and the effort to develop its product for his own financial benefit.

This history also demonstrates that by the time he started PixarBio, Reynolds was well aware of the need to be accurate about the FDA timeline.  However, far from learning from the experience to be more careful, he repeated his fraudulent conduct with a new company.

C.  Need to Promote Respect for the Law and Just Punishment

The securities and obstruction laws are designed to protect the integrity of the nation's securities markets and the process of regulating them.  Failure to sentence Reynolds, who committed securities fraud over a period of years and then fragrantly obstructed the SEC's investigation into his fraud, to a significant term of incarceration would send the wrong message

---

[4] Moreover, once he realized, in or around June 2013, that he was either going to be forced out or resign, Reynolds began selling large amounts of InVivo shares, thereby seeking to trade on the inside information, the same information he also shared with Herod and Herod passed on to Kazis.  *See* Atts. 1, 7-8 (filed under seal).

– the message "that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).  A serious sentence here is important both to "the deterrence of white-collar crime (of central concern to Congress)," and "the minimization of discrepancies between white- and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail." *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (cited and quoted with approval in *United States v. Levinson*, 543 F.3d 190, 197 (3d Cir. 2008) (noting that "probationary sentences for white-collar crime raise concerns of sentencing disparities according to socio-economic class.")).[5]  A significant term of incarceration is required to promote respect for the law and provide just punishment to Reynolds in this case.

D. <u>Need to Afford Adequate Deterrence</u>

Reynolds' continued securities fraud, along with his repeated obstruction of the SEC investigation, render both specific and general deterrence necessary.  Reynolds will no doubt return to trying to promote a fraud at the very first opportunity he has.  Indeed, he continued to seek new investments in PixarBio based on false claims even as the SEC's investigation continued.  Thus, the sentence here will serve the purpose of specific deterrence by keeping Reynolds from engaging in this or other fraud while incarcerated.

---

[5] *See also United States v. Sample*, 901 F.3d 1196, 1198-1201 (10th Cir. 2018) (vacating sentence for white-collar defendant sentenced to probation to allow him to work and repay victims as impermissibly sentencing based on the defendant's income); *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."); *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) ("[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); *United States v. Stall*, 581 F.3d 276, 286 (6th Cir. 2009) ("We do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose.").

General deterrence through the imposition of serious sentences for white collar crimes is an essential means of minimizing the risk of such attractive crimes.  Here in Massachusetts, there are many biotech start-ups raising money to pursue ideas.  The temptation to deceive investors with false claims of certainty, financing, or FDA concurrence is significant – even for executives less prone to persistent false statements than Reynolds.  The sentence here must speak loudly to executives as to the consequences of this type of fraud in order to deter such conduct.  Absent such deterrence, others with the means and opportunity to enrich themselves at the expense of investors might cynically conclude that the potential rewards of such criminal activity outweigh the risks of being caught and punished.  The sentence in this case should send a strong message to would-be cheats that a significant term of imprisonment is a reality for such willful fraud, and a significantly longer term if it is then followed by obstruction.  The sentence should also assure law-abiding participants in the capital markets that they are not foolish for being balanced and honest about the benefits and risks of their proposed investment opportunities.

E.   The Need to Avoid Unwarranted Sentence Disparities among Defendants Guilty of Similar Conduct

The correct calculation of the Guidelines places Reynolds at a level 37, resulting in a Guidelines imprisonment range of 210 to 262 months (17.5 years to 21.8 years).  However, a review of sentences for somewhat similar crimes in this District, and even more broadly, suggests that a sentence in this range would be too disparate from other sentences.  Attached as Att. Y is a chart laying out some of the investment fraud and other similar fraud cases and the sentences imposed.  The range of sentences is significant but sentences above the 10-year range are rare and generally involve even worse conduct.  In consideration of all of the facts and circumstances of Reynolds' crimes, and in light of sentences in roughly comparable cases, the United States submits that a sentence of ten years is sufficient, but not greater than necessary to send the appropriate

message, adequately punish the defendant, and fulfill the goals of sentencing under 18 U.S.C. § 3553(a).

CONCLUSION

Reynolds engaged in years of fraud.  He cheated the investors in his company out of more than $10 million.  He engaged in a campaign of deceit and corrupted others to carry it out.  He has never taken any responsibility for his actions or shown any remorse.  Reynolds' utter disregard for the rule of law, as further demonstrated by his blatant obstruction of the SEC investigation, should be seriously punished.  The government respectfully submits that a sentence of ten years is appropriate.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:     /s/  Sara Miron Bloom
        SARA MIRON BLOOM
        LESLIE WRIGHT
        Assistant United States Attorneys
        John Joseph Moakley United States Courthouse
        1 Courthouse Way, Suite 9200
        Boston, MA 02210
        (617) 748-3265

Dated: February 6, 2020

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Sara Miron Bloom
Sara Miron Bloom
Assistant United States Attorney

Date: February 13, 2020