UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br>    v.<br><br>FRANCIS M. REYNOLDS,<br><br>    Defendant | No. 18-CR-10154-DPW |

GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM

The United States respectfully submits this supplemental memorandum to respond to questions and issues raised in the first day of the sentencing hearing of Defendant Francis M. Reynolds ("Reynolds").

I.    PRIVATE SALE VICTIMS HAD TOTAL LOSSES OF $10.3 MILLION.

The United States submits that the correct amount of actual loss for Guidelines purposes and restitution is at least the total amount of sales to the private investors, which is $10.3 million. Attachment AA (provided under seal) is a list, prepared by the Securities and Exchange Commission ("SEC"), of the private sale investors, based on PixarBio records, along with the dates and amounts of their investments, as confirmed by the SEC through a review of PixarBio's bank records.[1] Specifically, the SEC forensic accountants went through the records for PixarBio's bank accounts and confirmed the amounts of money and dates the amounts were received from each person listed as an investor on PixarBio's private sale investor list, which was produced by PixarBio in response to a subpoena from the SEC. This list does not include investments made by Reynolds, members of his immediate family, Herod, or Stromsland. If the amount invested as set

---

[1] The United States provided a copy of this list to counsel for Reynolds on Friday, February 14.

forth in the PixarBio investor list differed from the amount in the bank records, the SEC used the bank records to determine the investor's total amount invested.

All of the investors on this list invested during the time period of Reynolds' scheme[2] and prior to full disclosure of the relevant facts regarding PixarBio and its product, NeuroRelease (which the Government submits was at the time of filing of the criminal charges).[3] While the list does include so-called "insiders," the evidence at trial was that Reynolds kept his employees in "siloes" and deceived them with lies about himself and his past and about PixarBio's prospects, particularly its financing. He deceived his own board of directors and senior managers at the company with his claims, and the amounts these individuals invested therefore should not be deducted from the loss amount. Accordingly, the United States submits that the actual loss amount, and thus the correct restitution figure, is the entire amount of the private investor losses of over $10.3 million, as set forth in Attachment AA, Spreadsheet 1.

Nonetheless, to address the Court's questions and support alternative bases for the Court to calculate a reasonable estimate of loss in this case, the United States provides the following additional information. The total amount of private sale investments if one does not include any

---

[2] Although the list includes two investments made prior to the issuance of the fraudulent PPM materials in December 2015, these total only $50,000 and thus the total loss even without these amounts is $10.3 million. Att. A, Spreadsheet 1.

[3] Reynolds has argued that anyone who invested after the SEC trading suspension is not a victim of the fraud and that those losses should not be included for loss or restitution. In fact, however, the charged scheme continued until the date of the filing of criminal charges in April 2018. Moreover, the SEC trading suspension did not alert investors to the full nature and extent of Reynolds' fraud. Evidence before this Court, including in the victim impact statements, makes clear that Reynolds continued his fraud even after the SEC trading suspension. Robert Abrams also testified at trial about how Reynolds encouraged the Newbridge brokers to further invest after the suspension. *See* Government's Sentencing Memorandum Att. N (Abrams at 20-23). Thus, victims should include all private sale investors who invested prior to the filing of criminal charges in April 2018, and their investments should be included in the actual loss amount.

investment by an officer or director of PixarBio is $9,827,058 and thus issue this makes no change in the Guideline level.[4] Att AA, Spreadsheet 3. The total amount of private sale investments from December 2015 to the SEC trading suspension in January 2017 is $9,222,867. Att. AA, Spreadsheet 4. The total excluding any investment after January 2017 *and* any investment by an officer or director is $8,929,967. Att. AA, Spreadsheet 5. Thus, the loss is clearly at least above $3.5 million and the loss enhancement at least 18 under USSG § 2B1.1(b)(1)(J).

> II. THE DEFENDANT'S GAIN FROM THE OFFENSE IS AT LEAST GREATER THAN $1.5 MILLION.

Although the Government submits that this Court can and should calculate actual loss and can also conclude that this amount is intended loss, if the Court were to consider gain as an alternative measure of loss, Reynolds' gain from the offense should include the approximately $910,000 in proceeds from Herod's sales of PixarBio stock, of which Herod transferred $500,000 back to PixarBio and $300,000 to Reynolds. *See* Att. BB, Herod Testimony at 36, 45-52. The $910,000 received by Herod and shared with Reynolds is gain from the scheme.

In addition, the gain amount should include the compensation received by Reynolds from PixarBio during 2016 and 2017 – when the source of operating funds for the company was the investments induced by his fraudulent scheme. These amounts, as set forth in Atts. CC and DD (under seal), were as follows:

|   |   |   |   |   |
|---|---|---|---|---|
| 2016: | Gross: | $846,070 | Net After Withholding: | $575,134 |
| 2017: | Gross: | $71,09 | Net After Withholding: | $52,588 |
| TOTAL: |  | $917,167 |  | $597,722 |

---

[4] However, this amount excludes investments made by an individual before he became a director of the company. If this individual's investments are not excluded, the total is higher by $419,000 if all of his investments are included, and by $236,000 if only his investments prior to becoming a director are included. In either event, it does not change the Guidelines range. Att. AA, Spreadsheet 6.

Even using the after-withholding amounts for Reynolds' compensation, the total gain, including the proceeds from Herod's stock sales, therefore, is $1,507,722.

III.   THERE ARE MORE THAN TEN VICTIMS PURSUANT TO USSG § 2B1.1(2)(A)(i).

There are numerous ways the Court can find that there are more than ten victims in this case under USSG § 2B1.1(2)(i). Attached as Exhibit EE (under seal) is a list of 26 victims who filed victim impact statements or claims. These alone are sufficient to establish more than ten victims. Moreover, the following victims provided statements both listing their losses and noting that they relied upon Reynolds' fraudulent statements in choosing to invest in PixarBio:

(1)   VIS 5778650: Victim who invested $200,000 stating that he/she "participated in the PixarBio PPM stock offerings for a company that was a fraud. All of the fundraising, stock trading and company and it' product pipeline was fraudulent. – there was no material product development, no accelerated path to FDA clearance, and the 'oversubscription' announcements on the original PPM were a fraudulent effort to entice more investment. I was a victim of that fraud perpetuated by the leadership of the company. I specifically increased my investment based on the public notice of an oversubscribed PPM." Victim also notes that after she/he raised suspicions of stock manipulation, this victim was "subsequently threatened and intimidated online and verbally" and falsely accused of being an SEC whistleblower. Victim further states that his/her shares are now worthless.

(2)   VIS 5778655: Victim who invested $79,000 stating that the victim invested based on information now in question and that the victim was "misled and lied to."

(3)   VIS 6176704: Victim who invested $10,000 stating that the victim had known Reynolds for thirty years, trusted Reynolds given his apparent success as an entrepreneur, and believed in his "mission to combat opioid crisis with new treatment methods." Victim concludes that Reynolds "used our friendship to defraud me."

(4)   VIS 5778325: Victim who invested $1,000 stating: "I was made to believe that my $1,000 was going towards a business to help with the opioid epidemic and to someone that made me believe they had already cured their own paralysis as well as that my investment was made under statements about the company that ended up being false. … Information about clinical trials and how far along company was timeline wise made company seem more inviting when these things were also false information." Victim also stated: "This was a significant amount of money at the time and it has created an emotional toll and has frightened me from investing in a

company ever again. … I was so misled and it created a financial burden on my life."

(5) VIS 5778338: Victim who invested $30,000, and whose family and friends invested nearly $200,000, stating that Reynolds "claimed to be crippled and 'cured' himself, including in TedX talk where he gets a standing ovation." Victim also states: "Reynolds psychopathic behavior and deeds are incredibly hurtful and he has no idea nor does he really care as it is all about himself." Victim describes Reynolds as the type of persons who "lie, cheat and defraud their way through life." Victim notes that s/he "work[s] incredibly hard to earn money, pay for family and save for retirement, and live[s] a frugal life" and states, "I don't have a lot of money so $30,000 is a fortune to me."

(6) VIS 5778340: Victim who invested $40,000 and another $30,000 from his/her family trust, became an unpaid PixarBio employee, and spoke at Reynolds' sentencing hearing, reported that even after the SEC trading suspension, Reynolds claimed that PixarBio stock would be trading again soon and wanted to submit materials to the FDA as soon as possible even though the product was not developed sufficiently. Victim explained: "Frank didn't care. … Day after day he used us knowing that it was all a house of cards. … Frank has never cared for anyone but himself."

(7) VIS 5778321: Victim who invested $30,000 stating that he/she is not a wealthy person but invested because he/she suffers from chronic pain on a daily basis and Reynolds promised this research was "a breakthrough in chronic pain management." Victim also states that $30,000 was "a large portion of my savings due to the fact that I can no longer work. Not only has this hurt me financially, but mentally as well … Needless to say, everything I was told was not only a lie, but an outright fraud."

(8) VIS 5778687: Victim who invested $34,000 stating that s/he believed PixarBio was "a legitimate opportunity to not only make a life changing investment, but to be involved with a company who would change the way managing pain would be treated," but that his/her money "was deliberately stolen from me and my family." Victim notes that even after the SEC trading suspension, he/she was given a second "opportunity" to invest at 35 cents per share and did so based upon "talk of things moving fast and the promise of a cure for opioid addiction." Victim also notes that he/she initially invested in InVivo due to Reynolds' "claims of being wheel chair bound and having created a method to be able to walk again."

(9) VIS 5778352: Victim who invested $35,000 stating that Reynolds "has lied and cheated in a way harmful to others in every way." Victim also reports that when he/she raised concerns in early January 2017, Reynolds "proceeded on a Friday night to blow up my phone and threatened me with sending the Mafia to take care of me."

    (10)    VIS 5778278: Victim who spoke at sentencing and invested $80,000, equal to his/her yearly earnings, states that s/he believed in the paralysis scaffolding Reynolds claimed to have invented at InVivo and that NeuroRelease would, according to Reynolds, "CURE the post-surgical opioid epidemic." Victim noted that he/she has severe pain from hip surgery.

    (11)    VIS 5778657: Victim who invested $53,000 and was also an unpaid vendor for PixarBio, stating that Reynolds told "stories about how he had cured himself" and offered to let the victim "get in during the friends and family round prior to going public."

In addition, Robert Abrams testified at trial that he himself was a victim of Reynolds' fraud and part of the committee that considered the investment for Newbridge clients. Government's Sentencing Memorandum Att. N (Abrams at 2-3, 6-15). Att. T, Trial Exhibit 101, is the list of 39 investors through Newbridge. The Newbridge victims alone are likewise sufficient to establish more than ten victims.

    IV.    **THE EVIDENCE AT TRIAL AND THE JURY'S VERDICT MAKE CLEAR THAT REYNOLDS WAS THE ORGANIZER AND LEADER OF THE CRIMINAL ACTIVITY.**

The jury's verdict necessarily means that it found that both the manipulative trading by Stromsland, Herod, or both, and the obstruction by both Stromsland and Herod was at the direction of Reynolds. Because the manipulative trading was not done by Reynolds, but by his two friends, it necessarily follows that for the jury to find Reynolds guilty they had to find that Reynolds in some way caused the trading. Moreover, this was no conspiracy of equals. The evidence was overwhelming that Reynolds was not just an organizer or leader of this activity, he was an overwhelmingly dominant person to whom easily influenced men like Stromsland and Herod felt they could not say no. For example, Stromsland testified as follows:

- "I – at the direction of the CEO, I bought shares of the stock of the company to manipulate the price of the shares, the stock price, and then I lied about that to the SEC." Att. S at 5.

- "When you work for Frank, you want to please Frank. Frank – if you're not doing a good job or you're not performing, either you're ignored or yelled at or screamed at or

6

cursed at. And when you do what Frank wants, you get rewarded and you get praise. So of course I wanted to do what Frank wanted. – [Frank] wanted me to make sure that I didn't let the stock get below 10 dollars before the weekend … He said I could buy shares in the company on the open market because I was permitted to." *Id.* at 63-65.

- Explaining that after making his first purchase of PixarBio shares to keep the price of the stock up, Stromsland called Reynolds, told him what happened, and Reynolds said, "Thanks, champ. God bless you" and within the hour, Reynolds awarded Stromsland a $27,500 bonus, which Stromsland understood was in exchange for his manipulative trades on Friday, November 11, 2016. *Id.* at 78-79.

Likewise, Herod testified that the whole idea of having Herod own the free trading shares of PixarBio began with Reynolds because Reynolds wanted the shares in "friendly hands." Herod further testified that he carried out Reynolds' playbook of putting the shares out into the market in 10,000-share blocks at prices increasing by 25 cents. Att. BB, Herod at 15-56. He testified that Reynolds "said to sell the shares and sit on the money. That was the arrangement." *Id*. at 33. He explained that Reynolds treated him like an ATM, checking on the balance of the proceeds from his trading and asking for money when he needed it. *Id.* at 45. Herod also described how he gave $300,000 of the proceeds to Reynolds for legal fees and put another $300,000 of his trading proceeds into PixarBio in January 20017 because Reynolds asked him to, even though he did not have any interest in purchasing more shares at that point. *Id.* at 36, 45-52, 53-54. Herod explained that out of about $910,000 in proceeds from his trading, he transferred about $800,000 to Reynolds, Reynolds' wife or PixarBio – because Reynolds asked him to. *Id*. at 55-56. Herod further testified with respect to his trading that in discussions about Herod trading, Reynolds would often "start a sentence by saying no I can't tell you what to do, but the smart thing to do would be to do this." *Id.* at 24. Herod then was questioned and answered as follows:

> Q: And was he [Reynolds] telling you what to do?
> A: In effect, yes.
> Q: And did you follow his instructions.
> A: I did.
> Q: Why?

7

> A: Because he's the one with all the fancy degrees. I trusted he knew what he was doing and he was giving me good advice.

*Id.* at 24-25. Similarly, Herod was questioned and testified as follows:

> Q: When you had discussions with Mr. Reynolds and then started buying PixarBio shares, was it your desire to buy those shares?
> A: No.
> Q: Why did you do it?
> A: Because I thought he wanted me to do it.
> Q: Why didn't you just say no?
> A: Frank's not an easy man to say no to. … The dynamic in our relationship was that he was very dominating, very hard charging and I was very laid back and reserved.

*Id.* at 34-35, 40.

Thus, the jury's verdict and the overwhelming evidence was that Reynolds was unequivocally masterminding and leading the criminal scheme and getting his friends Stromsland and Herod to help him carry it out.

V.   THE $300,000 HEROD PAID TO REYNOLDS SHOULD BE FORFEITED.

The United States has moved for forfeiture of the $300,000 in trading proceeds that Herod transferred to Reynolds by writing a check made out to Reynolds' wife in her former last name. Counsel for Reynolds argued that the $300,000 should not be forfeited because it went to Reynolds' wife. The evidence is to the contrary. Although the check was made out to Reynolds' wife, the evidence was overwhelming that Herod gave the money to Reynolds for Reynolds to pay the lawyers representing him in his lawsuit against InVivo and that is how Reynolds used it. *See* Att BB, Herod at 36 ("He [Reynolds] asked me to give him $300,000 to pay off some legal fees."), 45 ("He asked for $300,000 to pay some legal fees by the end of the year."), 46-54 (describing how why check was made out in wife's maiden name at Reynolds' request because Reynolds said wife also had a Fidelity account and it would clear faster). Thus, this was clearly Reynolds' proceeds from the offense, received for Reynolds' benefit and used by Reynolds.

8

CONCLUSION

The Government submits that it has correctly calculated the total offense level under the Guidelines as 37. The Court can and should find that a reasonable estimate of the actual loss is the total private sale investments of $10.3 million, as the record makes clear that the current value of the stock – which realistically could never be traded – is zero. The United States also notes that the Court could hold as an alternative basis for its sentence that the intended loss was more than $9,500,000 of victims' funds that Reynolds knowingly put at risk with his fraudulent scheme. In fact, given Reynolds' plans to become a billionaire, and brief claim that he met that goal (*see* Stromsland at 60-62, quoting Trial Ex. 259, text from Reynolds "I've been a billionaire for 12 straight days now, LOL."), it is arguable that his intended loss was even higher. Even using only the gain found by Probation, which the United States submits clearly understates the real losses in this case, the resulting Guidelines range is 108 to 135 months (9 to 11.25 years), which still encompasses the Government's recommended sentence.

Ultimately, however, the Guidelines are only a starting point. The Court can also find that in whatever way it estimates loss in this case, the ultimate sentence is based upon the underlying facts and would not be different even if the loss number were calculated in an alternative manner. Reynolds engaged in years of fraud. He cheated the investors in his company out of more than $10 million. Reynolds engaged in a Machiavellian fraud campaign, taking advantage of his closest friends as well as trusting strangers to carry it out. He took money and more from the many people he defrauded, bullied, and threatened along the way. He left a trail of victims – financially and personally. He has demonstrated that he will continue to commit fraud at every opportunity. He has demonstrated not one iota of acceptance of responsibility for any of his conduct. The government respectfully submits that a sentence of ten years is appropriate.

        Respectfully submitted,

        ANDREW E. LELLING
        United States Attorney

By: */s/ Sara Miron Bloom*
   SARA MIRON BLOOM
   LESLIE WRIGHT
   Assistant United States Attorneys
   John Joseph Moakley United States Courthouse
   1 Courthouse Way, Suite 9200
   Boston, MA 02210
   (617) 748-3265

Dated: February 17, 2020

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

        /s/ *Sara Miron Bloom*
        Sara Miron Bloom
        Assistant United States Attorney

Date: February 17, 2020