1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2

3      - - - - - - - - - - - - - - - - - - x

4      UNITED STATES OF AMERICA,                :

5              Plaintiff,                        :      Criminal Action No.
                                                        1:18-cr-10154-DPW-1
6          v.                                    :

7      FRANCIS M. REYNOLDS also known as         :
       "Frank Reynolds",
8                                                :

                Defendant.
9                                                :

10     - - - - - - - - - - - - - - - - - - x

11

12        BEFORE THE HONORABLE DOUGLAS P. WOODLOCK, DISTRICT JUDGE

13
                               SENTENCING
14

15
                       Thursday, February 13, 2020
16                              2:36 p.m.

17

18

19

20
       John J. Moakley United States Courthouse
21     Courtroom No. 10
       One Courthouse Way
22     Boston, Massachusetts

23
       Rachel M. Lopez, CRR
24     Official Court Reporter
       raeufp@gmail.com
25

```
1                        A P P E A R A N C E S

2

3      On behalf of the Plaintiff:

4          UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
           BY:  SARA MIRON BLOOM AND LESLIE WRIGHT
5          John Joseph Moakley Courthouse
           One Courthouse Way, Suite 9200
6          Boston, Massachusetts  02210
           (617) 748-3971
7          sara.bloom@usdoj.gov
           Leslie.wright@usdoj.gov
8

9      On behalf of the Defendant:

10         BALLARD SPAHR LLP
           BY:  DAVID L. AXELROD AND MARY K. TREANOR
11         1735 Market street
           51st Floor
12         Philadelphia, Pennsylvania  19103
           (212) 864-8346
13         axelrodd@ballardspahr.com
           treanorm@ballardspahr.com
14

15

16

17

18

19

20

21

22

23

24

25
```

1              **P R O C E E D I N G S**

2              (In open court.)

3              THE DEPUTY CLERK:  Criminal trial action number

4    18-10154, United States vs. Francis Reynolds.

5              THE COURT:  Well, I have a number of issues to take

6    up, and I'd like to kind of going to carve through them, if I

7    can.

8              First, I'm going to be denying the motions for

9    judgment of acquittal or in the alternative for a new trial.

10   It's plain to me that a reasonable juror, jury, under the

11   directions that they received from me and the evidence in

12   this case, could fairly have found the defendant guilty of

13   the charges in which he was found guilty.

14             The wrinkles that have been offered seem to me to

15   be not particularly compelling wrinkles, beyond the idea of

16   whether or not there's sufficient evidence.  One aspect of

17   that is some suggestion of variance.  It doesn't apply here.

18   What was involved here was a narrowing of the issues, to some

19   degree at my instance.  But everything for which the

20   defendant was found guilty was fairly comprehended within the

21   indictment.  It was not distorted, not changed.

22             The evidence was similarly calibrated because of

23   the somewhat colorful way in which the defendant chose to

24   present himself, and it became necessary to do some carving

25   of the Government's case.  Otherwise admissible evidence was

1     excluded, or the Government was directed not to pursue it,

2     just simply to avoid the danger of prejudice, self-inflicted,

3     to the defendant himself during the course of the trial.

4              There is a -- kind of a hangnail of suggested

5     discovery abuse.  I'm not sure that it rose to the level of

6     abuse.  It is the disclosure of matters, well before trial,

7     that occurs in a case with lots and lots of paper, in which

8     the defendant had an adequate opportunity to pursue it.  And

9     I gave him additional benefit for that.

10             In short, there's nothing in that aspect of the

11    motion for new trial or for judgment of acquittal that is

12    supportable.  So for all those reasons, I deny that motion.

13             Now, in terms of order, I understand that there are

14    at least two or three persons who are alleged to be victims

15    who wish to speak orally in court.  And I think probably the

16    best thing is to do that at the outset.  The reason that I

17    say that is, number one, we may run a bit longer than this

18    afternoon.  It depends.  Number two, what they have to say is

19    something that may or may not inform my judgment about

20    questions of loss or gain or how we characterize that.

21             So Ms. Bloom, are you familiar with who wishes to

22    speak and under what circumstances?

23             MS. BLOOM:  I believe so, Your Honor.  At this

24    point, I believe there are two victims who wish to speak.

25             THE COURT:  Okay.

1          MS. BLOOM:  Shall I have them come up?

2          THE COURT:  Yes.  And if they feel comfortable,

3    probably the easiest thing is to use the podium over there.

4          And if you can identify yourself, sir, by name.

5          MR. DOHERTY:  My name is Chris Doherty.

6          THE COURT:  Okay.

7          THE VICTIM:  I want to thank the Court for giving

8    me the opportunity to tell my story.  Thank you, Judge, and

9    thank you, Kathleen.

10          I am representing myself, my children, my eleven

11   brothers and sisters, and my deceased parents.  I met Frank

12   Reynolds through my brother, Kevin.  I had developed a home

13   health monitor for chronic disease patients.  I sold the

14   technology and joined a company where we received FDA

15   clearance for the electronic house-call device in 2009.

16   Kevin told me about Frank's paralysis story and how Frank was

17   working to cure paralysis with InVivo Therapeutics, where he

18   was the CEO.

19          We visited him at his apartment one weekend in

20   Medford, where I demonstrated the health monitor for him to

21   use.  I left it for him, but he never did use it much.

22          Over the years I got to know Frank better,

23   witnessing his extreme generosity.  I was invited to see

24   Bruins and Red Sox games and other parties and events where I

25   met his friend, Jay Herod.  In August 2013, Frank had left

InVivo Therapeutics and had just started PixarBio.  It was an exciting time to see the Red Sox win the World Series.  My girlfriend, Dawn, who's here, her parents, my son and daughter went to some of the games in the suites above the field.  My daughter got to get on the jumbotron at one of the games, and her picture is still on the fridge.

Over time, I learned about his plans with a new company.  Frank was very good at showing his success by throwing his money around and paying for everything.  He was uncomfortably generous, and everyone just went with it because it was just the way he was.  He always carried a big wad of bills and would let you know.

When Frank met his wife, Mary, Dawn and I had the opportunity to go out with them for more sporting events, dinners, and concerts.  We were invited to go to New York to celebrate Frank's birthday and attended their extravagant wedding in New York at Central Park.  We visited them at their home and got to know their children, too.

When Mary's daughter received the spinal injury from a trampoline accident, Dawn and I visited her in the hospital and provided whatever support we could to them.  We considered ourselves really good friends.  We cared about them and their family.

When Frank, Jay, and Ken Stromsland created their scheme to raise money and defraud all of us by merging BMP

1    Holdings into PixarBio, we, of course, the two of us were on
2    the friends and family list of investors.  I ended up
3    investing $40,000.  Dawn invested 80,000, which I hold myself
4    responsible for, because I believed in Frank and she believed
5    in me.  As the trustee for my family trust, I invested
6    another $30,000.
7            Around 2015, the healthcare company where I worked
8    acquired a fuel technology patent.  I revised the patent and
9    then created a diesel and gasoline additive called "Dynamo,"
10   as well as a methanol-based fuel that could be used in
11   flex-fuel vehicles.  Jay Herod had a software company, so I
12   met with him and hired him to create a mobile device
13   application to help demonstrate the cost savings of using the
14   Dynamo additives.  I met with Jay a few times at his
15   apartment in Cambridge to discuss the app.  I got to know Jay
16   pretty well, too.
17           He was also friends with my brother, Kevin, and my
18   sister, Eileen.  Jay finished the app, but unfortunately, it
19   wasn't really utilized.  There was a big downturn in the
20   company.  They stopped focusing on healthcare, sold off my
21   technology, mismanaged funding, and then unwilling to pay its
22   employees.  I know this sounds familiar, because I went
23   through the same thing with Frank and PixarBio.
24           After many months without pay, I had no choice but
25   to leave the healthcare company that was founded on my

1    technology.  I sold whatever shares I had to survive, and I

2    hadn't -- had to look for a job for many years.  I found that

3    it was very difficult to get a job that would pay enough to

4    support me.  I had applied for many positions and interviewed

5    with many companies for months.  I ended up filing for

6    unemployment.  I supported myself and my children by selling

7    stock and extending my unemployment.

8              In the spring of 2016, I decided to go back to

9    school to study biotech.  I applied, interviewed, and was

10   accepted to the applied biotechnology program at BU medical

11   school, which started in August.

12             For the second semester, we were required to get a

13   part-time internship.  There was a special biotech incubator

14   program available that allowed companies to get reimbursed

15   for this internship.  So I applied at a number of places but

16   decided to get in touch with Frank, because my goal was to

17   expand my learning, knowledge, and expertise with

18   pharma-related regulatory affairs.

19             PixarBio was awarded the *Boston Business Journal*

20   best places to work in June 2016.  It seemed like a perfect

21   fit, because I was very interested in what Frank was trying

22   to accomplish with pain management.  My girlfriend at the

23   time, Dawn, who is here, she had a hip replacement and went

24   through so much pain, and the idea of not experiencing any

25   pain postsurgery was exciting.

1          In October of 2016, I reached out to
2     Katrin Holzhaus, who worked at PixarBio as Frank's right-hand
3     person.  She did a little bit of everything at the company.
4     I find it very hard to believe that Katrin did not have full
5     knowledge of everything that transpired at PixarBio.
6          I spoke with Frank, and after a few weeks he got
7     back to me and let me know that I could intern there.  I was
8     very excited to be able to watch over our investment.
9          I started my internship in December of 2016.  I
10    worked very hard looking at the regulatory pathway for their
11    products.  On February 6, 2017, I was offered the position of
12    associate director of regulatory affairs, with 50,000 stock
13    options.  At BU Medical, I put together a poster presentation
14    for my final project, based upon the regulatory pathway for
15    neural release.  I got straight As in all my classes and
16    received the Paul Queenan Memorial scholarship.
17         Unfortunately, I only received one paycheck from
18    PixarBio.  It was the first real paycheck that I had received
19    in over two years.  Just when I thought that things were
20    getting better for me, they got much worse.
21         I stayed at the company.  We were promised our
22    salaries and later received stock options for each week we
23    worked.  I continued to work very hard, meeting Frank at his
24    house in Newton, at his house in Salem, New Hampshire, to go
25    over an FDA fast-track filing.

1         At this point, the SEC was still investigating.

2    Frank claimed that the stock would be trading again soon, but

3    he appeared frantic and paranoid.  I wanted to reach out to

4    communicate with the FDA, but he wouldn't listen to me.  He

5    always had to control every little detail, even when everyone

6    knew he was wrong.  He just wanted something filed with the

7    FDA as soon as possible.

8         We weren't ready to file, because we couldn't show

9    enough progress yet and details for the FDA to make a clear

10   determination.  Frank didn't care.  I worked very long hours,

11   packing up the office and labs in Medford at PixarBio, and

12   another lab in Cambridge, with three other employees who

13   decided to stay on.  I was convinced that the concept and

14   technology was sound.  For some reason, I still believed in

15   Frank.

16        I saw the video data on the rat studies, and I

17   could see that it really worked.  Frank always had something

18   positive to say about how everything was going to go.  It was

19   going to go so well, but it was all a lie.  Day after day, he

20   used us, knowing that it was all a house of cards.  While not

21   paying us, he told us many times that he didn't even take a

22   salary.

23        However, in 2015, Frank made over -- almost

24   $300,000 in salary, and his reported total executive

25   compensation that year was $860,000.  Katrin Holzhaus made

1    $239,000.  Jason Criscione made $226,000 that year.  These

2    were the founders of PixarBio.  Frank has never cared for

3    anyone but himself.

4         I felt compelled to stay and do whatever I could to

5    preserve the investments I made for myself and my family.

6    The whole situation put so much stress on my relationship

7    with Dawn, that we ended our eight-year relationship.

8         My last day at the company was September 13th.  I

9    was out $75,000 in back pay, my $40,000 investment, and

10   30,000 of my family's money.  My mother passed away that

11   October, god rest her soul.  As trustee, many members of my

12   family were upset about the resolution of the trust and how I

13   had spent the money.  And even today, there are members of my

14   family that don't speak to me.

15        At the end of December of 2016, Frank had 49,133

16   shares of InVivo, and the stock was valued at $206,000.  It

17   appears that all those shares were sold before the asset

18   freeze.  Isn't that timely.  He appears to have hidden any

19   money for himself and his wife.

20        I'm a single dad with twins.  My son was just

21   accepted early decision to Northeastern for business.  My

22   daughter hasn't decided yet but has been accepted to every

23   school she's applied to.  This investment was going to help

24   with their education and future.  I just want the Court to

25   know how many lives have been affected by Frank.

1          Why should he receive the maximum sentence?

2    Something I want you to consider when deciding this is that

3    Frank is a person who puts his own self-interest in front of

4    anyone or anyone else -- or anything else, who willfully,

5    purposely deceives and preys upon his friends and co-workers

6    for his own benefit.

7          Let me walk you down the path of trust, trust in

8    personal relationships, the trust that I had in Frank, in his

9    family.  He makes you feel indebted to him, because he pays

10   for everything.  You think he's generous and wants to do good

11   for people, but if you look at the evidence, all the evidence

12   that was provided in this trial to -- you see that he was

13   just sucking you into his vortex of deceit.  So many of us

14   were sucked into that vortex of false truth.

15         Thank you.

16         THE COURT:  Thank you, Mr. Doherty.

17         If I understand correctly, because the victim

18   statements were submitted redacted, Mr. Doherty submitted

19   one, and there were attached to it certain photographs to

20   illustrate the statement --

21         MR. DOHERTY:  I think that might have been in the

22   other.

23         THE COURT:  Is it not true?

24         MS. BLOOM:  Those, I believe, were attached to the

25   other victim who will be speaking.

1          THE COURT:  Okay.  All right.  Sorry.  Thank you.

2          THE VICTIM:  Thank you.

3          THE COURT:  Yes, ma'am.  If you give us your name.

4          I think maybe Ms. Bloom will clarify that I was

5     assimilating Mr. Doherty and the next speaker.  Is that

6     right?  She has the photographs and so on?

7          MS. BLOOM:  Yes, Your Honor.

8          THE COURT:  Okay.  All right.

9          MR. AXELROD:  Your Honor, can we briefly see you at

10    sidebar?  It will take 15 seconds.

11         THE COURT:  Okay.

12         (The following discussion held at the bench.)

13         MR. AXELROD:  Your Honor, this victim in a letter

14    that she wrote largely attacking Mary Reynolds, as well.

15    Mary Reynolds has not been charged with anything; it would be

16    unfair for her to attack her.  But attacks on Ms. Reynolds

17    are unfair.

18         THE COURT:  Well, I have to say that a good deal of

19    the defendant's argument, with respect to sentencing,

20    included references to Mary Reynolds and the relationship

21    that they had.  I've read the oral statement.  That's why I

22    made that reference before.  It is uncomfortable;

23    nevertheless, it's been brought into play, so I'm going to

24    permit it.

25         (Bench conference concluded.)

```
1              THE COURT:  So ma'am, if you could introduce
2      yourself.
3              MS. KELLOGG-BLOOM:  Good afternoon.  My name is
4      Dawn Bloom.  Thank you for hearing my victim statement.
5              I do realize that most of my statement does mention
6      Mary Reynolds, who is Frank's wife, and I also think that
7      it's very important for you to hear how I feel about the
8      betrayal that I feel by their family.  I decided to start my
9      impact statement with personal photographs in order for the
10     Court to get a very clear picture of Frank Reynolds' family
11     and friends deception.
12             I would like to make an oral victim statement at
13     Frank's sentencing.  That's why I'm here today.  I took time
14     off work to be here.  I want Frank and Mary to know exactly
15     how their deception affected my life.
16             I met Frank and Mary through Christopher Doherty at
17     Frank's extravagant celebration he hosted for himself in New
18     York City in June of 2012.  Shortly after I met Mary, she and
19     Frank were engaged to be married.  Mary soon moved her family
20     to Boston to be with Frank.  This is when I got to know Mary
21     on a more intimate level.
22             Mary and I had many things in common.  Mainly we
23     both had left long-term marriages and each had two children.
24     We talked quite openly about our financial situations
25     postdivorce.  Mary was very fortunate.  She met Frank who
```

1    swept her off her feet, lavishing her with more materialism

2    than she was ever exposed to.  I was married for 24 years.  I

3    was with my husband for 30 years.  I had a very difficult,

4    long, and expensive divorce.  I split two private university

5    tuitions, and I was forced to go back to work as a full-time

6    dental hygienist.

7         Mary, who did not work, was very aware of my

8    financial situation.  She encouraged me to invest as much

9    money as I could into PixarBio.  Mary shared with me how

10   generous Frank was to allow she, her friends, and her family

11   to invest with Frank's private offerings.

12        I invested my settlement money with Frank Reynolds,

13   because I believed in his MIT credentials and his paralysis

14   scaffolding he invented while at InVivo Therapeutics.  I

15   believed in his long-lasting neural release injectable, which

16   was, according to Frank, the cure for postsurgical opioid

17   epidemic.  Because I experienced such severe pain from my own

18   hip replacement surgery, I was very excited about PixarBio's

19   product and the impact it would make for other's pain

20   management.

21        As an inexperienced investor, I was not aware of

22   the SEC-approved rules for nonaccredited investors, which

23   somehow Frank managed to avoid, for my $80,000 investment

24   into PixarBio.  My investment is my annual salary as a

25   full-time dental hygienist.  A risky investment one might

say; yet, when I see the depth of deception Frank Reynolds
went through to take his friends and family's money, I do not
feel as naive as I felt when I first learned of PixarBio's
trading suspension.

Frank was always very generous.  I was extremely
uncomfortable with his generosity and often questioned it.  I
attended several World Series playoff games in his lavish
private boxes, which overflowed with lobster, shrimp, and
top-shelf alcohol.  I was able to invite my parents to a
playoff game due to his generosity.

I considered myself a friend of Frank and Mary
Reynolds.  I attended their wedding, was a guest in their
home many times.  I visited Mary's daughter, Lauren, at
Spaulding Hospital, when she was recovering from her own
paralysis accident.  I spoke at length with Mary about
private schools for her children.  I spent time with her
mother, with her best friends, all while Frank was off in
another room, in their house, planning and plotting his
deception.

How did Frank Reynolds impact my life?  I'm going
to tell you right now.  I invested $80,000 of my divorce
settlement money.  I also lost my long-term relationship with
Christopher Doherty, who was not only an investor, but an
unpaid employee of Frank Reynolds.  Frank Reynolds' greed and
deceit was a direct cause of the demise of my relationship

1    with Christopher Doherty.  Thank you.

2              THE COURT:  Thank you, Ms. Bloom.

3              I want to be sure that I have --

4              I'm sorry, I'm speaking to the larger questions

5    there, Ms. Bloom.  You can return to your seat.

6              I want to talk about housekeeping with respect to

7    victim statements here, because there's been a large number

8    of them and they've cascaded in over a period of time.  The

9    ones that I -- the form that I've seen them in have had names

10   redacted on them.  And I guess the question I raise is

11   whether they don't all go in the docket sheet and accessible.

12   They are matters that I review here.  I don't want to

13   compromise people's personal positions.  I don't want to

14   chill the willingness of people to come forward with their

15   stories.

16             On the other hand, the process of sentencing, I

17   think, has to be transparent and has to demonstrate what it

18   was that the judge was exposed to, except relatively limited

19   areas of compromise of personal, say, medical information,

20   that sort of thing.

21             I had also been a little bit concerned, just as a

22   matter of practice, particularly, and it's exacerbated here

23   by the kind of way in which a victim witness statements get

24   to me, anyway, and I think generally, which is through the

25   coordinator for the United States Attorney's Office, who then

1    submits them to probation and then they come to the Court.

2    And I -- this is a broader issue.  I think, perhaps, it might

3    be better to have them submitted directly with copies to the

4    probation office in the future, so we have a clear

5    understanding.  Because I think the coordinator, if I have

6    Ms. Griffin's position correctly, is the one who really knows

7    who's submitting and under what circumstances and who is

8    likely to submit.

9         So I raise those issues.  I'm not sure they can be

10   responded to immediately, but I am relying upon all of the

11   victim/witness statements that I received, relying in the

12   sense of I've reviewed them and tried to digest them and

13   tried to understand what the implications might be for

14   sentencing here.  I want to be sure, for housekeeping

15   purposes, that they're available to others who may or may not

16   be directly interested in what it was that was presented to

17   the judge for the purposes of sentencing.

18        So Ms. Bloom, do you have a suggestion with respect

19   to how to proceed on that?

20        MS. BLOOM:  So I think that we redact them,

21   recognizing that they may be public.  And so I think in this

22   case, some of them are quite detailed and personal, so all I

23   would ask is that we have an opportunity to take a second

24   look and make sure there's nothing in the body of them that

25   is more revealing than we believe it should be.  I can't

1   think of anything off the top of my head where I think, "Oh,

2   know, that should definitely not."  Much of this thing that

3   might otherwise trigger that have already been the topic of

4   disclosures on public websites.  And so this may, in fact, be

5   a balance for that.

6           THE COURT:  Uh-huh.

7           MS. BLOOM:  But I would like an opportunity to

8   review the issue with our victim/witness coordinator, and

9   make sure we don't have some policy that I'm not aware of.

10          THE COURT:  That's fine.  I guess I will state on

11  the record that I had been exposed to all of the ones that

12  had been submitted to me in their redacted form; that I

13  consider all that's been submitted to me and will consider it

14  in connection with the sentencing in this case, perhaps a

15  week to decide whether additional redactions are appropriate

16  and called for.  If they are, I'll leave it to anyone who

17  wants to challenge the redactions to raise them better with

18  me.  But I want the record to be clear that apart from

19  names -- although I've kind of teased some of them out --

20  apart from names, I've considered all of those documents.

21          So let me, then, turn -- I take it that there are

22  no others who want to speak directly here or orally.

23          MS. BLOOM:  Not that we're aware of, Your Honor.

24          THE COURT:  Okay.  So let me then turn to the

25  presentence report.  And I want to be clear on what I do have

1    in front of me.  Obviously, I have the presentence report

2    itself, which is revised as of February 6th.  I have the

3    Government's corrected -- for typographical errors, but the

4    version called the "Corrected Sentencing Memorandum," which

5    supercedes the original one.  I have the defendant's

6    memorandum and motion for downward departure, and I have the

7    supplemental sentencing memorandum submitted by the

8    defendant, as well.

9            The question of sealing is not absolutely

10   transparent to me.

11           Had there been submitted redacted versions of the

12   sealed memorandum?  Here, Mr. Axelrod, maybe you can answer

13   for Mr. Reynolds.

14           MR. AXELROD:  Your Honor, for the defense, there

15   have not been redacted versions submitted to the Court on

16   ECF.

17           THE COURT:  Okay.  So I will say that I am

18   reviewing all of it.  I'll ask you to do the same thing I've

19   asked Ms. Bloom to do, which is, as to those sealed

20   documents, you provide me with -- provide the Court with

21   redactions that are appropriate within a week.

22           MR. AXELROD:  And just file those publically, Your

23   Honor?

24           THE COURT:  Yes.

25           MR. AXELROD:  Okay.

1            THE COURT:  Yeah.  Now, if someone says it's been

2     too heavily redacted and we want to see all that the judge

3     saw, they'll make the motion and I'll deal with that, if that

4     arises.  But I want the record to be clear with respect to

5     that.

6            So then turning to the presentence report, because

7     that seems to be the focus of at least the initial layer of

8     dispute, I've gone through it and think that -- I assume that

9     I'm dealing with maybe three things; the most important of

10    which, at least for driving the guidelines in this case, is

11    how we calculate loss or gain.

12           I also have a secondary question -- I say

13    "secondary," because I don't want to get to them until I've

14    come to closure on the question of loss or gain, but the

15    question of whether or not there was mass marketing done

16    here, if that was part of the scheme that was involved, and

17    related question -- of course they're all related, but a

18    question that arises concerning enhancements for a criminal

19    enterprise involving at least two complicit participants.

20    And as I've indicated, as well, by reference to the

21    assimilation of other individuals, whether or not the

22    defendant, in committing the offense, exercised control over,

23    organized, or was otherwise responsible for the

24    superintending of activities at least of one of the other

25    persons.

1          Those, I think, are the big ones here.  You'll

2     bring to my attention, as we get on to it, anything else that

3     needs to be taken up.  They seem to be set forth, you know,

4     fairly extensively in the addendum to the probation office's

5     report, and then they're, of course, discussed in the

6     memorandum, sentencing memorandum that the parties have

7     submitted.

8          I want to start, first, with the question of loss

9     here, as the, perhaps, way of dealing with this.  I recognize

10     that the probation office has taken the position that the

11     gain is not readily -- the loss is not readily identifiable

12     or able to statement and consequently is looked to gain.

13     We'll get back to that in a minute.  But I want to understand

14     more fully the Government's theory of loss.

15          And I guess one way of focusing is:  When did the

16     loss take place?  On what day?  Was there a day?

17          You know, there's a kind of quicksilver quality to

18     all of the arguments -- I'm not suggesting that anybody's

19     acting improperly, but it seems to me that if I have to

20     calculate loss, I have to calculate it as of a specific date,

21     or else I'm calculating loss differentially for every

22     potential investor in the case, which may be my lot in life,

23     but I want to be sure I know what I'm supposed to be doing

24     here.

25          So Ms. Bloom, do you want to speak to that?

1          MS. BLOOM:  So I guess my understanding is that we

2     should be calculating loss as of today.  And in fact, what we

3     know today is that the shares that these victims received did

4     not have the value that they were led to believe they did.

5     So did they -- did they experience the loss, but didn't know

6     it when they purchased?  In any case where there's a fraud as

7     to a --

8          If we assume, for a moment, a simpler case -- or

9     maybe this is this case -- a total sham, but the stock is

10    trading at $3 a share.  So the person buys in; they pay $3.

11    They get a share.  At that point, the stock, let's assume

12    it's trading at $3 a share, but it isn't worth $3 a share.

13    And when the true facts hit the market, the stock drops to

14    zero.

15         I don't know what date you say that loss occurred,

16    whether it was they lost the money the minute they put it

17    into the hands of the defendant.  I think you measure their

18    loss by the money they put in, minus what they have gotten

19    back by the date of the sentencing, or still hold of value,

20    if they got something of value.  But our position is they

21    didn't get something of value.  The value was inflated by

22    fraud and is now revealed to be zero.

23         THE COURT:  I think I understand the overview of

24    it, but traditionally in securities matters, using the kind

25    of analysis that you've used, it's when the market has had an

1    opportunity to absorb the information; that is, the

2    information about the fraud.  That occurred quite a bit

3    before today.

4         One might look at people who hold as making

5    judgments about -- after the information is absorbed, making

6    judgments about residual value, maybe a partial value, maybe

7    they are less sophisticated in trading, all of those things.

8    But it seems to me that the date is probably the point at

9    which the market could have been understood to have absorbed

10   the information about the fraud.  And that's not generally

11   months, that's within a very short time of when the fraud is

12   disclosed.

13        Now, you could say maybe the day of the -- that --

14   or the day after the SEC stay is put in place; maybe it's

15   a later point at which there's some clarity about the

16   information.  But I think there has to be something a little

17   bit more precise in order to -- in order to make the

18   calculation that the Government presses on me, which is some

19   form of loss calculation.

20        MS. BLOOM:  So let me first address one thing you

21   said, which that, if the investor retained the stock, they

22   were making a decision.  So I think when you're talking about

23   an unregistered, privately-held stock, that assumption is not

24   justified.

25        THE COURT:  Can I pause with that for a minute.  It

1    raised a little bit by Ms. Bloom's statement, but I want to
2    be sure that I've understood.
3                Everyone here signed a stock subscription who got
4    stock, right?  Who had private -- who had privately-held
5    stock?
6                MS. BLOOM:  (Nods head.)
7                THE COURT:  And in that, they made a representation
8    about being suitable investors?
9                MS. BLOOM:  Yes and no.
10               THE COURT:  Let's use Ms. Bloom -- or maybe not
11   familiar enough with the specifics of her -- if I have it
12   right, it was Ms. Bloom; is that right?  Or am I
13   mispronouncing her name?
14               MS. BLOOM:  Yes.  And that explains my slight
15   confusion.
16               THE COURT:  Right.
17               MS. BLOOM:  But some of the people --
18               THE COURT:  But the name of the individual who gave
19   the --
20               MS. BLOOM:  I believe she had a hyphenated name,
21   which may help us distinguish ourselves.  I believe it was
22   Kellogg-Bloom.
23               THE COURT:  It's Kellogg-Bloom.
24               MS. BLOOM:  Ms. Kellogg-Bloom.
25               THE COURT:  Okay.  But so she represented that she

1    put all of her -- the equivalent of her yearly income into

2    this.  The -- generally the touchstone is a million dollars

3    worth of net worth.  Was she given, to your knowledge, a

4    subscription agreement?  Did she check off the subscription

5    agreement as to suitability?  That's the first question.

6           The next question is, can't people like that

7    dribble it out through 144?

8           MS. BLOOM:  I didn't catch the second question, but

9    let me answer the first question, which is some of the

10   victims did check boxes.  Some of them, we understood, maybe

11   have been checked by people at PixarBio.  Some of them simply

12   left the boxes unchecked.  And many of them, we believe, were

13   clear that they were not, in fact -- they had $2,000, they

14   were $1,000, and didn't -- probably were unsophisticated

15   enough, although the language was in the subscription

16   agreement, they didn't check something, didn't understand

17   that they needed to and that were representing that they were

18   accredited investors.

19          THE COURT:  Okay.  So if it's going to be relevant,

20   that's -- presents individualized determinations about each

21   of those persons to some degree.

22          But the question that I raised, that you were

23   probably focusing on the first one.  It's unregistered stock,

24   but unregistered stock can be dribbled out, generally,

25   through 134.  They have an opportunity, don't they, to engage

1    in those kinds of sales.  That is to say, they're not locked

2    up entirely with the unregistered shares, or are you going to

3    tell me otherwise?

4         MS. BLOOM:  It is my understanding that because the

5    shares were never -- the SEC registration statement was never

6    approved -- that had it been approved, they would then have

7    been able to release them and sell them.  But the agreements

8    themselves provide that they cannot be sold or traded until

9    there is an approved registration statement.  A registration

10   statement, as you probably recall, was filed.  The SEC raised

11   a number of concerns.  Some of them related to the fraud

12   issues, and it has never been confirmed.  And so those have

13   never been -- become subject to a valid registration

14   statement and, therefore, it is my understanding, cannot be

15   traded.  I think under *Prange*, that doesn't mean they have

16   necessarily --

17        THE COURT:  I'll get to that at a later point.

18        But Mr. Axelrod, do you disagree?

19        MR. AXELROD:  I think there are some exceptions

20   under Rule 144, and also, I think if we're going back to the

21   accredited investor issue, I think there are some exceptions

22   for a limited number of small people who don't qualify as an

23   accredited investor --

24        THE COURT:  Modest investors, rather than "small

25   people."

1          MR. AXELROD:  Yes.  Sorry.  A small number of

2    modest investors under Reg D, even if it generally requires

3    accredited investors.  But we're really diving into Reg D

4    issues that I didn't come prepared for today.

5          THE COURT:  But I want to understand it, because

6    it, to some degree, in a broad brush, because it impacts

7    this.  A way of looking at it is there's no registration

8    statement.  There was no opportunity easily to dispose of the

9    shares.  Fixing the value at -- putting to one side various

10   personal reasons and maybe lack of sophistication in trading

11   or trading in bottom-feeding kind of shares that the

12   defendant -- that the victims could not take steps to dispose

13   of the shares, so we deal with the shares right now, what the

14   value of them is right now.

15         MR. AXELROD:  Well, I think we need to be pretty

16   careful, rather than just simplifying all of the investors as

17   one group.  I mean, as you may recall, Your Honor, from

18   testimony at trial, there was two raises, one that began in

19   2015 and went into the beginning of 2016, the friends and

20   family raise.  And at that time of that raise, there was no

21   contemplation that the stock was going to go public.

22   Everyone who signed on as investors of that understood that

23   they were buying a privately held stock that had no market --

24         THE COURT:  Well, no, they weren't buying

25   certificates suitable for framing.  They assumed that there

1    might be long term before it became public or at least was

2    tradeable.

3              MR. AXELROD:  Potentially.  But they knew they were

4    buying a privately-held investment without a discernible

5    market.

6              THE COURT:  That may be so, but the question is,

7    did they, at that time, buy on the basis of manipulative

8    trading or false statements?  If they did, and the jury's

9    finding in this case, as far as I'm concerned, mine as well,

10   is they did, then the issue becomes what's the value that we

11   can assess if we're saying loss is not going to be complete

12   loss?  Or we look at some of the, perhaps, less complex cases

13   that other courts, including the First Circuit, have dealt

14   with.

15             MR. AXELROD:  Your Honor, I'm not going to quibble

16   with the jury's finding or your conclusion about the jury's

17   finding, but of course there are a number of investors -- and

18   this is a different issue and I don't want to complicate, but

19   I don't want to leave it.  There are a number of investors

20   who we don't know why they invested.  They're insiders who

21   had more information than the general investors.  So I don't

22   want to just concede that everyone who invested in the

23   company was --

24             THE COURT:  But is reliance a requirement here in a

25   criminal case by individual investors?

1      MR. AXELROD:  It's certainly not an element of the
2   Government's case to bring.  But for sussing out who is a
3   victim of the fraud, I think it is.  I mean, you're going to
4   have people here and you're going to have insiders who had
5   perfect information about what the company was doing, and I
6   would argue that those are not victims as the guidelines
7   define a victim.  They didn't invest based on some
8   misknowledge or misapprehension of what they were getting
9   into.  But --
10      THE COURT:  I don't mean this to be too arch, but
11   it is arch.  We're going to blame the victims?
12      MR. AXELROD:  I'm not blaming the victims at all,
13   but there were a subset of people who invested in this
14   company who were insiders.  I'm not blaming them for
15   investing.  I'm just saying that they -- it's hard to say --
16   even assuming the jury's verdict is correct, which I'm doing,
17   it's hard to say those people were defrauded.  Those were
18   people who worked inside the company who --
19      THE COURT:  I don't know why that would be the
20   case.  If Mr. Reynolds puts into the market false
21   information, engages in manipulation of the market, then
22   those who are purchasers in that market are adversely
23   effected by his actions, I'm not sure there's a discount for
24   them.  I suppose there's an *in pari materia* kind of defense
25   that might -- or discount that might be involved.  But

1    everybody who is involved in this loses money, including, of

2    course, Mr. Reynolds, who invested $8 million, I guess, with

3    family, on it.  But the loss here, as a result of the

4    misrepresentations or perhaps the grandiosity of

5    Mr. Reynolds' views about this and various other things, is

6    less important to me, anyway, in trying to figure out who's

7    the victim.  It's someone who didn't get what they thought

8    they were buying, and that applies to even those who continue

9    to support and embrace Mr. Reynolds.

10            MR. AXELROD:  I think that, Your Honor, there is a

11   subset of people who did invest, who got exactly what they

12   thought they were getting.  And those are the people like

13   Mr. Reynolds, who were inside the company, who knew exactly

14   what was going on, who knew exactly what the timelines were.

15            THE COURT:  Well, who would that be?  Just not to

16   characterize it or personalize it, but would it be

17   Mr. Doherty?

18            MR. AXELROD:  Well, if we're talking about the

19   issues that I raised in the sentencing memorandum, you may

20   remember there was a Jason Criscione, the chief science

21   officer, or technology officer.  His parents invested.  He

22   certainly knew what the time frame was for FDA approval.

23            THE COURT:  Uh-huh.

24            MR. AXELROD:  So he's one, I would say.  There are

25   board members who invested, who would presumably, if they

1   were doing their fiduciary duty, had full knowledge of what

2   the company's outlook looked like.

3            THE COURT:  Okay.  So let's just, for loss

4   purposes, which --

5            MR. AXELROD:  I know that places it far afield,

6   Your Honor.

7            THE COURT:  No, you weren't.  I mean, there's still

8   boundaries that I'm trying to think this through on.  But we

9   take those people, and we take them out of the list.  You

10  identified them and Ms. Bloom can argue about them, and we'll

11  see where that leaves us in terms of loss.  But there's some

12  subset of people who lost on the basis of the conduct of

13  Mr. Reynolds, and that, it would seem to me, is where I would

14  find loss in this case.

15           MR. AXELROD:  Your Honor, I was really taking on a

16  different problem.  Unfortunately, I went there.  I agree

17  that, based on the jury's finding, that there was some subset

18  of people who lost.  I do not think -- I do not agree with

19  the Government that that amount that they lost is so easily

20  discernible.  This case is not as the *Prange* court talked

21  about, the flimflam sham.

22           THE COURT:  You know, I read those cases, and of

23  course, you try to apply them to your own, but -- and they're

24  not this case.  Fraud is versible.  It expresses itself in a

25  variety of different ways.  It can be the flimflam artist.

1    It can be the embezzler who thinks he's going to pay it back.

2    It can be the person with a grandiosity.  That may be what we

3    have here with Mr. Reynolds.  But the short of it is that it

4    feels the same to the people who are out the money, who can

5    be called victims, irrespective -- it feels the same

6    monetarily.  It may feel like more of a betrayal of faith if

7    their personal relationships, or the suggestion of being

8    drawn into a vortex of deceit, but that's not something I

9    value.  I value it in terms of loss value.  It's something

10   I'll consider, obviously, for purposes of sentencing.

11           So I guess I would want to know, you know, what you

12   think -- and maybe I shouldn't be doing it this way, but --

13   because it puts a burden, to some degree, on the defendant,

14   although we're there, is who's out in this list?  And if we

15   start checking them out, where do we get to in terms of loss

16   that's cognizable for purposes of deciding what kind of

17   additions to the base offense level are involved?

18           MR. AXELROD:  I say this, with all seriousness,

19   this is -- that the guidelines calculate -- stress that when

20   you're calculating loss, you give an offset of what was

21   exchanged at the time of the investment.

22           THE COURT:  Well, what was exchanged at the time of

23   the investment here is the difference between the value then

24   and the value now.  That's why I started by saying we've got

25   to focus on when we're talking about.  We've got a

circumstance in which the investors really have no way to
divest themselves of it.  We're here on sentencing day.
There's been some movement, brokers might call it death
rattle activity on the market, involving modest amounts of
money for being offered or as bid an offer.  Maybe there's
something out there.  You know, we have suggestion there's
some intellectual property that can be paid for.  Maybe.  But
in any event, we're here for -- to try to find a fixed time
for dealing with that.  And I -- if it's not today, I don't
know what other day it is -- I know what day it is, but what
other day it is for making the calculation.

And you know, there may be people who don't belong
in that class.  Okay.  Knock them out of the class.  But
we've got to figure out -- or make an effort to figure it
out.  Probation made a good faith effort.  They were not
satisfied that they were going to be successful in doing it.
They made their determination.

I'm not so sure that you can't successfully
identify loss in this setting, loss to the individuals,
without even getting into intended loss.

MR. AXELROD:  Well, Your Honor, I obviously think
you can.  I think the guidelines specify that you take the
value of the shares exchanged at the time they were
exchanged.  And when you look at the guidelines and the
commentary notes, it talks about in a case of where

1    collateral is exchanged in a mortgage case, and it says

2    there, you take the collateral on the date of sentencing.

3    But it doesn't -- they use that same language in terms of

4    investment cases.

5              THE COURT:  That's an application note, if I

6    recall.

7              MR. AXELROD:  It certainly is.

8              THE COURT:  So what do we do here?  We've got

9    unregistered stock, not easily tradeable.  At this stage,

10   based on the discussions we've had, without diving into Reg D

11   and 144 and all of that, willing to say there really is --

12   they had no way to get out, because the S-1 was never

13   effectively -- that never wanted to -- effectiveness.  And

14   the reason it didn't go into effectiveness is the fraud

15   itself; that is, the concerns of the SEC, which were

16   vindicated, at least in this case, by the jury's verdict.

17             So they had a value on a particular day, whenever

18   this information could properly be absorbed by the market,

19   and then we've got the difference between the value on that

20   day and today.  And the value today is -- I'm not sure

21   visible to the human eye.

22             MR. AXELROD:  It's something, but we don't know.

23             THE COURT:  Well, more than that.  Is there any

24   trading on it?

25             MR. AXELROD:  Public trading, no.  But I mean,

1    as -- I mean, we're jumping around.  But as Mr. Abrams said

2    in his letter to the Government, that he and others who are

3    still working with the company believe that there is still

4    some inherent value in the company.  So I don't think we can

5    just assume, with nothing more, that there is no value in the

6    shares.

7            THE COURT:  Okay.  So I mean, there's a triumph of

8    hope over experience, I guess, is one way to describe it.

9    That's used in a different context, but it describes what's

10   going on here.  Investors think that they've got some chance

11   to get something, but you can't find anybody out who's -- you

12   know, arm's length purchaser for value, who's going to pay

13   any money for this, or at least it doesn't appear that

14   they're going to pay any money for it.  And so I guess I'm of

15   the view that it's valueless now.

16           Now, if it's valuable in the future, Mr. Reynolds

17   still holds his shares or can choose to hold his shares or

18   maybe Judge Young will decide whether he can hold his shares.

19   But in any event, that can be applied, I suppose, to -- as a

20   discount, against -- if it comes in, a discount against

21   restitution in a case like this, which is the other area in

22   which this calculation of loss goes, but I don't think that

23   anybody could say -- that anybody who would be an arm's

24   length purchaser for value would say, "I'll take a flyer on

25   this one."

1          It's dead.  So no value today.  That would --

2     market is probably as good a place to figure that out as any.

3     There's no public trading in it, no value.

4          Now, there -- as I said, there may be people who

5     value hope over experience and -- but that can't be the basis

6     for valuing it.  So then we've got this delta between what

7     did they pay for it under misrepresentation, and what do they

8     have now?  They've got zero now.  I don't know whether we can

9     promptly go through this and say, "Okay, maybe it's not

10    $9.5 million.  Maybe it's a different spread," but a spread

11    in which all of us can say comfortably, somewhere in there,

12    in going through this.

13         So Ms. Bloom, do you want to speak to that?

14         MS. BLOOM:  Yes.  Let me see if I can offer a

15    couple of options and insights.

16         First of all, I think that, as the Court, I think,

17    recognized, the fact that someone is an insider does not mean

18    that they were not defrauded.  We heard from multiple

19    witnesses who believed that when the defendant announced

20    something that there was $30 million, they thought the

21    company had $30 million.

22         THE COURT:  But there's certainly the case that

23    it's differential.

24         MS. BLOOM:  There could be a differential.

25         THE COURT:  Let me just -- so I can frame the issue

1    that you can respond to.  Insiders are controlled in various

2    ways in their transactions and securities because of a

3    presumption that they have access to information.  And so

4    they're trading, if not barred -- although in some cases it's

5    barred, if not barred, is limited, and that's -- presumption

6    is based on the idea that they have more ready access to

7    information than others in the marketplace might have.  And

8    so I won't necessarily call them colleagues, but maybe fellow

9    travelers of Mr. Reynolds might be assumed to have that kind

10   of information.  Mr. Stromsland might, Mr. Herod might, and

11   there may be others.

12            And so I'm just trying to figure out, you know, if

13   we take -- it may not be a scalpel, but I don't want to use a

14   meat axe, to the list of victims, where might we be making

15   the cuts?

16            MS. BLOOM:  So we took out of the list

17   Mr. Stromsland and Mr. Herod, their spouses, their children.

18   We did not take out people who were their parents, their

19   uncles, their -- because we didn't feel like we could impute

20   to them the knowledge that -- but for the defendants'

21   immediate families, we removed all of those.

22            Having spoke -- as I think you may recall from the

23   trial, many of the people at the company described a very

24   siloed set of information.  And so while I think it is fair

25   to say, you know, did Ms. Phelan have access to more

```
1    information about inaccuracies?  Is there some kind of
2    concept of contributory negligence in victimhood?  I'm not
3    sure.  We have not done a list of certainly not all of --
4    Mr. Lovett, who I think was an investor, but certainly didn't
5    have access to all of that information.
6              My suggestion --
7              THE COURT:  Why wouldn't statutory insiders be
8    clearly prescribed?
9              MS. BLOOM:  Well, I think that would be -- would
10   that be officers or directors?
11             THE COURT:  Right.
12             MS. BLOOM:  So I don't believe anybody other than
13   Mr. Stromsland.
14             The question would be Ms. Phelan, but I don't think
15   anybody else -- and maybe Mr. Criscione.
16             THE COURT:  So let's take Ms. Phelan and
17   Mr. Criscione, and look at how much they had.
18             What did they have?
19             MS. BLOOM:  That's -- let me look at -- I believe
20   we have the full chart.  Mr. Criscione, in terms of actual
21   investments, we're looking at 22,500, and I believe
22   Ms. Phelan was 15,000.  Mr. Criscione gets more shares, but
23   most of those are just by virtue of getting options and being
24   an employee.  And we only counted money in for purposes of
25   victims.  So I'll double-check on Ms. Phelan.  So I don't
```

```
 1    think either of those would be --

 2            THE COURT:  That doesn't get us down to

 3    9.5 million.

 4            MS. BLOOM:  No.

 5            THE COURT:  So now I'm trying to figure out,

 6    Mr. Axelrod, do you know where we get to those kind of steps

 7    that generate the guidelines, and if you've got suggestions

 8    of other people who are putatively or questionably victims

 9    here?

10            MR. AXELROD:  Your Honor, I'm certainly not

11    conceding that this is the right way to do it, because I

12    still think we haven't found out what the offset is for the

13    value of the shares.  But to answer your question, Bernard Ho

14    was a director of the company.  I think he invested over

15    $400,000.  David Cass was a director of the company.  I don't

16    recall what he invested.  I can go through the list, there's

17    more, but there's other problems, also, with this list.

18            The Government found it, presumably, in documents

19    produced to the SEC.  But if you look at our submission,

20    there's also people on this list who are recorded as buying

21    in the open market, which put them in a different position

22    than people who bought in the private offering.

23            THE COURT:  Why does it?  I mean, I suppose one way

24    to say that is because they could have unloaded as soon as

25    they found out the information and gotten some residual
```

1    value.

2           MR. AXELROD:  Correct.

3           THE COURT:  Okay.

4           MR. AXELROD:  There are also people who bought

5    after January 27, 2017, on this list, who bought after the

6    SEC freeze.  I think that they're in a different bucket, as

7    well, because by that point, they had seen that the SEC, the

8    market information that had hit the market was out there and

9    was known.  So I think that --

10           THE COURT:  Out there that there was suggestions of

11    impropriety.

12           MR. AXELROD:  So I think they're different, too.

13    So I don't think it's as easy as simply removing

14    Mr. Stromsland and Mr. Herod.  I think there's a couple of

15    buckets that can be excised, if Your Honor thinks that that's

16    the appropriate way to go, which I still don't necessarily

17    agree with.

18           THE COURT:  Nothing I've heard so far, but perhaps

19    I'll hear something else, tells me that it's not, to be

20    perfectly candid.  We can make this more complex than is

21    necessary.  I'd like to apply Occam's razor as my scalpel to

22    get to the core, which is they bought at a certain time, you

23    were someone who is unaware of the information, all the

24    evidence suggests you were unaware of the information.  There

25    was a value, and now there's no value.  And that's easily

1    identifiable by what they put into the market, not what they

2    put into the purchase of the shares, either in the open

3    market or out of the open market.

4         I might think about, you know, a different date for

5    the open market people, but I simply don't know what -- I

6    don't have that breakdown.

7         MR. AXELROD:  Two additional critiques.  The *Prange*

8    case says that even registered shares have some value.  Now,

9    I don't know what that value is but --

10        THE COURT:  Yeah, I read that, and I'm not sure

11   that it resolves cases.  You know, no piece of paper is

12   beyond redemption would be another way of describing that

13   language from *Prange*.  It doesn't decide questions of loss

14   here.  There could be value, but, you know, the value, from

15   my perspective, has -- something like this should be some

16   market, private market, open market, whatever market.  And

17   all I'm aware of is that there was a public market, and it

18   tanked.

19        MR. AXELROD:  Okay.  And then my second point would

20   be, Your Honor, there's a group of investors that we haven't

21   talked about yet, who are friends and family of Mr. Reynolds,

22   who did not invest because of misrepresentation, but invested

23   because of their belief and their knowledge of Mr. Reynolds.

24   And I don't think --

25        THE COURT:  Mis -- benighted knowledge.  I mean,

1    you know, what we have is someone who is engaged in fraud,

2    who makes the tender of the opportunity to invest in

3    fraudulent securities, and says, "I do that only for family

4    and friends."  I'm not sure that they fall in a different

5    category, unless, of course, they knew that this was part of

6    the scheme and they wanted to participate in it.  I don't see

7    that at all.  You know, this is created as a kind of, "But

8    for you, a special deal," and the special deal is to get

9    something that becomes worthless after awhile.

10             MR. AXELROD:  That's certainly not what I'm

11   suggesting.  I'm just saying that these are different than

12   people who say, "I invested because," to pick one of the

13   misrepresentations, Mr. Reynolds said that he cured himself

14   of paralysis.  They didn't invest because of that.  They may

15   have invested because they were friends with Frank; they saw

16   his drive, and they saw his -- they believed in him.

17             THE COURT:  So that gets to a reliance question of

18   whether or not loss depends upon reliance.  I'm not sure that

19   it does, in the sense of a determination that there has been

20   market manipulation and misrepresentation.

21             Now, maybe it does have to be sliced that thin.

22   But it seems to me, we go through the list in some -- to

23   identify buckets, but I'm not sure that it's going to get us

24   much below the next tier of money involved here.  I mean, you

25   know, it's something.

1            And I have to say, as you all know, or probably

2     know, the guidelines are placed, for me anyway, to begin.

3     They are rarely a place I end up, but I want to know what the

4     figures are.  I happen to, as a matter of policy, think that

5     they are in the fraud area a little bit like the sorcerer's

6     apprentice and subsequently don't give us a full

7     understanding of what the actual culpability is there.

8     They're a way of thinking about culpability, but they don't

9     do all that is necessary, nor does the Supreme Court expect

10    that that's going to be the case.  The judge has to apply

11    some judgment in this area, but the first thing I've got to

12    do is get them right.  So --

13            MS. BLOOM:  So keeping in mind the fact that this

14    is not the ending point, I looked through this list, and

15    maybe if I make a suggestion of a couple more people who are

16    insiders, who at least could be considered to be in a

17    slightly different position, whether I agree that they're not

18    victims or not, it might get us below the 950 level --

19            THE COURT:  9.5.

20            MS. BLOOM:  9.5.

21            THE COURT:  Million here, million there, kind of?

22            MS. BLOOM:  Yes, and therefore, put us in a range

23    where it would be a reasonable estimate to think that there

24    are losses clearly above 3.5, and I'll give you some other

25    reasons for that, but under 9.5.

1    THE COURT:  Well, another way of doing it is not to

2    back people out, but to tell us what people are indisputably

3    in there, and that means finding $3.5 million worth of losses

4    by people who can, with reasonable certainty, be expected to

5    be those who relied upon representations -- I say "relied

6    upon," without introducing that as an element, but who

7    expected representations to be accurate, bought, and there

8    was fraud and there went -- there went all of their money.

9    So --

10    MS. BLOOM:  So let me try both approaches, and see

11    if we can get to a comfortable place.

12    THE COURT:  Okay.

13    MS. BLOOM:  So I -- just in noting a couple of

14    other people who had larger investments who had some more

15    inside connection, Mr. Axelrod is right, that Mr. Ho was in

16    the 416- to 419-thousand range.  Mr. Kaplan, who was also an

17    employee, was in the $200,000 range.  And I noticed

18    Dr. Maita, who I believed worked with the company and

19    probably had more information.

20    THE COURT:  It is reported, as I recall, as being

21    here to provide support during the course of the trial for

22    Mr. --

23    MS. BLOOM:  No, I think that's someone else.  That

24    other person who is reported as being supportive filed a

25    victim statement claiming $700,000 in loss.

1          THE COURT:  So he was a supportive victim.

2          MS. BLOOM:  So he was a supportive victim.  So I

3     don't think we can move him out of the victim category

4     without an express release of that victim status, but I think

5     that if I added those together, I got to -- I think we were

6     at about 1.3 million, so we'd need -- 10.3 million, so if we

7     take out $800,000, I thought I got there.

8          But I think what we're saying is if you think that

9     the insiders are in a different category, that might bring us

10    down a category, and I would hope that Mr. Axelrod and I

11    could sit down and work through the list, if that would be

12    helpful.

13         But let me go to the other end of the spectrum,

14    which is, as to the victim statements that have been

15    submitted, the total of those numbers and adding in

16    Mr. Abrams who testified at trial as a victim himself, that

17    comes to 1.8 million.  So I would say, at a minimum, we are

18    clearly above 1.5 million.  Mr. Abrams testified that the

19    clients of Newbridge, alone, invested about 2.5 million.  He

20    was part of the group who decided to go forward on behalf of

21    Newbridge, and he testified that the false statements were

22    significant and important.

23         Now, I want to be clear, that 2.5 million does

24    overlap with the 1.8 million I just discussed by at least a

25    couple of hundred thousand.

1          In addition, Ms. Phelan testified that, and there

2     was evidence that there was about 5.7 million raised in the

3     private offering in the summer and fall of 2016, during the

4     time period when the false press releases were being

5     released, claiming that the subscription was oversubscribed.

6     I think it would be reasonable to assume that the investors

7     who came in during that time, when the false materials were

8     clearly being circulated and the -- and where we've heard

9     that even the internal employees, the only people who knew

10    that those oversubscription statements were false, were

11    Ms. Phelan and Mr. Reynolds, as best we can determine, that

12    all of that 5 million could be considered at a minimum.

13          THE COURT:  I don't want to extend this; on the

14    other hand, I want to get it right.  And I understand, in a

15    rough sort of way, what you're saying, but I want to be sure

16    that I'm in the proper range, reasonably calculated under

17    these circumstances.  And so I think I do have to ask you to

18    refine and do it by reference to particular categories that

19    may be temporal, may be status based as a way of parsing

20    through this a bit so that I've got some number.  Because

21    working from the bottom up, you're in a different range than

22    3.5 million.  That would be 3.5 to 9.5, and that generates a

23    big difference in the guidelines.

24          As I said, I view these guidelines as not only are

25    they helpful and nuanced, but first I got to get them --

```
 1    whatever it was that is supposed to be the calculation, I've
 2    got to get that right.
 3              So what does it take to do it?  I want to go
 4    through other things today, but I -- do you want to come back
 5    tomorrow and do it?  It's Valentine's Day, Mr. Axelrod, you
 6    can --
 7              MR. AXELROD:  At the risk of giving the Court too
 8    much information, you're talking to two lawyers without any
 9    bags, but I should have rightly anticipated such a thing.
10    But that poses some difficulty for us.
11              THE COURT:  So when?
12              MR. AXELROD:  Could I have a second, Your Honor?
13              THE COURT:  Yeah.
14              (Counsel confers.)
15              MR. AXELROD:  Your Honor, unfortunately, I think
16    next week is probably the best option for us.
17              THE COURT:  Okay.  So you came to the right place,
18    because I had settlements and pleas, so the next week will be
19    fine.  We can find time in the mornings of next week, I
20    think.
21              Ms. Beatty?
22              (The Court and the deputy clerk confer.)
23              THE COURT:  So Tuesday, which is the 18th.  And can
24    we start at 9:00?  10:00?
25              MR. AXELROD:  Your Honor, if I would, I would ask
```

1    to start at 10:00.  We'll catch the 6 o'clock flight up that

2    morning.

3              THE COURT:  Okay.  10 o'clock.

4              For that aspect, I want to get to the question of

5    loss, at least to parse it the way in which we've been

6    talking about it now.  I haven't finally decided, obviously,

7    but that's where I think we're going.  I don't think I can

8    properly hear talk about intended loss on the part of

9    Mr. Reynolds, but I'll hear argument that you want to make.

10   The reason I say "intended loss" is that imports an intent

11   that, what I know of Mr. Reynolds, tells me is inconsistent

12   with his grandiose sense of what is going on.  I would have

13   to blink at the $8 million investment that he kept himself.

14   Now, that doesn't mean that he didn't act with the intent to

15   commit the crimes themselves, but what it does mean is the

16   culpability that's calculated by that alternative mechanism

17   of thinking about loss is more problematic here, with someone

18   who, I'll just broadly say, whose psychology is as -- was

19   presented here concerning Mr. Reynolds.

20             That doesn't end the question of loss, obviously,

21   but unless there's something more that you want to say about

22   it, to people who are said to intend the natural consequences

23   of their acts, I perhaps often think about that.

24             MS. BLOOM:  Well, I understand that you and

25   frankly, initially I had that approach myself.  And I went

1    back and looked more carefully at the cases, and I thought

2    that the First Circuit actually says it's the total degree of

3    loss that the defendant could have reasonably expected to

4    occur.  And the First Circuit in *Appolon* quotes, with

5    approval, *United States vs. Bonanno*, saying, "How many

6    dollars did the culprit scheme put at risk?"  And if the

7    question is did he know he was putting these victims' money

8    at risk, the answer is absolutely.  Did he believe that he

9    was going to lose it?  Perhaps not.

10             THE COURT:  So he intended it by being reckless at

11   putting people's money at risk?  It's a recklessness

12   standard?  Is that what it is?  Because I read those cases,

13   too.  I'll go back and look at them, to see if there's

14   something more, but I have to say, when we get into scienter,

15   and the Supreme Court is getting into scienter quite a bit

16   now, it's a dog's breakfast of language that doesn't provide

17   a consistent theme to the pudding, and so I'd like to look at

18   this more carefully.

19             If you say recklessness is enough for that purpose,

20   I'll think about that.  But I want something other than, you

21   know, fraud is divided into two parts, the fraudsters and the

22   people who do it with the $80,000 nut and then get another

23   $20,000.  I just think they're singularly unhelpful as ways

24   of looking at these things.  I'm just trying to figure out,

25   what do I do with someone here who is reckless, I guess.

1    Maybe that's the -- a way to say it.  Does that count as

2    grounds for introducing the requisite intent?

3              MS. BLOOM:  I think that my reading of the First

4    Circuit cases, and I think the Fifth Circuit case, maybe

5    Seventh Circuit, is you call it reckless, and maybe that's

6    the right -- it is you are intentionally putting someone's

7    money at risk.  Intended loss, in the way I understood it

8    before looking at these cases, might mean do I intend to lose

9    the person's money.  But many people who commit frauds and

10   put it into some risky thing do not intend to lose, they

11   intend to -- they think they're somehow going to make it all

12   work out.  And clearly the cases have stepped back and said:

13   You don't have to plan to lose everybody's money, but if you

14   know, you're -- that's a likely result, then that's your

15   intent.

16             Now, this case comes, I think, a step down from

17   knowing it's a -- the pure Ponzi scheme, where obviously,

18   eventually, the house of cards is going to have to fall.  And

19   I recognize it's a different case; that here, it -- although

20   a rational person might say, obviously, "This house of cards

21   is going to fall," it doesn't -- we don't have the feel that

22   the defendant was sitting there facing that fact.  But does

23   his failure to face the fact that if you bring people into an

24   investment in a company that's based on a series of lies from

25   A to Z, there's a risk they're not going to get their money

1    back, just as there was a risk he wasn't going to get his

2    8 million back, and you've taken their money by fraud.

3              THE COURT:  Yeah, okay.  So why isn't that just

4    actual loss, rather than intended loss?

5              MS. BLOOM:  Well, because actual -- the only real

6    difference, I think, here is that it -- you don't get into

7    the vagaries of, well, what did actually happen when the

8    shares dropped to zero.  It was foreseeable that the company

9    would be worthless; whether it, in fact, became worthless, we

10   don't have to then argue about.

11             THE COURT:  Well, but I think that's where I start,

12   to be perfectly candid.  I want to figure out what the loss

13   is.  Was it intended?  Was it actual?  The intended becomes

14   much vaguer than actual, but I understand your point.  Maybe

15   we'll get to that question.

16             I want to turn to the question of gain, however,

17   and understand more fully what the Government's objection is

18   to using, as an alternative, gain here.  The probation office

19   offers it.  I don't think the defendant is objecting to the

20   probation office's determination of gain.  So what's the --

21   what -- except that the theory that you started with was much

22   higher with loss than it was with gain, but as a matter of

23   concept, what's the difference?

24             MS. BLOOM:  So I think that -- two questions here.

25   If you're going to gain, is this the right calculation?  Let

1    me get to that next.  But our view is that the correct
2    calculation that is a reasonable estimate of loss here, that
3    that number is much larger than the gain, and therefore, that
4    that is what we needed to argue for and support.  I think
5    when you can see, when we came to --
6                THE COURT:  Okay.
7                MS. BLOOM:  -- recommending a sentence, we didn't
8    actually stay there, but that to us is what seems like the
9    right number --
10                THE COURT:  Okay.  So with respect, that's a bit
11   result-oriented for my taste.  And so now when I understand
12   the concept, that is to say if we conceptually think of what
13   the gain was to the defendant, what's the problem with it?
14   You said there may be a calculation problem?
15                MS. BLOOM:  So the 900 and -- I think it's 920,000
16   that he came from -- that Mr. Herod made, he's a
17   co-conspirator, it's a gain to the co-conspirator.  I don't
18   think there's a problem with that piece of the calculation.
19   Mr. Reynolds received an additional, about, in the last two
20   years, a compensation of about $922,000, which was at a time
21   when the company was receiving all of its money, essentially,
22   from the fraudulent financing.  And so we would argue that if
23   you're going to look at gain, you probably should also
24   include that amount as part of his gain, which he could not
25   have gotten but for bringing in money by fraud.

```
 1              THE COURT:  So what difference does that make?  I
 2    mean, that's a computational difference -- as calculation,
 3    what difference does that make?
 4              MS. BLOOM:  So 900,000 plus 950, I believe, puts
 5    you over the 1.5 million.
 6              THE COURT:  Uh-huh.  Okay.
 7              MR. AXELROD:  I don't know what the basis is for
 8    the 900,000.  The first time I'm hearing that.
 9              MS. BLOOM:  I can actually -- I have some documents
10    showing those numbers.  I can provide those right now, or I
11    can do them after the hearing.
12              THE COURT:  Maybe it's more useful, so we can get
13    through all the things that I want to get through, that we
14    can get through today, because I want to deal with all of
15    these things, you know, promptly when we get back here.
16              But returning to the way in which the probation
17    office did its calculation, just so I understand what the
18    departure might be for the -- from the Government's approach.
19    I want to go to the specific paragraph.  Probation has the --
20    I'm looking at paragraph 48.  Probation has the figure as
21    being $910,000.  I assume that that's related to the
22    transactions of Mr. --
23              MS. BLOOM:  With Mr. Herod, yes.
24              THE COURT:  With Mr. Herod and Mr. Stromland, yes.
25    And you're adding something else to it?
```

1          MS. BLOOM:  Yes, I'm adding his --

2          THE COURT:  His compensation during that -- or

3    his -- yeah, compensation during that time period, after the

4    fraud is committed, but before it's disclosed.  Okay.

5          MS. BLOOM:  Some of that is from 2017.  I think the

6    question of what it means to say when it was disclosed may be

7    a tricky one.  So that might shave off a little.

8          THE COURT:  But I want to clarify that here,

9    because I think, unless somebody moves me off this, that it

10   comes to this that what did they think they had when they

11   purchased it.  I'll take that as their fair value.  And the

12   second issue is what did they have as of today, or maybe it's

13   Tuesday, in terms of a value, which, apart from saying that

14   even penny stocks have some value, I guess, is another

15   translation of *Prange*, but not have one here.  But I really

16   do want you to be able to focus on this or say, "We just

17   can't figure it," in somehow -- or one of you is going to say

18   that, I suspect.  Okay.

19         So now let's then turn to the other outstanding

20   issues presented by the guidelines and see if we can resolve

21   those at least today, so that we're down to a question of

22   loss or gain if we come to that.  The -- let me use the

23   defendant's objections, which I think are the -- apart from

24   the loss/gain thing, which is the Government's objections,

25   the remaining objections are those of the defendant.

1          MS. BLOOM:  There might be one thing that I would

2     like to clarify that may save us some effort, which is, if

3     there are more than ten victims, then the mass marketing --

4     that overlaps with mass marketing, so we only need to resolve

5     one of those issues.  Intuiting where you seem inclined to go

6     on loss, it seems obvious that there are more than ten

7     victims.  And therefore --

8          THE COURT:  Right.  Is there any question about

9     that?  Whatever the victims were -- I'll make the Government

10    identify their best ten, or maybe give them a baker's dozen,

11    but that gets us over that if we have to do it directly.

12         MR. AXELROD:  Not to be too academic, but I guess I

13    will.  I mean, the guidelines define "victim" as -- and this

14    is 2B1.1 application, note 1, "Victim means any person who

15    sustained any part of the actual loss determined under

16    subsection (b)(1)."

17         THE COURT:  Right.  And that's why I've been

18    focusing on actual loss.  But assume that we get to actual

19    loss.  Assume that that's here.  There doesn't seem, to me,

20    to be a question of about ten victims or more.

21         MR. AXELROD:  If Your Honor determines that you can

22    calculate actual loss, which we object to, then I think that

23    that follows logically that you could get to the victim

24    count.

25         THE COURT:  I think I could do that, even if I

1    don't base the enhancement on actual loss.  I can do it on

2    gain, but I can say that there's actual loss with respect to

3    at least ten victims.  But in any event, do you agree that

4    that remains open?  You can consider it to be remaining open,

5    but giving me a Whitman's sampler of actual victims will

6    probably satisfy that part of it.

7            MS. BLOOM:  Your Honor, I have gone through the

8    list of victim statements and identified ones that I believe

9    I clearly identify that they have a victim loss -- probably

10   all of them do.  But if you like me to read the numbers, I'd

11   be happy to.

12           THE COURT:  Why don't you give me a list.

13           MS. BLOOM:  File it?

14           THE COURT:  Yeah, file it later.

15           MR. AXELROD:  And Your Honor, there is difficulty

16   with us here, and I'm sure Ms. Bloom can do this, but we only

17   received redacted copies, so it would be very helpful for my

18   analysis to actually see the names of who those people

19   represent.

20           THE COURT:  Okay.  That brings -- and I think you

21   should, but that brings me to another question that had to do

22   with the request for the sealed hearing having to do with

23   jurors.  I would be happy to provide that -- satisfied to

24   provide that to counsel.  Under the circumstances, I would

25   want an undertaking by Mr. Reynolds that he would not

1    directly or indirectly contact any of these victims or any of

2    the jurors here.  He is under that obligation generally in

3    this circuit, but as a kind of belt and suspenders, I would

4    like to have that undertaken.  I understand it's an

5    assented-to motion with respect to that transcript, but

6    that's a condition.

7              MR. AXELROD:  In what form?  I can certainly give

8    the Court my assurance that I will instruct Mr. Reynolds --

9              THE COURT:  And I appreciate that.  That's not

10   enough.  So I want an affidavit from -- or declaration from

11   Mr. Reynolds that he will not contact, directly or

12   indirectly, any juror member, and that, frankly, if he does,

13   that he's exposing himself to separate consequences.

14             MR. AXELROD:  We can do that and that was not our

15   intent to file a motion.

16             THE COURT:  I understand.  But this is, as I say,

17   belt and suspenders or trust and verify.  The same concepts

18   are at play.

19             MR. AXELROD:  Yes.  Yes, sir.

20             MS. BLOOM:  Can I just elaborate that "directly or

21   indirectly" includes making any kind of statement, public

22   statements, or notice on website, given the history of

23   personal attacks in website, that there would be none of that

24   with respect to any victim --

25             THE COURT:  I think that that fairly comprehends

1    it -- I mean, is fairly included in it.

2              MR. AXELROD:  The intent for getting that

3    transcript, Your Honor, was solely to use it in judicial

4    proceedings.

5              THE COURT:  No, I understand that entirely, and I

6    intend that that's the only place it's going to be used.  But

7    sometimes incidental use takes place, and I want to be sure

8    that everybody understands the ground rules on that.  And

9    specifically Mr. Reynolds, but everybody involved, without

10   suggesting misconduct.

11             MR. AXELROD:  We'll submit that.

12             THE COURT:  Okay.  So back, then, to this question.

13   It seems to me, on that basis -- or maybe it doesn't have to

14   go to Mr. Reynolds; that is, the victim statements, name

15   identification.  You tell me whether you think you need it.

16   If you need it that way, then I'd like the same undertaking.

17             MR. AXELROD:  Yeah, I do need it, Your Honor.  We

18   will put in the undertaking that Mr. Reynolds will not

19   contact the identified -- we already have the information in

20   the unredacted spreadsheet, but we don't have the names and

21   numbers.

22             THE COURT:  No, it was very hard.  It was hard for

23   me.  I should have been more careful when I said to

24   Mr. Doherty that he was the person who submitted the

25   photographs when, in fact, it was Ms. Kellogg-Bloom.  And so

1    keeping track of it is hard without the actual names there.

2    So the Government will provide you with the unredacted

3    versions of those victim statements that they're going to

4    rely on for the ten or more.

5            So then let's go to the questions of -- that is

6    also raised by the defendant, I think, this is the last

7    objection to the calculations, concerning a two-point role

8    adjustment for the Government proving that there was a

9    criminal enterprise that's involved here, involved at least

10   two complicit participants, of whom the defendant may be

11   counted as one; and the defendant, in committing the offense,

12   exercised control over, organized, or was otherwise

13   responsible for superintending the activities of at least one

14   of those other persons.

15           So certainly for purposes of Mr. Stromsland, I

16   don't have much problem saying that.  I don't know whether

17   that extends, then, to everybody else or other people.  Or it

18   might be a different way of saying it, to the other offense

19   conduct.  That is the core securities fraud violations.

20           And so do you have a position on that here?  That

21   is to say, we've got Mr. Reynolds making the false

22   statements -- I'm not sure who else helps him in that or who

23   else the Government contends helps him in that.  You might be

24   able to say Mr. Stromsland.  I don't think so, because it

25   will be hard to properly characterize him, I think, his role

1    in this matter.

2          MS. BLOOM:  I don't think we've established that

3    anyone else understood the falsity of those statements to a

4    level where we're going to argue it.

5          THE COURT:  Okay.  So then for purposes of the

6    guidelines, unless there's some argument from the defendant,

7    because dealing with grouping, it's only in the grouping that

8    has to do with the false statements, isn't it?

9          MS. BLOOM:  Your Honor, I think we have one count

10    of securities fraud here, which we had two theories on which

11    the jury could convict on securities fraud.  So as to the

12    manipulative trading, I think it was also clear that

13    Mr. Reynolds was directing Mr. Herod and Mr. Stromsland, and

14    therefore, gets organizer and leader as to both of the

15    obstruction and the securities fraud.

16          THE COURT:  Okay.  I understand the theory.

17          Why doesn't that work?

18          MR. AXELROD:  Your Honor, listen, all three men

19    were engaged in the criminal conduct, but I don't think that

20    the evidence establishes that Mr. Reynolds was directing or

21    supervising or superintending their activity.

22          THE COURT:  Why doesn't it?  I mean, I understand

23    because you don't want it to, but why doesn't it?  You know,

24    here the finding, actually, it is informed by the inducement

25    to engage in false statements before the SEC.  That tells us

1    a little bit about the way the relationships worked, and

2    we've got both of them engaging in manipulative trading.

3           MR. AXELROD:  But they're certainly friends.

4    There's no doubt about that.  There's a friendship

5    relationship.  But I don't think you can say just because

6    they -- if you listen to the -- if you take the evidence as

7    to the -- as the cooperators gave it, that there was a wink,

8    wink, nudge, nudge, Mr. Reynolds said, "Here, why don't you

9    say this?"  I don't think you can take that fact and say

10    because they were friends of his and he said, "Hey, it would

11    be a good idea to say X to the SEC," then you can suddenly

12    say that -- imply that he was a supervisor.

13           THE COURT:  Well, certainly you can for

14    Mr. Stromsland, can't you?

15           MR. AXELROD:  No.

16           THE COURT:  Okay.  Then I'm going to look more

17    carefully at this.  I'm raising it.  It seems fairly obvious

18    to me, but I will go back and look at the evidence about it.

19           MR. AXELROD:  I thought long and hard about this.

20    You can certainly say that Mr. Reynolds was Mr. Stromsland's

21    supervisor at PixarBio.  And had Mr. Stromsland been charged

22    in the false securities -- false statements securities fraud

23    aspect and Mr. Reynolds had directed him to go out to

24    investors and make false statements, I would agree with you.

25    But Mr. Stromsland's manipulative trading was wholly apart

1   from his job at PixarBio.

2          THE COURT:  But it was at the direction of

3   Mr. Reynolds, and what we're talking about is not the

4   corporate niceties at PixarBio.  We're talking about the

5   criminal enterprise.

6          MR. AXELROD:  Well, I'm not sure that it was at the

7   direction.  Again, it was they were good friends, and

8   Mr. Reynolds -- remember, Mr. Stromsland testified,

9   Mr. Reynolds had a way of talking to you.  He would say

10  something like, "Oh, it would be a good idea to do this," and

11  then Mr. Stromsland would do it.  I don't think that there

12  was testimony where Mr. Stromsland said, "Mr. Reynolds, as my

13  supervisor at PixarBio, directed me to engage in manipulative

14  trading."

15         THE COURT:  No, we wouldn't be having this

16  conversation if there was.  But there is, let's call it,

17  "Reynolds talk," in which the vein of his communications is

18  enough to indicate, you know, what's the right thing to do,

19  while coupled with -- but that would be wrong, that's for

20  sure.

21         MR. AXELROD:  And that is certainly what

22  Mr. Stromsland testified to.  But I think that this goes back

23  to what the First Circuit said in *United States vs. Ramos*

24  *Paulino*, Mr. Reynolds was certainly, from the evidence at

25  trial, the jury could have found that he was directing the

1    criminal -- actually, I'm not going to concede that.  That

2    you're taking the jury's verdict that it showed that there

3    was a criminal activity here that Mr. Reynolds was in charge

4    of.

5            THE COURT:  Right.  And the question now is

6    enterprise.  I'm not -- do I say that his -- the woman who

7    assisted as kind of secretary, special assistant -- I'm

8    trying to remember her name.

9            MR. AXELROD:  Ms. Holzhaus.

10           THE COURT:  Ms. Holzhaus.  Does she fall in that

11   category here?  Does she know all of what was going on?  I'm

12   not sure I would find that for her.  I really am focused on

13   the Stromsland/Herod dimension of this.

14           MR. AXELROD:  I just want to say this, before I

15   forget.  I was clumsy in what I was saying before, and I

16   didn't mean in any way to concede that --

17           THE COURT:  I didn't understand that as a

18   concession.  That was not an ah-ha moment.

19           MR. AXELROD:  I'm saying it more so for someone who

20   would look at the transcript of this.

21           THE COURT:  It's an easy way, shorthand way of

22   capturing the issues that we are dealing with here.

23           MR. AXELROD:  I just -- I don't think that the,

24   "Hey, that would be cool if you did this for me, man.  You're

25   my buddy," which I think Mr. Stromsland didn't even testify

1     that those conversations went to that level, I don't think

2     that that meets what this enhancement is trying to capture.

3     Supervision and superintending to me is a much more distinct

4     way of saying you're controlling what someone is doing, and I

5     don't think the evidence at trial supported the conclusion

6     that Mr. Reynolds was controlling Stromsland and Herod, even

7     if you conclude that they were acting based on his wink,

8     wink, nudge, nudge.

9            THE COURT:  All right.  So exercising control over,

10    organized, or otherwise, was responsible for superintending

11    is probably the operative language.  Although I suppose

12    complicit has some role in it.

13           I think it would be helpful for me if the

14    Government, in support of its position, point me to

15    particular parts of the record to do that.

16           MS. BLOOM:  Yes, Your Honor.  And I think that --

17           THE COURT:  And if there's anything beyond the

18    sentencing memorandum that you have now.

19           MS. BLOOM:  So I'm sure we can find more examples.

20    I think that we cited some of the testimony from

21    Mr. Stromsland, where he very specifically explained how

22    difficult -- I think both defendants explained how difficult

23    it was to say no to Mr. Reynolds and that they did this only

24    because they believed it was what he wanted and was directing

25    them to do, albeit in Reynolds speak.

1          And I also would point out that Mr. Reynolds
2    rewarded Mr. Stromsland by giving him a bonus for the
3    activity, which also is a form of supervision.
4          THE COURT:  I think I understand all of that.  I
5    don't mean to be saying, "Do you have anything else," but I'm
6    keeping these open.  If there's something additional that
7    either party wants to adduce on this issue, I think it's
8    clear which way the wind is blowing, but the winds change.
9    And that really is ten or more persons as victims, and it is
10   that at least Stromsland and probably Herod were involved in
11   the market manipulation in some fashion.  But I'm not going
12   to make that determination until I've afforded an
13   opportunity, since I've afforded the opportunity on other
14   stuff, for you to address that.
15         But I think that deals with all of the questions
16   that are open for purposes of the guidelines.  Before I make
17   the calculation with respect to the guidelines, I want to be
18   sure and close those -- close those loops on it.
19         And then we will take up the larger questions of
20   departure, because both of the parties are asking for
21   departure here.  Depending on where the guidelines are, both
22   parties are asking for departure, below the guideline,
23   because as the Government, in any way, calculates it, it's
24   not quite a telephone number, but it's generated a very high
25   level that seems to illustrate the limitations of the

1  guidelines in the fraud area.  Okay?

2           Are there other things that you want to take up at

3  this point, knowing that you've got to come back?  But it's

4  going to be the last time you come back -- well, you can come

5  back whenever you want, but the last time to resolve these

6  issues.

7           MR. AXELROD:  Your Honor, given that we're coming

8  back, the natural sequence of a sentencing hearing, it would

9  be our position that I think it makes sense to take up

10  everything at the -- when we resume.

11           THE COURT:  Well, oh, yeah.  I'm going to -- well,

12  let me tell you what I think I'm going to do, which is that

13  I'm going to resolve those sentencing guideline issues, say,

14  "Here's what the guidelines are," and I'll hear both of you

15  on where the sentence should be, in or outside of the

16  guidelines.  That's how I'll do it and then taking up the

17  various departure or variance kinds of arguments that are

18  made outside the guidelines.

19           MR. AXELROD:  Right.  I was just -- I was clumsily

20  saying that I think allocution and all those arguments should

21  obviously wait until next week.

22           THE COURT:  Oh, yes.  Oh, no.  I'm not asking for

23  anything like that.  The foundational thing is get the

24  guideline calculations straight.

25           MR. AXELROD:  Right.  Okay.

1          MS. BLOOM:  In the interest of efficiency, one of

2     the issues that's going to come up is restitution.

3          THE COURT:  Uh-huh.

4          MS. BLOOM:  Mr. Axelrod had raised in his materials

5     that he thought that we had included some people from the

6     PixarBio spreadsheet that were either incorrect or shouldn't

7     be in there.  I invited counsel to provide me any corrections

8     or adjustments, and we have had some victims put in numbers

9     that were higher than what we had.  Not huge differences from

10    the original, but some victims were higher, some victims were

11    not on the list.  Some victims may be a little lower.  It

12    doesn't -- I don't think it changes our range in any way.

13         THE COURT:  But restitution is.

14         MS. BLOOM:  But adjustments.

15         THE COURT:  And I urge you to have precise

16    adjustments, because I'm not going to award restitution

17    except on an individual basis to individuals.  So if somebody

18    is asking for more than they're entitled to, of course I'm

19    not going to do that.  I'll try to figure out what they're

20    entitled to.  But I hope we can narrow that down a little

21    bit.

22         MR. AXELROD:  Your Honor, it's not going to

23    surprise you that our objection to restitution was the same

24    objection to the calculation of actual loss.

25         THE COURT:  Correct.

1          MR. AXELROD:  And there's provisions about

2    calculating restitution, if it's too difficult or too time

3    consuming, you punt.  And I would just suggest that --

4          THE COURT:  Well -- well, maybe punt, but it's punt

5    at the end of the third quarter, because you've got to come

6    back to finish the entire game at some point.  It means that

7    I cannot put it in the initial judgment, but sooner or later,

8    I have to do it.

9          MR. AXELROD:  And one thing that I would propose is

10   that, in this instance, there's going to be a second game,

11   using your analogy, before Judge Young.

12         THE COURT:  Uh-huh.

13         MR. AXELROD:  And so that, perhaps, in a different

14   venue, where there's going to be -- where the SEC is going

15   to, I believe, explore all of those issues that that -- the

16   SEC is certainly going to seek disgorgement from

17   Mr. Reynolds.  And I know that's not a perfect substitute for

18   restitution, but rather than going through a time consuming

19   process --

20         THE COURT:  But do I have the authority to not just

21   punt, but duck?

22         MR. AXELROD:  Under 18, USC, 3663, big (A), you do,

23   if you conclude that -- I have the language somewhere here --

24   that restitution would be too difficult or time consuming in

25   this process.

1          THE COURT:  Okay.  So it's been raised.  You may or

2     may not want to address that issue as a way of dealing with

3     that; that is, restitution as being just another way of

4     spelling disgorgement.

5          MS. BLOOM:  I think that we have an obligation, if

6     it can reasonably be determined, to determine it.  And I

7     believe it reasonably can be determined.  And I guess what

8     I'm proposing is that in this interim time period,

9     Mr. Axelrod and Ms. Treanor have our list; they provide us

10    anything they believe is incorrect.  We will have an

11    opportunity to respond to that and revise the list and look

12    through the documents or check with the victims, if there

13    are -- I don't think that they're arguing that most of the

14    list is incorrect.  I think they're saying there might be

15    some specific items.  Whether in whole --

16         Putting aside their objections to the concept of

17    loss and the concept of restitution, none of us want the

18    numbers to be incorrect.  So if Mr. Reynolds, being

19    knowledgeable at PixarBio, knows that there is something on

20    that list that is incorrect, I would request that they be

21    given a time period to give us that information and we

22    will -- otherwise, I think what we have is a reasonable basis

23    on which to order restitution, which is PixarBio's own list

24    of who put money in when.

25         THE COURT:  Well, let me just pause with that.  A

1  suggestion has been made that that list is not necessarily

2  what it purports to be or what you purport it to be.  I think

3  that's the thrust of an argument that's made.

4        And I may need to understand what it is,

5  Mr. Axelrod, this list.

6        MR. AXELROD:  Well, Your Honor, I don't know.  The

7  Government is seeking to use that list as the basis for

8  actual loss.

9        THE COURT:  Right.

10        MR. AXELROD:  We object to the whole -- the whole

11  formulation of how they're --

12        THE COURT:  Okay.  Let me put it a different way.

13  This sounds like an elaborate incentive structure, but if the

14  Government can show me that this comes from the -- from

15  PixarBio and it appears that it is a list of shareholders

16  with sufficient information to identify that their victims --

17  I'm going to use it.  And so if there's -- now, maybe they

18  can't do that for me.  I haven't really gotten to that.

19  They're put on notice that they've got to do that.  But

20  you're also put on notice that I will be using it, if it's

21  admissible.  And if there's something in there that's wrong,

22  then -- presumably it favors you, too, but you're going to

23  tell me about it or be left -- be stuck with that

24  determination.

25        MR. AXELROD:  And we've already noted many

1    instances of -- there's significant reasons to doubt the
2    accuracy of that list.  It includes open market purchases; it
3    includes post-SEC freeze purchases; it includes wrong dates.
4    I think it's our position generally, at this point, that it's
5    unreliable as a whole.
6              THE COURT:  Okay.  So the Government will have to
7    support it.  I mean, I see it.  You know, you look at it and
8    say, "Ah-Ha, this is the list."  On the other hand, sometimes
9    things that are created as business records are not accurate,
10   and so I'll look at it from that perspective.  I mean, if
11   there are things on there of -- that are pretty clear, like
12   open market purchases, which we've all pushed off to the
13   side, I think, properly, then you ought to scrub the list.
14             MS. BLOOM:  I understand that, Your Honor, and --
15             THE COURT:  I'm creating an incentive structure for
16   both sides.  But the defendant, just because you say you've
17   got to tell us, and if you don't tell us, then it's -- we get
18   the benefit of that, no.  You're going to have to show
19   independently that the list is reliable, and I should rely on
20   it.
21             MS. BLOOM:  And that's what I wanted to inquire
22   about, because these lists, I believe, were kept by
23   Ms. Holzhaus or Mr. Stromsland at different times, and are we
24   talking about needing an affidavit or testimony from one of
25   these witnesses?  They certainly were produced as the list of

1    investors.  Many of them line up with, I believe, the names

2    that are in the --

3             THE COURT:  How did you get them?  Did you get them

4    as grand jury submissions?

5             MS. BLOOM:  I believe we received a copy of the

6    productions that were made to the SEC, and they were

7    contained in the SEC -- the production to the SEC.

8             THE COURT:  And they were provided by the

9    successors to Mr. Reynolds at PixarBio?

10            MS. BLOOM:  No, by PixarBio, under Mr. Reynolds'

11   control.

12            THE COURT:  Okay.  So maybe you show it by showing

13   the document request and treat it as an admission by them.

14   And I see where I go from there, which may put the burden

15   back on the defendant.

16            MR. AXELROD:  And the difficulty, Your Honor -- I'm

17   really not trying to be difficult or play games, but in the

18   SEC production that PixarBio made to the SEC, in 2017 into

19   '18, I think, there are different versions of that list.

20            MS. BLOOM:  (Nods head.)

21            MR. AXELROD:  And just saying that PixarBio

22   produced it to the SEC I don't think gets us to the finish

23   line.

24            THE COURT:  It may not, but I'll look at it from

25   that perspective.  If there's a request for accurate list or

1   lists that they maintained as business records regarding

2   their shareholder, it's presumptive.  And if you show that

3   there -- "Here's another list.  Why does it say that the

4   purchases were on this date," that kind of thing, I'll look

5   at it.  That may extend the question of restitution.  I think

6   that I probably have to -- not probably, I must take a shot

7   at figuring out what restitution is, rather than leaving it

8   to the SEC case; although that has an allure to me, but I'm

9   going to resist the allure, I think.

10          Okay.  So I think you have your marching orders.  I

11   hate to say that things have to be submitted by noon on

12   Monday, but I will say that things have to be submitted by

13   noon on Monday if you want me to fully digest it.

14          MS. BLOOM:  Your Honor, I also want to raise the

15   issue, Ms. Wright cannot be here at 10 o'clock on Tuesday.

16          THE COURT:  Okay.  What's the timing?

17          MS. BLOOM:  I believe that later would be okay.

18          THE COURT:  I have a fairly sensitive 2:30 hearing.

19          MS. BLOOM:  11:30.

20          MS. WRIGHT:  11:30?

21          MS. BLOOM:  11:30 would be fine.

22          THE COURT:  We'll go at 11:30 and disappoint or

23   deferred gratification for the people who are involved in

24   seeking a resolution in the 2:30 hearing.  We'll just push it

25   back a little bit.

1           MS. WRIGHT:  Thank you, Your Honor.

2           MS. BLOOM:  Thank you, Your Honor.

3           THE COURT:  I don't think it's going to take us a

4    lot of time, or if it does take a lot of time, it's going to

5    be restitution lot of time for this.  But I think I'm in a

6    position to say, well, actual loss or the formulation of

7    intended loss that you offered.  Does it?  And if I don't,

8    then I've got to look back.

9           Now, one further thing, there is a money judgment

10   forfeiture motion.  Here it's $300,000.  How do we get to

11   $300,000?  Remind me, as to Mr. Stromsland -- I mean, as to

12   Mr. Reynolds.

13          MS. BLOOM:  So that is, I would say, a fair -- we

14   took a conservative view.  That's the $300,000 that Mr. Herod

15   transferred to Mr. Reynolds from the trading.  So the rest of

16   the money went into PixarBio, the $500,000.  So for

17   forfeiture, we look at the gain to the individual, and here

18   we set off the 300,000 was clear and limited it to that.

19          THE COURT:  Okay.

20          MR. AXELROD:  Your Honor, we oppose it.  I don't

21   think that the trial testimony established that the $300,000

22   went to Mr. Reynolds.  I think Mr. Herod's testimony was that

23   he dropped the check off for Mr. Reynolds' wife.  That's the

24   first problem.  The second problem was that we believed that

25   the evidence showed that Mr. Reynolds and -- that Mrs.

```
 1    Reynolds and Mr. Herod engaged into a contract, where
 2    Mr. Reynolds was going to get ten percent of the future
 3    earnings of a lawsuit, and so the $300,000 isn't necessarily
 4    easily prescribed as the Mr. Reynolds value he received from
 5    the trading.
 6              THE COURT:  Well, I'll resolve it.
 7              Anything else that you want to submit on that, I'll
 8    look at, pointing to the Government on that.  That's quite
 9    elaborate defense there and perhaps not one I'm going to find
10    compelling.  But it's raised, so I'll try to resolve every
11    defense that's raised.
12              MR. AXELROD:  Thank you, Your Honor.
13              THE COURT:  Here something more that the Government
14    thinks it wants to provide, I'll look at that, as well.
15              MS. BLOOM:  Thank you, Your Honor.
16              THE COURT:  But that focuses me on the testimony.
17              MR. AXELROD:  Thank you.
18              THE COURT:  Okay.  Then if there's nothing else,
19    we'll be in recess until 11:30 on Tuesday.
20              THE DEPUTY CLERK:  All rise.
21              (Court in recess at 4:29 p.m.)
22
23
24
25
```

**CERTIFICATE OF OFFICIAL REPORTER**

1

2

3

4       I, Rachel M. Lopez, Certified Realtime Reporter, in

5  and for the United States District Court for the District of

6  Massachusetts, do hereby certify that pursuant to Section

7  753, Title 28, United States Code, the foregoing pages

8  are a true and correct transcript of the stenographically

9  reported proceedings held in the above-entitled matter and

10  that the transcript page format is in conformance with the

11  regulations of the Judicial Conference of the United States.

12

13             Dated this 10th day of September, 2020.

14

15

16

17          /s/ RACHEL M. LOPEZ

18

19

20          _____

             Rachel M. Lopez, CRR

21         Official Court Reporter

22

23

24

25